Robert Anthony REED, III, et al., Plaintiffs,

v.

James A. RHODES et al., Defendants.

No. C–73–1300.

United States District Court, N. D. Ohio, E. D.

Aug. 31, 1976.

James L. Hardiman, Cleveland, Ohio, Nathaniel R. Jones, Gen. Counsel, NAACP, New York City, Thomas I. Atkins, Roxbury, Mass., for plaintiffs.

James E. Michael, Asst. Atty. Gen., State of Ohio, Columbus, Ohio, for defendant Gov. James Rhodes and Atty. Gen., State of Ohio.

Mark O'Neil, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, Mary A. Lentz, Ohio Dept. of Ed., Columbus, Ohio, for defendant Ohio State Bd. of Ed. and Martin W. Essex, Supt. of Public Instruction, Ohio Dept. of Ed.

Charles F. Clarke, George I. Meisel, William C. Hartman, James P. Murphy, Squire, Sanders & Dempsey, John H. Bustamante, Bustamante, Donohoe, Palmisano & Co., L. P. A., Cleveland, Ohio, for defendant Cleveland City Bd. of Ed. and its members, and Superintendent of the Cleveland City School Dist., Paul Briggs.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

During at least the last 20 years, patterns of racial isolation in the Cleveland public school system have become steadily more pronounced. This situation is illustrated by a review of the percentage of all students attending regular[1] Cleveland Public schools whose school was a one-race[2] school:

```
1940: 88.37%
1950: 74.09%
1955: 71.55%
1960: 79.09%
1970: 86.07%
1975: 88.21%
```

Looking only to the above statistics, one could reasonably conclude that the Cleveland school system was in essentially the same position with respect to racial integration in both 1940 and 1975. A single statistical measure seldom is a full representation of an actual situation. In trying to understand racial patterns in the recent history of the Cleveland public school system, another measure sheds additional light on the subject. Examining the percentage of black students attending regular schools which were one-race schools in various years indicates that from 1940 to 1974, there was a steady trend toward concentration of black students in segregated schools:

```
1940: 51.03%
1950: 58.08%
1955: 57.72%
1960: 76.03%
1970: 90.00%
1975: 91.75%
```

These figures show that with one exception, the proportion of black students in the Cleveland public schools who have been regularly receiving their education in an integrated setting has steadily diminished during the past 35 years.

These statistics and the underlying situation which they describe give rise to many troubling questions. Most of these questions however are beyond the purview of this court in resolving the issue now before it. In reviewing the above facts as well as all of the evidence included in the volumi-

---

1. As used in this opinion, this term is best defined in the negative. It excludes vocational schools which draw students from the entire city and schools for children with special problems. Generally, it includes schools with general or comprehensive curricula, serving attendance zones delineated by school officials to include immediately surrounding areas.

2. A school will be considered a one race school when its student population is 90% or more one race.

nous record in this case, the court has sought an answer to a single question of constitutional law. To what extent, if any, are the defendants in this case, public officials and public agencies, responsible for creating or for maintaining or both the segregated situation in the Cleveland public schools?

The plaintiffs are certain named students in the Cleveland public school system and their parents and the National Association for the Advancement of Colored People. They are proceeding on behalf of all persons in the state of Ohio who are similarly situated to them. Their complaint alleges that the defendants, the Governor and Attorney General of Ohio, the State Board of Education, the Superintendent of Public Instruction of the Ohio Department of Education, the Cleveland Board and its individual members and the Superintendent of the Cleveland City Schools, under color of state law, have pursued policies, customs, practices or usages in operating the Cleveland public school system in a manner that had the "purpose and effect of perpetuating a segregated public school system."

It is deceptively easy to state the three elements which the plaintiffs must prove to establish their case. The court has the guidance of many recent court opinions explicating what duties the 14th Amendment of the Federal Constitution imposes on public officials in operating programs of public education. At the outset, it is useful to summarize the state of the law to focus the task of this court.

The Constitutional guarantees afforded under the Fourteenth Amendment entered a new era in 1954 with the landmark decision of the Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). That Case, which serves as the benchmark in the area of school desegregation, set forth a holding, the simplicity and brevity of which belied its national import:

"in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated . . . are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. . ."
*Id.* at 495, 74 S.Ct. at 692.

In the wake of *Brown,* trial and appellate courts sought to ascertain what school districts bore the brand of unconstitutional duality and how such districts should be dismantled and reconstructed in a unitary fashion. Initial efforts were in the south. Northern school desegregation cases constitute a relatively recent development.[3]

■ As in so many areas of the law, the critical issue in school desegregation cases is intent. It is an amorphous term that can mean different things in different factual and legal contexts. Because intent is such a subjective element, existing in pure form only in the minds of individual people, courts have found it necessary to discern evidence of intent through an analysis of its objective manifestations.[4] This is admittedly an artificial mechanism, but one not

3. For a detailed and exhaustive list of "northern and western" school desegregation cases, *see United States v. School District of Omaha,* 521 F.2d 530, 535 n. 7 (8th Cir. 1975).

4. The reason for resorting to such an "objective" test for intent was set forth by Judge Gurfein in what has become an oft-quoted passage:
"To say that the foreseeable must be shown to have been actually foreseen would invite a standard almost impossible a proof save by admissions. When we consider the motivation of people constituting a school board, the task would be even harder, for we are dealing with a collective will. It is difficult enough to find the collective mind of a group of legislators. It is even harder to find the motivation of local citizens, many of whom would be as reluctant to admit that they have racial prejudice as to admit that they have no sense of humor." *Hart v. Community School Board,* 512 F.2d 37, 50 (2d Cir. 1975) (footnote and citation omitted).

unknown to other areas of the law,[5] and without which, courts would be hard put to protect individual rights.

At the outset it should be noted that the instant action does not involve a statutorily mandated dual school system that is segregated on the basis of race. Such systems were particularly prevalent in the south and were ultimately struck down in *Brown*.[6] The segregation alleged in this case was not imposed by legislative fiat but rather is alleged to have been the result of purposeful action on the part of the defendants. This is to say that the segregation complained of is alleged to be *de jure* as opposed to *de facto*. The distinction transcends far more·than semantics for the dichotomy between the two conditions appears to remain a very viable one.[7]

What then, is the yardstick against which the conduct complained of will be measured? The applicable law in this regard was set forth perhaps more succinctly in *Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir. 1974). Therein the Sixth Circuit Court of Appeals stated:

"A finding of *de jure* segregation requires a showing of three elements: (1) action or inaction by public officials (2) with a segregative purpose (3) which actually results in increased or continued segregation in the public schools. A presumption of segregative purpose arises when plaintiffs establish that the natural, probable and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies." *Id.* at 182 (footnote omitted).

In almost the same breath, the court went to great lengths to say that the inquiry does not go to individual motives or prejudices, but rather to the overall condition that has been brought about.as a result of official action.

"When constitutional rights are involved, the issue is seldom whether public officials have acted with evil motives or whether they have consciously plotted with bigotry in their hearts to deprive citizens of the equal protection of the laws. Rather, under the test for *de jure* segregation, the question is whether a purposeful pattern of segregation has manifested itself over time, despite the fact that individual official actions, considered alone, may not have been taken for segregative purposes and may not have been in themselves constitutionally invalid." *Id.* at 182–83.

It is thus clear that the necessary intent upon which a finding of *de jure* segregation is predicated, may be evidenced by the natural and foreseeable effects of the official practices and policies pursued, *Hart v. Community School Board of Education,* 512 F.2d 37, 50 (2d Cir. 1975). These condemning effects can be either the creation of a segregated condition or the continuation of an existing segregated condition that may have found its genesis in extrinsic forces, *Morgan v. Kerrigan,* 509 F.2d 580, 585 (1st Cir. 1974).

---

**5.** The Sixth Circuit Court of Appeals in *Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir. 1974) found an analog in the practice in employment discrimination cases, *id.* at 182 n. 6, while the Second Circuit made additional reference to civil rights and criminal cases, *Hart v. Community School Board,* 512 F.2d 37, 50 (2d Cir. 1975).

**6.** The scope of the decision in *Brown,* of course, was not limited exclusively to statutorily mandated dual school systems.

"The target of the *Brown* holding was clear and forthright: the elimination of state-man-

dated *or deliberately maintained* dual school systems with certain schools for Negro pupils and others for white pupils." *Milliken v. Bradley,* 418 U.S. 717, 737, 94 S.Ct. 3112, 3123, 41 L.Ed.2d 1069 (1974) (emphasis added).

**7.** *See e. g., Keyes v. School District No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), wherein the Supreme Court stated that the differentiating factor between *de facto* and *de jure* segregation was the intent to bring about segregation.

The underpinning of this approach in the area of school desegregation is the Supreme Court's holding in *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The precise holding of that case was:

"that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions." *Id.* at 208, 93 S.Ct. at 2697.

Thus, courts have combined the test for *de jure* segregation with the holding of *Keyes* to articulate the applicable standard of liability in a school desegregation case:

"We hold that a presumption of segregative intent arises once it is established that school authorities have engaged in acts or omissions, the nature, probable and foreseeable consequence of which is to bring about or maintain segregation. When that presumption arises, the burden shifts to the defendants to establish that 'segregative intent was not among the factors that motivated their actions.'" *United States v. School District of Omaha,* 521 F.2d 530, 535–36 (8th Cir. 1974) (citing *Keyes,* footnote omitted).

Noteworthy, too, is the recent case of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597, (1976). While that case provides additional guidance in the area of racial discrimination and equal protection of the law, it does not minimize the role of effect in the formula for ascertaining intent.

*Washington, supra,* involved a constitutional challenge to the testing procedures utilized by the District of Columbia in the recruitment of potential police officers. A literacy test was administered to all such applicants, regardless of race. The test was also commonly used for evaluating other job applicants throughout the federal government. It was revealed, however, that approximately four times as many black applicants to the Metropolitan Police Force failed the test as did whites.[8] The claim of a denial of due process and equal protection of the law was based solely on the racial disparity contained in the test results.

The court, in responding to plaintiffs' due process claim stated:

"our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact." *Id.* at 239, 96 S.Ct. at 2047.

Thus, it is clear that evidence of disparate racial impact, standing alone, is insufficient to sustain a cause of action based upon an alleged deprivation of constitutional rights. This is nothing more than a restatement of the widely accepted proposition that the mere presence of racial imbalance, without more, will not support a claim of unconstitutional segregation. *See e. g. Hart v. Community School Board,* 512 F.2d 37, 45–46 (2d Cir. 1975).

It should be noted, however, that the decision in *Washington* is in no way a departure from the existing state of the law, particularly with regard to the inferring of intent from effect.

---

**8.** It appears that these statistics apply only to applicants to the Metropolitan Police Force and do not reflect test scores throughout the federal bureaucracy. *See Davis v. Washington,* 168 U.S.App.D.C. 42, 512 F.2d 956, 959 n. 10 (1975) wherein the court refers to test results for *applicants* (emphasis added) and states that such data was obtained through discovery proceed- ings. Presumably, the defendants would have access to, and therefore provide, only test scores of aspiring police officers. If four times as many blacks failed the test as did whites throughout the federal government, then the discriminatory effect would be clearly foreseeable.

"Necessarily, an invidious discriminatory purpose may often be inferred from the totality of relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another . . . Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Id.* at 242, 96 S.Ct. at 2049.

The holding in *Washington, supra,* is totally reconcilable with the test for *de jure* segregation articulated in *Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir. 1974) and *Berry v. Benton Harbor School District,* 505 F.2d 238 (6th Cir. 1974). Those cases authorized a presumption of segregative purpose from the fact of foreseeable segregative result. *Oliver, supra,* at 182. That presumption could be overcome only by affirmative proof of "a consistent and resolute application of racially neutral policies." *Id.* The policy complained of in *Washington, viz.* the administering of the literacy test, was unequivocally racially neutral even though the results of the test, and therefore its effect, were not. Under those circumstances, and in accordance with the precise terms of *Oliver,* there could be no permissible presumption of segregative intent. Therefore, the only source of culpability in *Washington* was actual segregative purpose or motivation and it was this state of mind that was found lacking.

■ One additional comment is necessary. The evidence adduced at trial encompassed far more than mere segregative effect. Many of the incidents established at trial, such as intact busing and certain school construction, can be rationally attributed only to a deliberate and conscious desire to create or perpetuate a segregated condition. As to these incidents, therefore, there is no need to resort to the inferring of intent from effect, although such an infer-

ence would be entirely permissible. The requisite intent sufficient to find *de jure* segregation was clearly and independently established.

■ The plaintiffs are seeking relief from both local and state officials. Each set of defendants, the local school officials, the state school officials, the Governor and the Attorney General, are alleged to have caused or maintained the segregated nature of the Cleveland school system. It is therefore necessary to examine the nature of the authority vested in each set of defendants and the evidence as to how this authority was exercised. Absent a showing of a delegation of authority from one set of defendants to another, the liability of any of the defendants cannot be shown vicariously. At any particular time, however, the conduct of one set of defendants could give rise to an obligation of another set of defendants to take action. In determining whether any of the defendants denied the plaintiffs their constitutional rights, the derivative nature of their obligations must be kept in sight.

A detailed understanding of what was happening at the local level, therefore, is necessary before determining the nature of the liability of the various parties, if any, for the segregated conditions which all parties admit exist in the Cleveland system. In their arguments to the court, the plaintiffs characterized this case as consisting of literally hundreds of segregatory incidents. The evidence as to these incidents was submitted primarily in documentary form. The court has considered all of this material exhaustively and the conclusions of this analysis are set forth at length, *infra.*

■ In interpreting the evidence in the record, the court has faced a number of recurring questions or problems. A general discussion of these issues and the approaches which were taken toward them will aid in the understanding of the court's treatment of specific factual questions. First, while the evidence in this case is voluminous, one question which it does not answer directly is what the racial composi-

tion of any given residential area was at any specific time. This information is crucial in assessing the intent and effect of many of the local defendants' actions. Given the period of time which the plaintiffs' proofs span, it would be virtually an impossible task to produce direct evidence on this question for each area and each time period as to which the plaintiffs' alleged incidents raise the question. Testimony about general patterns at trial from several witnesses who had first hand knowledge of the residential racial patterns in Cleveland during various parts of the period from 1940 to the present has been helpful to the court in tackling these individual factual questions. The plaintiffs also prepared maps showing residential racial information as shown by the decennial census from 1940 forward. In addition to these sources, whenever such a factual question has arisen, the court has looked at the percentage of black students enrolled in schools in the particular area under consideration for periods preceding and following an alleged segregatory action by the local school officials and inferred from that the probable racial composition of area affected in the specific time frame.

In terms of volume, the majority of the plaintiffs' proofs focused on specific pupil assignment decisions made by local school officials over a 35 year period. These included boundary changes, creation of optional zones, use of rented facilities for classrooms, additions to existing schools of both permanent and temporary classrooms and other facilities, construction of new schools and closing of old schools. In analyzing these individual events, no easy formula emerged for judging when a specific incident had a segregatory effect. Actions which on their face might appear integrative on closer examination frequently were found to have enhanced emerging segregative patterns. For instance, the local defendants have suggested in some of their responses to these specific alleged incidents that where the sending school had a lower proportion of black students than the receiving school, the incident was prima facie integrative and bore no further scrutiny. In some instances where a reassignment

was made to send students from a "whiter" to a "blacker" school, there was an integrative result, as suggested by the local defendants. However, on other occasions the reassignment decision appeared to have had the effect of drawing black students primarily from the "whiter" to the "blacker" school. Conversely, every reassignment decision in which the sending school had a higher proportion of black students than the receiving school did not necessarily have the effect of isolating black students. The court has examined each alleged incident to determine its effect and, if that effect was segregatory, whether such a result was foreseeable.

Much of the plaintiff's case focuses on the use to which Cleveland school officials put their available facilities. Some incidents to which the plaintiffs call the court's attention are situations where predominantly black schools appear to have been overcrowded, sometimes to the extent of requiring the use of portable classrooms or rented space or both and sometimes involving use of half-day sessions or "relay classes" in educational jargon. In these instances, the plaintiffs have indicated "nearby" majority white schools which appear to have had available space that might have been used to obviate resort to such educationally undesirable solutions to overcrowding. In other incidents on which the plaintiffs have focused, they allege that boundary changes or creation of optional zones were undertaken with the intent or effect or both of identifying one of the two schools involved as the "black" or the "white" school. In several of these situations, the local defendants' proffered explanation for the changes has been that they were necessary due to the overcrowding of one of the schools involved.

Against this background, the issue of the "capacity" of any given school became one of the most sharply disputed issues in the case, in presenting their case, the plaintiffs relied, where possible, on the capacity figures computed by the Cleveland Board's own employees from 1952 to 1963 as represented in P.X. 74. The local defendants

attacked the use of such figures, arguing that capacity was a variable figure, not an immutable figure which could be derived from application of any of several unchanging formulae. It was noted that a change in the average pupil-teacher ratio throughout the system could radically change any set of capacity figures. Other policy decisions, such as Superintendent Briggs' program to have a library in every elementary school in the system and participation in school meal programs requiring space for food preparation and serving, also diminished the space available for basic classroom instruction. Further, various witnesses for the local defendants noted the varying impact which different types of classwork, e. g. typing, music, or science or language laboratory work, had on the basic capacity of a school. But beyond such general observations, the local defendants have not assisted the court in untangling what they insist is a very knotty problem. Given the wealth of information which local school officials have on year-to-year operations of the schools within their district, the court must note the failure of the local board to come forward with the specific data which it urged was necessary to the resolution of questions where capacity was a factor. (See transcript of closing arguments at 277 to 280).

■ In *Higgins v. Board of Education of Grand Rapids*, 395 F.Supp. 444 (Mich.W.D. 1973), the capacity of specific schools was also "hotly disputed by the parties." Judge Engel characterized and framed the issue as follows:

"The issue assumes great importance in determining the motives and intent of Board action concerning attendance zones, additions to existing buildings, new construction, and feeder patterns. The facts were involved, but the question for the court's consideration was relatively simple: how, under the circumstances at a given time, would a school board fairly and realistically employ its available classroom space, without any intent to discriminate?" *Id.* at 462.

The utility in this formulation of the problem is that it recognizes that in assessing the evidence in school cases, basic capacity figures are not used for their intrinsic validity, but rather as a point of departure for comparison of school use at any given time.

Any difficulties which the court might have encountered in dealing with the collateral issue of capacity were significantly diminished by the fact that the issue generally arose in the context of elementary schools. In assessing the significance of enrollments which were either above or below the stated capacity, the court assumed that factors such as variations in curriculum from school to school were not nearly as significant at the elementary level as at the secondary level. In making such an assumption, the court was guided by statements in the local defendants' publications on the meaning of capacity which distinguish between the problems in computing and interpreting capacity figures for secondary schools (P.X. 117 at 8–9) and elementary schools (P.X. 117 at 23–24.) At the elementary level, the court regarded the capacity figures as an indication of the relative potential for use of various schools. The court recognizes this to be a theoretical measure and has considered the various specific conditions, which the local defendants brought to the court's attention, that would have lowered or raised such potential.

The court relied heavily on P.X. 74 on the issue of capacity, but this exhibit had specific information only for the period from 1952 to 1963. The plaintiffs offered a document prepared by the Cleveland City Planning Commission in December 1971 which purported to give capacity figures for Cleveland schools as of that date, P.X. 223. Apparently capacity as reported in this document was computed by a different formula than that which the school employees used in P.X. 74. The court found that these estimates tended to be higher than capacities calculated on the assumptions used in P.X. 74. Accordingly, where possible, the court has calculated its own capacity estimate for schools not listed in P.X. 74 or for schools which have had additions since 1963. In doing so, the court assumed that a new

classroom in an elementary school could accommodate 35 students, where enrollments were pressing, without being considered overcrowded. As with all capacity figures, these estimates were relied upon only for their relative value.

Much documentary evidence was submitted to the court concerning specific assignment decisions of the local defendants. This evidence has for the purpose of clarity been analyzed by geographical area and, within such analyses, generally in chronological order. Following this detailed examination the court has addressed the general issues of relay classes, intact busing, special transfers, faculty assignment, housing and neighborhood school policy.

## CENTRAL AREA

In 1940, approximately 15 percent of the students in the Cleveland Public Schools were black. Slightly more than half of these students were enrolled in 10 regular schools which were plainly identifiable as black inasmuch as black students constituted 90 to 100 percent of the enrollments of those schools. Of course, the other obvious way of describing this situation, as the proverbial optimist might do, is to say that almost half of the black students in the system were being educated in situations with a significant number of white students. From the point of view of the present polarized conditions in the Cleveland system, such a situation is almost enviable. Some statistical measures of integrated or segregated conditions in the system, particularly the percentage of all students in essentially one race schools, are almost the same for the years 1940 (88.37%) and 1975 (88.21%). However, comparison of this measure with a statistic which focuses on the impact on black students in the system, the percent of black students in essentially one-race schools, 51.3% in 1940 and 91.75% in 1975, aids in understanding the basic issue in this case. At issue is whether black students in the Cleveland public schools have been denied equal access to the benefits which a unitary public educational system provides.

All of the defendants have maintained that the present situation in which over 90 percent of the black students in the system are attending one-race schools has evolved as a result of private actions over which they had no control and in which they had no involvement. The plaintiffs' proofs essentially date from 1940, and the court has been asked to scrutinize many specific acts of the local school officials which occurred long before any of the present individual defendants had come to their present positions. Despite the apparently mooting effect of the passage of time as to many of these incidents, the court undertook such a detailed analysis. The overriding inquiry in the course of examining the older incidents in the record was to determine what factor the actions and policies of school officials had played in giving rise to the underlying residential segregation which the defendants now argue is a defense.

During the decade of 1940–50, the total enrollment in Cleveland public schools dropped significantly from 114,769 in 1940 to 94,186 in 1950. During this period there was a moderate rise in the number of black children enrolled in Cleveland public schools from 16,772 in 1940 to 24,849 in 1950. This indicates the effects of the economic depression of the 1930s and of World War II on the average size of families as well as the effect of suburban development attracting young white families outside the city limits. The increase in school age black children appears to have been in part the result of in-migration of black families drawn to Cleveland by the prospect of employment, particularly in the many industrial plants in this area. In 1940, the eight regular elementary schools in the system had black student enrollments in excess of 95 percent and all were in the Central Area, as designated by the local school authorities. At the same time, there were an additional 58 regular elementary schools which had some black students enrolled, although their percentage in the schools' enrollment in most instances was relatively small. One may infer that as of 1940 the residential patterns which were to emerge

as more black families moved to Cleveland was not predestined. Testimony at trial was to the effect that the real estate market in Cleveland was managed in such a way that black consumers were afforded the opportunity to bid for housing only in certain areas. In this respect, the concept of the neighborhood school was meaningful according to the plaintiffs as a signal to all concerned of who should expect to be able to make their home in any neighborhood at any particular time. With this in mind, it is useful to examine in a chronological order the student assignment decisions which were being actively made during the 1940s and 1950s to see if such signals were being broadcast.

A number of the schools operating in the Central Area in the 1940s have since been closed. It is clear that boundary changes or other assignment decisions concerning these schools exclusively could have no continuing direct effect. (See, for instance, the alleged incidents discussed in the local defendants' response documents E–1, E–2, and E–3.) Tracing the student assignment decisions which affected the enrollment at Rutherford B. Hayes Elementary School during the 1940s and 1950s, one detects a distinct pattern of color-conscious conduct on the part of school officials.

In 1940, overcrowding was plainly a problem at Case-Woodland (0.81%, 807/630) [9] and was also considered a problem at Burroughs (96.27%, 1154/1225). The next year the school officials by rescinding a 1933 boundary change which had transferred part of the Rutherford B. Hayes attendance area to Burrough and a 1935 boundary change transferring an additional portion of the Hayes attendance area to Case-Woodland, attempted to deal with those overcrowding situations. In 1941 it appears

that Hayes (833/980) did have some available space which could be used to help alleviate overcrowding, but it does not appear that this would have been sufficient to thoroughly solve the overcrowding at one of the two sending schools, Case-Woodland (864/630). Adjacent to the Case-Woodland attendance area and sharing a long boundary with it was Mayflower (809/1085). There is no explanation as to why its available space was not used to help relieve overcrowding at Case-Woodland. One fact is known. Both Case-Woodland ('40: 77.57%; '41: 94.91%; '42: 95.9%) and Mayflower ('40: 79.35%; '41: 87.76%; '42: 85.6%) had experienced significant increases in the ration of black students in their enrollment. Mayflower which was on the periphery of what appears to have been the major overwhelmingly black residential area in the city did not have as high a black ratio in its enrollment as Case-Woodland. On the basis of this single incident and particularly in light of the relatively slight difference in proportional black enrollment at the two schools, it is difficult to draw any conclusions as to the practices or motivations of school officials which caused this omission. Subsequent events, however, may shed some additional light on the matter.

In 1943, Hayes which was 98% black appears to have become seriously overcrowded. Its enrollment was 1605, while its basic capacity as reported in 1952 was 980. There appear to have been no additions or closings of classrooms at the school between 1943 and 1952. Even allowing for the possibility of a higher acceptable teacher-pupil ratio in the 1940s than in the 1950s, the need for some remedy was and is clear. A portion of the Hayes attendance area was transferred to the Sterling Elementary

---

**9.** For convenience and brevity, the relevant data for schools discussed is given parenthetically throughout the text. Where a percentage figure is given, it refers to the proportional black enrollment. The relation of the enrollment to capacity is shown in one of two ways, either as a fraction or as a single plus or minus figure. In fractional figures, such as this one, the numerator indicates the number of students reported to have been enrolled in the particular year, and the denominator indicates the estimate of capacity. Where there is a single plus or minus figure, it represents the remainder when the enrollment (sometimes taken from P.X. 74) has been subtracted from the capacity estimate. Unless otherwise indicated, parenthetical data is for the year of the alleged incident. Where the data is for another year, that year is shown without the first two numerals, as in '42 for 1942.

School attendance zone in December 1943. The 1943 percentage of black students enrolled at Sterling was 78.5 and its 1952 capacity is shown as 630. Its 1943 enrollment was 675, but by 1943 standards arguably it might have had some available space. This boundary change appears to have been somewhat integrative. Further relief came with the conversion of Outhwaite (later Alfred Benesch) to a regular elementary school in the fall of 1944. Outhwaite also drew students from two other overwhelmingly black schools, Case-Woodland and Gladstone. It opened 99.07% black. But to fully evaluate the significance of these boundary changes, it is necessary to determine whether they solved the underlying problem of overcrowding, and, if not, whether further remedial actions were rejected because of racial considerations.

The overcrowding problem at Hayes did not end. Its 1944 enrollment of 1159, while a considerable reduction from the 1943 figure, would still overtax a structure with a theoretical capacity of approximately 980. Additional resources appear to have been available. A school with at least as much available capacity as Sterling was Marion with a 1943 enrollment of 557 of whom 49 percent were black. While its 1952 capacity is reported at 560, in 1942 when it had an enrollment of 553, it is reported to have had one closed classroom. Marion did not share a boundary with Hayes, but it was approximately the same distance from other portions of the Hayes attendance area as Sterling was from the area affected by this boundary change.

A school which did share an attendance boundary with Hayes was Waring Elementary School, which was also approximately the same distance from portions of the overcrowded Hayes attendance zone as Sterling was from the actually affected area. Waring clearly appears to have had available pupil stations in 1943. Its 1943 enrollment was 588, while its basic capacity in 1952 was 630. This capacity figure presumably incorporates an assumption of a lower acceptable student-teacher ratio than would be reflected by the 1943 average practice. Interestingly, in 1944 Waring's enrollment dropped to 514. Black students constituted 4.4 and 7.0 percent of Waring's enrollment in 1943 and 1944 respectively.

The resources of Marion and Waring were not marshalled to solve overcrowding at the overwhelmingly black Hayes despite their accessibility which appears nearly equal to that of Sterling. Safety factors do not appear to be a plausible explanation for these omissions. The Hayes, Sterling, Marion and Waring attendance areas were sliced by crosstown streets. However, a child living in the northern part of the Hayes attendance area would encounter no more traffic hazards going north to Waring than south to Hayes. Accordion-like boundary changes transferring part of the Sterling area to Marion and in turn more of the Hayes area to Sterling would have led to a fuller solution of the Hayes overcrowding problems. One common characteristic of both Marion and Waring was that less than half of their enrollment was black. One might infer that there was a reticence on the part of school officials to introduce more black students into these schools. Such an inference would be supported by evidence of other similar behavior by school authorities during this time period.

The opening of Outhwaite as an elementary school suggests an inclination of school planners to contain blacks. The attendance area of the new school was completely surrounded by schools which were in excess of 90 percent black, which conferred upon it the dubious distinction of becoming the second thoroughly impacted black school in the Cleveland public school system. An impacted school, as the term will be used in this opinion, is one which could not be integrated by a redrawing of boundaries with contiguous schools, all of which are in excess of 90 percent black. The first such school in the Cleveland system was Dike Elementary School. The court is aware that in opening Outhwaite as an elementary school, school officials were converting an existing board-owned facility to a new use. During a period of war, as this was, obvi-

ously new construction would have to be viewed as an unlikely alternative. The court is also equally aware of the fact that the concentration of black families with school age children which necessitated the opening of a new elementary school was not largely the result of the workings of the private real estate market. Rather the opening of Outhwaite as an elementary school coincided with the opening of Carver Park Housing Project, a public housing estate planned for occupancy by blacks. As discussed elsewhere in this opinion, the planning of public housing was coordinated with agencies providing public services, assurances that public services will be provided being a necessary prerequisite to the construction of the project. Thus school officials were involved in this public housing site decision and its foreseeable result of residential concentration by race. This concentration, in turn, resulted in an impacted black school.

Another measure allegedly aimed at relieving the overcrowding at Hayes (99.7%, 1159/980) in 1944 was the creation of an optional zone at the south end of the Hayes area allowing students from that zone to attend Case-Woodland (92.8%, 724/630). This approach is subject to two criticisms. First, in seeking to relieve overcrowding at one school, it exacerbated a similar problem at another school, when, as discussed above, this was not the only possible alternative. Second, there is no explanation as to why the school officials addressed the problem with optional zone, rather than a boundary change. While the relative disparity in the proportional black enrollment at the sending and receiving schools is not large in absolute terms, there is the possibility that the optional zone contributed to the loss of white students at Hayes from 1943 (98.0% black of 1605 or, conversely, approximately 30 non-black students) to 1944 (99.7% black of 1159 or, conversely, 3 or 4 non-black students).

The enrollment at Hayes continued to increase through the 1940s in spite of the assignment adjustments discussed above.

In September 1948, the school officials again sought to ameliorate the problem at least partially with a boundary change assigning upper elementary students from a designated portion of the Hayes area to attend Sterling. Clearly Hayes which had an enrollment of 1262 in 1947 and 1352 in 1948 after this change and a theoretical capacity of only 980 was in need of relief. But the choice of Sterling as the source of that relief again strongly suggests that school officials were not neutrally considering all of the alternatives available to them. In 1947, the Sterling enrollment was 658, already 28 students over its theoretical capacity of 630, as shown in P.X. 74. In 1948, after this boundary change its enrollment had increased to 723. In ameliorating one problem of overcrowding, school officials were contributing to the creation of another. Again, if this were the only alternative available to school officials, it would be reasonable to more evenly distribute the pressures of overcrowding. It was not the only alternative. Waring was still operating with an enrollment, 548 in 1947 and 575 in 1948, which was less than its basic capacity of 630. Since the reassignment measure adopted at this time affected only older elementary students, students from the northern portion of the Hayes attendance area could have reasonably been assigned to Waring. The most apparent distinguishing characteristic between Sterling and Waring at this time was the proportion of black students in their enrollment, 88.8% and 4.0% respectively. Notable is the fact that Waring's proportional black enrollment had in fact decreased from 7.0% in 1944. Given the nature of the remedial action taken in 1948, the court concludes that reasonable school officials acting in a color-blind fashion would have transferred some of the upper elementary students from the 98.7% black Hayes to the 4.0% black Waring.

There is one point about the court's evaluation of various decisions by school officials which should be made clear. Clearly since the 1940s, there has been an enormous rethinking as to how public officials should treat racial issues. Indeed this process con-

tinues to this very moment. The court does not conclude that the school officials who engaged in the various conduct discussed here were necessarily acting with actual malice toward black students. In fact, the court assumes the contrary. The Court has undertaken this minute analysis not to cast aspersions upon particular individuals who were responding in all probability to the social and political pressures of the day. Throughout the school system, they were facing problems of mobility in the population and later of population explosion, the so-called postwar baby boom, of a magnitude that was difficult to predict. Clearly developments in the community called for responsive action from school officials. At the same time, constitutional principles required that those actions meet certain standards in affording all students in the Cleveland public schools an equal education.

Even prior to *Brown v. Board of Education, supra,* it was understood that black children were entitled to educational programs and opportunities equal to those afforded their white counterparts.

In this spirit, the court must conclude that the various actions and inactions in dealing with overcrowding at Hayes during the 1940s, considered as a whole, are strong evidence of a pattern and practice at that time to contain black students in overwhelmingly black schools. This was done despite the fact that the crowded conditions in these black schools must be viewed as indicia of their inequality when compared with predominantly white schools.

On several occasions, the "solution" to overcrowding was to shift students to another predominantly black school which was already overcrowded itself, e. g. Sterling and Case-Woodland. At the same time, the resources of essentially white underenrolled schools, most notably Waring, were not used in resolving problems of over-crowding. It is fair to conclude that this conduct by school officials was interpreted as a signal to families in the real estate market that the Waring attendance area would remain a white "neighborhood."

Another incident during this time period which suggests that, where ameliorative action was necessary, containment of black students in identifiably black schools was a practice, is the 1947 boundary change in which a southern portion of the Marion attendance area (64.3%, 644/560) was transferred to Mayflower (97.0%, 942/1085). The court assumes that the whites attending Marion lived primarily in the northern section of the schools attendance zone, that is in areas abutting the predominantly white neighborhoods which were in the St. Clair Elementary School attendance area. Conversely the court assumes that the children affected by this boundary change were primarily black children. Based on likely conditions, the record indicates that a less segregative alternative to Mayflower was Harmon (87.7%, 293/535). According to the School Housing Report for 1947, Harmon had six closed classrooms while Mayflower had one. As a single incident, the decision to send students, most or all of whom were presumably black, to a 97% black school rather than an 87% black school does not suggest the worst kind of manipulation. As part of a pattern, however, it cannot be ignored.

At the end of the decade of the 1940s, the concentration of black residents continued to be most heavy in the Central area of the Cleveland School System. By 1950, there were 13 regular elementary schools which had proportional black enrollments in excess of 95 percent, as opposed to the 10 such schools in 1940. These schools formed a core. Four shared no boundaries with any school having a black enrollment of less than 90 percent. Six had enrollments substantially in excess of their capacity as calculated by school officials in 1952. Only one of these schools had any closed classrooms, Gladstone with four such rooms. A summary of relevant statistics for these predominantly black schools follows:

| | proportion black | enrollment/ capacity | closed classrooms |
|---|---|---|---|
| Bolton | 98.8% | 829/1050 | 0 |
| Burroughs | 100.0% | 1053/1225 | 0 |
| Case-Woodland | 99.5% | 777/630 | 0 |
| Giddings | 99.7% | 670/775 | 0 |
| Gladstone | 100.0% | 500/735 | 4 |
| Hayes | 97.6% | 1350/980 | 0 |
| Irving | 96.2% | 707/600 | 0 |
| Dike | 100.0% | 590/665 | 0 |
| Kinsman | 95.7% | 1446/945 | 0 |
| Mayflower | 95.4% | 802/1085 | 0 |
| Outhwaite | 98.0% | [10] n/a/1155 | 0 |
| Wooldridge | 99.0% | 792/700 | 0 |
| Quincy | 99.6% | 750/665 | 0 |

In contrast, they were ringed by 12 schools, all but three of which had proportional black enrollments substantially below the percentage of black students in the Cleveland Public Schools at the time (26.7%). Eight of these schools had enrollments which were at least 200 students below their basic capacity as calculated in 1952.

One school had an enrollment significantly over capacity, Hough. According to the 1950 School Housing Report, these schools had a combined total of 51 closed standard classrooms. For comparison, the same 1950 statistics listed for the core school are listed for the ring schools herewith:

| | proportion black | enrollment/ capacity | closed classrooms |
|---|---|---|---|
| Boulevard | 7.34% | 395/700 | 4 |
| Dunham | 17.66% | 1138/1125 | 0 |
| Harmon | 87.81% | 230/535 | 6 |
| Hough | 10.98% | 1148/1015 | 0 |
| Observation | 81.67% | 311/910 | 0 |
| Mt. Auburn | 0% | 260/700 | 8 |
| St. Clair | 18.37% | 283/490 | 6 |
| Tod | 30.15% | 252/490 | 7 |
| Waring | 6.77% | 576/630 | 0 |
| Warren | 5.85% | 259/770 | 9 |
| Woodland | 2.49% | 562/595 | 0 |
| Woodland Hills | 4.22% | 332/455 | 1 |

At the very least, the above figures indicate an uneven management of these various schools. The task before the court, however, is not to review generally the administration of the schools over the time period covered by the plaintiffs' evidence in this case. Rather, as has been indicated before, the task brought to the court is to determine whether the Cleveland Public Schools were operated as a truly unitary system. On the facts above, the color-blindness of school officials during this period must be questioned.

Assuming that the practice in the early 1950s was to assign approximately 35 students to an elementary class—an assumption which plainly gives the local board the benefit of the doubt—the 51 unused classrooms in the "ring" schools could have accommodated 1785 students. School officials ought to have utilized such presently available facilities, if possible, before opening any additional schools. Step-by-step changes would have achieved the end of making the fullest use of these otherwise under utilized "ring" schools.

Instead in 1950, the school officials dealt with overcrowding in the core schools by converting part of the Longwood Vocational School for Girls into a primary (K–3) School. Longwood Primary School (100%, 371/?—dual use of school makes PX 74 ca-

10. As hereinafter used, the abbreviation n/a stands for not available.

pacity figure unreliable for this year) opened with a totally black enrollment which had been drawn from Mayflower ('49: 897/1085; '50: 95.39%, 802/1085), Sterling ('49: 723/630; '50: 89.49%, 674/630), Case-Woodland ('49: 797/630; '50: 99.49%, 777/630), and Hayes ('49: 1409/980; '50: 97.56%, 1350/980). As the 1949 enrollments at the latter three schools reveals, action to deal with overcrowding at the sending schools was plainly needed. The initial difficulty with the action taken by the school officials in partially converting Longwood is that the overcrowding in three of the four sending schools appears to have not been fully resolved. If all the schools within this area of the city were similarly overcrowded, this result would have had to be tolerated. There were, however, at least five schools which were reported to have unused standard classrooms that might have been incorporated in a plan of step-by-step boundary changes to relieve the overcrowding addressed by the opening of Longwood Primary School. These schools were:

| | closed classrooms | proportion black |
|---|---|---|
| Warren | 9 | 5.85% |
| Tod | 7 | 30.16% |
| Harmon | 6 | 87.1 % |
| Gladstone | 4 | 100.0 % |
| Marion | 1 | 68.95% |
| Total | 27 | |

Utilization of these available classrooms theoretically would have created 945 pupil stations. The aggregate overenrollment at Sterling, Case-Woodland, and Hayes in 1950 (that is, enrollment minus capacity totalled for the three schools) was 561. While Gladstone and Harmon had black enrollments which were in the same range as the three overcrowded schools, the low ratio of black students at Warren and Tod is notable. The high number of available classrooms at these two schools strongly suggests that student assignment policies concerning this area of the school system were being managed to keep these schools as white as possible. Physical barriers which might otherwise define "neighborhoods" should not be taken as excusing unnecessary waste of available school resources with such a detri-

mental impact on a suspect class of students.

Indeed, to the extent that school attendance zones were supposed to reflect some underlying sociological structure, school officials apparently viewed such patterns as being more flexible in essentially all black residential areas than in other areas. In January 1951, a portion of the Longwood Primary School, (100%) attendance zone was transferred back to the Mayflower area (98.6%, 836/1085). The incident is a minor one, as certainly there was available space at Mayflower and it affected only one block. Moreover, whatever its original direct effect, it could not be continuing as both the sending and receiving schools have since been closed. The incident is instructive, however, because of the two changes which this area underwent (Mayflower to Longwood in September 1950 and Longwood to Mayflower in January 1951) within a five month period.

The number of children attending Cleveland Public Schools increased dramatically during the decade of the 1950s, reflecting the so-called "baby-boom" following World War II as well as continued in-migration of new families to the city. By 1955, the total public school enrollment (113,067) was almost equal to the 1940 figure (115,769) and still growing rapidly. New school construction was plainly going to be needed. Various decisions made in the course of this new construction appear to have had foreseeable effects which bear close scrutiny.

In 1954, Longwood (100%, 810/770) was converted from a primary school to a regular elementary school. Students were assigned from areas formerly in the Sterling, Case-Woodland, Mayflower and Hayes attendance areas. The act of creating more room for elementary students is not itself subject to criticism. The problem is that the overcrowding in the sending schools which precipitated this conversion was not completely resolved, as the figures below indicate, and apparently more could have been done.

| | '53 enrollment | '54 enrollment/ capacity | '53 % black | '54 % black |
|---|---|---|---|---|
| Sterling | 735 | 758/700 | 89.4% | 63.1% |
| Case-Woodland | 859 | 711/630 | 99.0% | 99.4% |
| Mayflower | 881 | 802/1085 | 98.8% | 97.9% |
| Hayes | 1473 | 1069/980 | 98.4% | 98.9% |

In responding to the plaintiffs' description of the various boundary changes associated with the 1954 conversion of Longwood, the local defendants note that at least one step-by-step boundary change was made. That is, after some Sterling students were reassigned to Longwood, some Marion students were assigned to Sterling. It is notable that after these changes the proportion of black students at Sterling dropped from 89.4% in 1953 to 63.1% in 1954. Harmon at this time was substantially underenrolled ('53: 89.9%, 307/535; '54: 89.9% 307/535). If the objective of the school officials had been full utilization of available facilities, it would seem that further step-by-step boundary changes should have been made to involve Harmon in the plan to relieve overcrowding. The reasonable boundary adjustment would have been to assign students from the northwest panhandle of Marion ('53: 66.4%, 634/560; '54: 67.2%, 568/560) to Harmon. See 1947 boundary map). The local defendants' explanation for not involving Harmon in this redistricting plan is that access problems existed, citing the problem of walking under railroad bridges. Neither the 1947 nor the 1967 map of school attendance zones indicate any railroad lines in the area between Harmon and Marion.

In absence of a sufficient neutral explanation for the failure to involve Harmon in resolving overcrowding in the area at the time, the court finds it necessary to consider what racially motivated reasons might have accounted for this omission. As noted above, the one step-by-step boundary change which the school officials did undertake appears to have resulted in a substantial reduction of the proportion of black students enrolled at Sterling. The end of seeking to establish Sterling as a more integrated school would be laudable when considered in a vacuum. If this was at least one of the goals of this redrawing of boundary lines, however, its execution would be subject to several criticisms. First, the increase in integration at Sterling appears to have been at the expense of isolating black students formerly assigned to Sterling to the totally segregated Longwood. Second, the unwillingness to assign students from Marion to Harmon not only isolated the Harmon students, but wasted valuable and limited resources of the school system at a time and place where there was obvious need. Finally, the failure to use all of Harmon's available space resulted from the school officials' conscious unwillingness to assign white students from Marion (67.2%) to the significantly more black Harmon (89.9%), this undercuts the local defendants' assertion that the neighborhood school policy has continuously been applied in a racially blind fashion. The various questions raised by the conversion of Longwood to a regular elementary school and the consequent boundary changes would not loom very large except for the pattern which emerges from several school openings at about the same time, in particular Chesnutt and Clara Tagg Brewer, discussed *infra*.

In 1954, George Washington Carver (98.8%, 730/590) Elementary School also opened. Unlike Longwood, which was an existing board-owned facility, Carver was newly constructed. Thus, school officials had a full measure of control oversite selection. Its students were drawn from areas which, formerly had been part of the Hayes, Burroughs and Outhwaite attendance. In 1951, the initial planning year for Carver, these three sending schools had the respective proportional black enrollment as follows: 97.9%, 99.6% and 98.5%. It was clearly foreseeable that Carver would open a virtually all-black school. The only schools which might have presented integrative alternatives, assuming that children

were to walk to school, were Sterling ('54: 63.3%, 758/630), Dunham ('54: 47.7%, 1638/1125) and Waring ('54: 8.3%, 576/630). Sterling and Dunham were both experiencing overenrollment, and the relatively small amount of available space at Waring could not absorb the burgeoning student population in the area ultimately served by Carver. The result of this school construction was plainly containment of blacks in an overwhelmingly black school.

Whether a different site selection for Carver might have been possibly less segregative in effect is a difficult question, given the commercial development to the north of the actual Carver site. The relevant observation, however, is that in 1954, ironically the year in which *Brown v. Board of Education* was decided, the Cleveland Board of Education opened the first newly constructed school which from its inception was essentially an all-black school. This event surely should have signaled school authorities that integrated education in Cleveland would be the exception and not the rule for both black and white students, unless the "neighborhood" school policy was tempered. Instead the policy appears to have been implemented in such a way as to contain blacks even where integration was not only feasible, but where the alternative resulted in gross disparities in utilization of adjacent "black" and "white" schools. This is illustrated by the events in the Kinsman area.

Kinsman was accommodating 500 students more than its basic capacity of 945, in other words, it was over enrolled by more than 50%. It shared boundaries with Boulevard (7.34%, 395/700, 4 closed standard classrooms), Mt. Auburn (0%, 260/700, 8 closed standard classrooms), Woodland (2.49%, 562/595, 0 closed standard classrooms), and Woodland Hills (4.22%, 332/445, 1 closed standard classroom). A double set of railroad lines did separate the Kinsman area from all of these schools. However, the distance and the safety factors which would have been involved in assigning upper elementary Kinsman students to Mt. Auburn and Boulevard do not appear to outweigh the benefit of relieving the gross overcrowding at Kinsman. Likewise, Tod shared the western boundary of Kinsman and had over two hundred theoretically available pupil stations. At this time, the Sidaway Bridge apparently provided access from the Kinsman area to Tod, as evidenced by its boundary at the time. The available space at Mt. Auburn, Boulevard and Tod was more than sufficient to solve the obvious overcrowding at Kinsman in 1940, and yet school officials allowed it to sit idle. This state of facts seems explicable only in terms of a deliberate effort on the part of school officials to preserve the identification of the "ring" schools as "white schools." By their inaction, school officials joined in transmitting the message that blacks were not welcome in these neighborhoods. They contributed to effective designation of areas as white neighborhoods or black neighborhoods. Subsequent actions by school officials only bolster this conclusion.

As the local defendants acknowledge in their response E–168, crowded conditions existed at Kinsman from 1944 to 1959. School officials did undertake certain actions to alleviate this continuing problem. But in each instance, these remedial efforts contained blacks in overwhelmingly black schools. Thus some Kinsman students were assigned to Rawlings Junior High ('44: 84.1%, '59: 100%) School from 1944 until 1959. During the 1950s, two schools were planned and constructed to draw students from Kinsman; Chesnutt ('55: 99.54%, 660/630) and Anton Grdina ('59: 97.6%, 687/665).

In reviewing the evidence, the student reassignment decisions made pursuant to the opening of Chesnutt in 1955 stand out as among the most blatant actions of school officials in deliberately separating students by race. In 1954, the year prior to the opening of Chesnutt, Kinsman (98.75%, 1771/945 had an enrollment which was 826 students above its theoretical capacity! While some Kinsman classes were being held at Rawlings Junior High School ('54: 99.65%, 1120/1567), even if all of the theoretically available space at Rawlings were

marshalled for use for the overflow of Kinsman students, there would still have been an aggregate over enrollment at Kinsman of approximately 400 students. In 1954 in addition to drawing students from Kinsman the new Chesnutt also drew students from Wooldridge (99.8%, 787/700) and Tod ('53: 28.7%, 251/490; '54: 6.38%, 188/490), which shared a long boundary with Kinsman. As a result of this latter change, Tod had a marked decrease in its total and its proportional black enrollment. Prior to the opening of Chesnutt, the walking distance from the western portion of the Kinsman attendance area to Tod was relatively short because of the existence of a footbridge, the Sidaway Bridge, which spanned Kingsbury Run. Prior to the opening of Chesnutt, the Tod attendance area included an area northeast of Kingsbury Run. Obviously, the Sidaway Bridge was part of the access route for the children from this area. When the Chesnutt boundaries were drawn, this area was included in its attendance zone. The apparent effect of this was to remove virtually all of the black students attending Tod to Chesnutt and to cause a substantial enrollment drop in the already drastically under utilized Tod. Consideration of the safety of elementary school children daily traversing a footbridge was clearly a matter which school officials could reasonably consider. But in the instant incident, the continuing severe over enrollment which plagued Kinsman until the opening of Anton Grdina in 1959 suggests strongly that the motive of the school officials was as much containment of racial minorities as it was safety considerations. Subsequent to the construction of Chesnutt, the Sidaway Bridge was not maintained. Although its framework still exists, it is now in an unusable state of disrepair and is closed. The physical separation which has since evolved between these two residential areas is such that, to reach one from the other, it is necessary to travel over a mile on surface streets through industrial areas. In seeking to justify the failure to utilize available space at Tod, the local defendants have relied on this distance as being prohibitively far for an elementary school child to walk.

The blind acceptance of this position would ignore the role of public agencies in creating or destroying connecting arteries between neighborhoods. In this particular instance, the local defendants stressed that Sidaway Bridge was no longer operative and a literal chasm existed between these two neighborhoods. But their description of the area stops again literally half-way. Kingsbury Run which creates the gulf between Tod and the present Chesnutt/Anton Grdina areas has been filled in to a point just several hundred feet southeast of Sidaway Bridge. This was done apparently to allow for the building of homes in the Garden Valley area. The families who came to occupy these homes were a major source of the increased enrollment in the Kinsman area in the 1950s. The filling of Kingsbury Run for this construction left only a small valley with sloping sides of perhaps 100 feet separating the Garden Valley residences from the Tod area. Yet no access was created between the neighborhoods, and, as discussed above, the one existing access route was permitted to fall into disrepair. This is an extremely unusual pattern. One reasonably might expect that at least one access route between these areas would have been developed by the city to facilitate public safety, i. e. access of fire and police vehicles. This did not occur.

Since the topographical modifications in this area, all that was necessary to allow school children to have access from one area to the other was the construction of a few hundred feet of sidewalk. The omission of the city in taking any actions to establish connections between these areas can reasonably be viewed as conduct by public officials aimed at fostering the virtual total racial segregation of both these neighborhoods. The court is not so naive as to believe that school officials could not have worked with city officials to have such a sidewalk constructed, if all of these public officials were not seeking to promote the separation of these neighborhoods. The

1954 change in the Tod attendance area appears to have been a part of a pattern of public action directed at encouraging this separation. In fact, it appears to have been the *coupe de grace* which cleaved these two neighborhoods from one another. Under these circumstances, the court views any reliance by the local defendants on the existing physical isolation of the Tod area as a defense to the racial isolation at Tod school as unacceptable in view of the role which their predecessors appear to have taken in bringing about this separation.

The inaccessibility of the available space at Tod continued to be significant into the late 1960s in simple terms of efficient utilization of school facilities. For ease of reference, the enrollment and proportion of black students enrolled at Tod from 1953 through 1970 are listed below:

| | enrollment/capacity | proportion black |
|------|---------------------|------------------|
| 1953 | 251/490 | 28.7 % |
| 1954 | 188/490 | 6.38% |
| 1955 | 174/490 | 1.15% |
| 1956 | 197/490 | 2.54% |
| 1957 | 200/490 | 2.50% |
| 1958 | 202/490 | 1.49% |
| 1959 | 100/490 | 1.00% |
| 1960 | 169/490 | .59% |
| 1961 | 185/490 | 0% |
| 1962 | 213/490 | 0% |
| 1963 | n/a | n/a |
| 1964 | 209/490 | 0% |
| 1965 | n/a | n/a |
| 1966 | n/a | n/a |
| 1967 | 237/490 | 1.68% |
| 1968 | 230/490 | 0% |
| 1969 | 216/490 | .92% |
| 1970 | 206/490 | 1.78% |

In 1959, an addition to Chesnutt (97.5%, 863) was built raising its capacity from 630 to 875. In the same year, the newly constructed Anton Grdina Elementary School (97.6%, 687/665) opened, providing further relief for the continued overcrowding at Kinsman ('58: 99.27%, 1361/980, '59: 100%, 979/980). But for the five years prior to this construction, both Chesnutt and Kinsman had been seriously over enrolled, while the utilization rate at Tod was consistently under 50%. In the early 60s, for the most part the overcrowding at these schools appears to have been resolved, although sometimes enrollments slightly exceeded theoretical capacity.

Then in August 1967, Kinsman was razed by a fire, necessitating the emergency reassignment of its students by the opening of classes in the fall. (The last available figures for Kinsman are from 1964 and show the school to be 100% black and to have an enrollment of 941/945). Students were reassigned to Grdina (100%, 1049/1015),[11] Chesnutt (100%, 849/875), and Dike (100%, 638/805). Those assigned to Dike were taken to school by bus. Giving full consideration to the emergency conditions, the court is compelled to view at least the reassignment of students to Dike as deliberately segregative. Kinsman, as of the date of the last available figures had a totally black student population. After the fire its students were assigned to three likewise totally black schools. Two of these schools were apparently within walking distance of the Kinsman attendance area. To enable students to attend Dike, however, the school authorities provided bus transportation to Dike. Oddly, while the local defendants provided the court with measurements of the purported distances from Kinsman School to nine other schools in the general area, they overlooked the distance from Kinsman to Dike. The court's measurement of this distance is 8,100 feet. Of

11. Reflects new capacity based on addition of 9 classrooms to Grdina in 1963.

course, when the decision was made to bus Kinsman students, walking distances were of little relevance. The decision to bus a group of all black students to an all-black school could only be viewed as not being evidence of intentional segregation, if it could be convincingly demonstrated that there were no available integrative alternatives.

Although Kinsman was a totally black school, its attendance area apparently bordered areas with substantial numbers of white residents whose children attended public schools. The plaintiffs have called attention to several schools which presented integrative opportunities and had 1967 enrollments which were less than their basic capacity:

| | 1967 enrollment/capacity | proportion black |
|---|---|---|
| Tod | 237/490 | 1.68% |
| Union | 408/490 | 0.98% |
| Wayne | 453/665 | 36.42% |
| Rice | 504/1120 | 50.59% |
| Mt. Auburn | 379/700 | 53.56% |

The only one of these schools for which the local defendants offer any explanation for not availing themselves of the integrative alternative is Tod. The school officials note that there was no furniture available for the use of Kinsman students at Tod. They fail to explain why classroom furniture could not have been transported to Tod. They also note that one or two of the Tod classrooms were in need of replastering. Such maintenance could have been accomplished within a month if school officials had any commitment to achieving integration where possible. Finally, the school authorities note that Tod is across Kingsbury Run from the Kinsman attendance area. As noted above, the decision to use bus transportation minimizes any dangers to the children's safety. The local defendants' explanations for rejecting Tod as a location

for reassigning Kinsman students are unconvincing. The court finds that Tod was not considered as a site for reassignment of Kinsman students because it would have been inconsistent with the Board's practice of maintaining Tod as a white school. The Board's intention to so operate Tod has been clear since 1954 when its enrollment dropped from 251 to 188 and the proportion of blacks enrolled dropped from 28.7% to 6.38% and then to 1.15% in 1955.

The court is compelled to note what it perceives as a lack of candor in the response E–19 by the local defendants. As noted previously, though the Board found walking distances to be relevant to its reply, it neglected to include the distance to Dike. More significantly, other measurements of distances appear to be significantly in error, including the following:

| | Board's figure | Court's measurement |
|---|---|---|
| Union | 11,900' | 7,800' |
| Boulevard | 7,900' | 4,900' |
| Mt. Auburn | 8,400' | 6,100' |

This appears to be one of the more blatant segregative incidents in the record of this case.

At the southeastern edge of the core of black schools, a series of student assignment decisions hint at the sensitivity of school officials to the race of students affected by changes. Thus in 1948, overcrowding at Quincy (99.9%, 748/665) was

addressed by a boundary change assigning part of its attendance area to Irving (91.7%, 686/530). The following year, the Irving facilities were upgraded by the addition of an auditorium-gymnasium and two classrooms which raised its capacity to 600. Considering only these two schools, the result was to distribute fairly evenly the over enrollment burden between them. Sharing

a long boundary with Irving was Woodland ('48: 0.85%, 586/595). In 1941 and again 1952, portions of the Irving area ('41: 67.1%, 641/530; '52: 97.7%, 757/600) were made optional zones giving the children in the affected area the right to attend either Irving or Woodland ('41: 1.87%, 643/595; '52: 8.1%, 614/595). The local defendants explain that these optional zones were created to relieve overcrowding at Irving. No explanation is given as to why optional zones were used rather than straight boundary changes. The enrollment and capacity figures for the years in which these options became effective indicate that the approach did not succeed in distributing over enrollment pressures nearly as successfully as had the 1948 boundary change between Quincy and Irving. Because of the extreme difference in proportional black enrollment in Irving and Woodland for the two years in which the optional zones were created, the suggestion is strong that a desire to provide some white students in the Irving attendance area the opportunity to attend the "white" Woodland was as much a motivation as the relief of overcrowding at Irving.

This suggestion is further supported by an examination of the available classroom space at other schools sharing boundaries with Woodland, i. e. Anthony Wayne ('41: 0.4%; '48: 0%; '52: 1.2%), Harvey Rice ('41: 0.5%; '48: 2.0%; '52: 2.4%), and Mt. Auburn ('41: 0%; '48: '52: 1.4%). These schools had varying numbers of unused classrooms, in the years under consideration, as indicated below:

| | '41 | '48 | '52 |
|---|---|---|---|
| Anthony Wayne | 0 | 0 | 0 |
| Harvey Rice | 17 | 9 | 7 |
| Mt. Auburn | 4 | 8 | 8 |

If relief of overcrowding had been a primary objective, step-by-step boundary changes transferring the part of the Woodland attendance area east of Woodhill Avenue to Harvey Rice or Anthony Wayne would have freed additional space at Woodland to fully relieve overcrowding at Irving. Such an approach would have also resulted in significant integration at Woodland. That such an approach was feasible was at least suggested by the small optional zones

created in the Woodland area to Wayne in 1941 and 1945. Its feasibility was ultimately borne out by boundary changes made by the authorities in the early 1960s.

In 1962, a portion of the Woodland area (61: 48.6%, 688/595; '62: 49.7%, 608/595) was transferred to Wayne ('61: 4.8%, 420/665; '62: 13.9%, 460/665). In 1964, an additional portion of the Woodland (53.9%, 705/595) area was transferred to Wayne (14.0%, 473/665) and a separate portion of the Woodland area was transferred to Rice (12.4%, 404/1120). The 1962 boundary change does appear to have had an integrative effect as witnessed by the relative stability of the proportional black enrollment at Woodland from 1961 to 1962 and the increase of such enrollment at Wayne. It is difficult to assess the racial impact of the 1964 changes because of the absence of data for the preceding and subsequent two years. In contrast to the 1962 changes, the 1964 changes did not fully resolve the overcrowding at Woodland. At the same time the receiving schools had an aggregate of 908 theoretically available pupil stations. Viewing the small increase in proportional black enrollment at the receiving schools from 1962 to 1964, Rice (11.49% to 12.4%) and Wayne (13.9% to 14.0%), it appears most likely that the affected areas were primarily white residential areas. The apparent effect was to siphon white children from the increasingly black Woodland to "white" schools. Thus it appears that even in the 1960s, when logical step-by-step boundary changes were made, two of the three changes in this area appear to have been less for the purpose of relieving overcrowding at the sending school than for the purpose of providing an escape valve for some white students from the increasingly black sending school.

Instead of utilizing such presently available space to integrative effect, the Board continued its patchwork approach to overcrowding in core "black" schools. In this particular area, there were several incidents in which additions were made to overcrowded schools which did not fully resolve the overcrowding. The first of these, as re-

flected by the record in this case was the 1940 addition of two classrooms to Quincy (98.9%, 784). This addition increased the theoretical capacity of Quincy, as measured in 1952, to 665. Step-by-step boundary changes at this time might have resulted in the utilization of closed classrooms in Anthony Wayne (1), Harvey Rice (15), Mt. Auburn (3) and Woodland (1).

Again in 1956, portable classrooms were added to Quincy (100%, 941) to increase its capacity to 805. As of 1951, the annual School Housing Report prepared by Board employees ceased to include listings of closed classrooms by school names. However, an examination of the 1956 enrollment and capacity figures for schools in the general area indicates that school officials had no reason to accept the continued overcrowding at Quincy. Adjacent to Quincy was Burroughs (99.66%, 1171/1225), which has some theoretically available pupil stations. It appears that these might reasonably have been used to further resolve overcrowding at Quincy, perhaps by a boundary change involving only upper elementary students at Quincy. If, however, Burroughs did not in fact have available space in 1956, other schools in the general area did:

```
Anthony Wayne 1.83% 437/665
Harvey Rice 2.04% 476/1120
Mt. Auburn 2.38% 252/700
```

While these schools were plainly not adjacent to Quincy, accordion-like boundary changes affecting Quincy, Irving, Woodland and these three schools would have evidenced both a commitment to equal education and to non-segregated education.

The addition of eight classrooms at Washington Irving (100%, 1309) in 1961, raising its capacity to 980, was yet another instance where school authorities did take action to deal with overcrowding, but appear to have stopped short of doing everything feasible when the line of race was reached. Without further belaboring the point, as indicated in the above discussion of the 1962 and 1964 optional zones created in the Woodland attendance area, much space was sitting unused in Anthony Wayne, Harvey Rice and Mt. Auburn. These resources could have been tapped by step-by-step boundary changes. The failure to do so indicates a determination on the part of school authorities to keep these schools "white."

Implementation of busing programs to relieve overcrowding at other schools in the system from 1961 to 1964 makes the failure to equalize enrollment pressures in this area even more inexplicable, if one excludes the possibility of racial motivation. Subsequent actions by school officials affecting this area further support the strong inference that strong efforts were made to maintain the "white" character of certain schools in this area. To understand these events, one must first be familiar with developments in the Beehive area.

Before shifting attention to the Beehive area and the corridor between Beehive and this Central area, a number of events affecting the western and northern part of this area remained to be examined. In the late 1950s and early 1960s, portions of the attendance areas of Harmon, Mayflower and Gladstone were selected by city officials as the object of urban renewal efforts. In the course of urban renewal in these areas, the three schools were closed, Harmon ('58: 99.9%, 205) in 1949, Mayflower ('61: 95.3%, 171) in 1961, and Gladstone ('64: 100%, 220) in 1964. Upon the closing of Harmon, its students were given the option of attending either Mayflower (98.6%) or Marion (64.3%, 526/560). When Mayflower closed, its students were reassigned to either Marion (38.4%, 369/560), Longwood (100%, 678/770), or Case-Woodland (99.7%, 672/630). When Gladstone closed, former Gladstone students were reassigned to Case-Woodland (99.8%, 642/630) or Benesch (100%, n.a./1155). The details of the urban renewal projects were not the subject of specific proof in this case. Obviously, such projects result in drastic changes in residential patterns and land use in the target areas. At trial, it was mentioned and the court is aware that much of this specific area is now the site of such institutions as the downtown campus of Cuyahoga Community College. What is nota-

ble about these events as pertains to the issues in this case, however, is that the net effect of this project was a significant drop in both the utilization and proportional black enrollment in the one integrated school in the vicinity of these urban renewal efforts. The court understands that none of the present defendants had control over site selection for urban renewal.

The net effect of the city's urban renewal efforts in this area and the school officials' reassignment decisions upon the closing of schools is similar to the earlier described situation which evolved between the Tod area and the Garden Valley area. School officials appear to have been willing partners in conduct which delineated neighborhoods along racial lines. The assignment decisions of the school officials were clearly one factor which contributed to such neighborhood definition.

At the northern edge of this area, the pattern of uneven use of facilities noted at the southeastern edge of this area, as discussed above, repeated on the northern edge, as evidenced by the situation at Carver in the late 1950s. In June, 1958, an addition was planned for Carver (100%, 813/590), which was completed in 1960. From 1957 to 1960, the overenrollment at Carver mandated that two Carver classes be housed at Central Junior High School. Where a school is overcrowded by more than 220 students, however, this measure must be viewed as providing partial relief only. Directly to the north of the Carver attendance area were Case ('58: 17.19%, 413/525) and Waring ('58: 14.35%, 525/630), which had a total of 213 theoretically available pupil stations. While school officials were willing to transfer Carver students to a junior high school pending a more permanent solution of the overcrowding at Carver, they allowed the resources of two nearby underenrolled elementary schools go unused. This clearly suggests an effort to keep students separated by race, where possible, in the face of pressing needs for unused facilities in "white" schools.

In 1966, school officials closed the overwhelmingly black Case-Woodland and assigned its students to Benesch ('64: 100%) and Longwood ('64: 100%). Step-by-step boundary changes involving Marion ('64: 35.2%, 423/560), Warren ('64: 12.0%, 636/770) and Sterling ('64: 69.1%, 481/630) appear to the court to have been an integrative alternative which school officials did not undertake.

In the late 1960s, a less predictable influence than urban renewal caused the closing of three schools in this area. Fires razed Kinsman and Giddings (99.6%) in the summer of 1967 and Hayes ('68: 100%, 749/980) in the summer of 1969. The arrangements which were made for Kinsman students have been discussed previously. Giddings students were reassigned to Burroughs (99.67%, 932/1225). To allow for the influx of Giddings students, the southern boundary of Burroughs was shifted to assign part of its attendance zone to Dike (100%, 638/805). Some of these changes were only temporary, however, as school officials decided to replace Giddings. This replacement school opened in 1970, and the former Giddings attendance area was reconstituted. Apparently the portion of Burroughs attendance area assigned to Dike stayed in the Dike attendance zone, where school officials opened a replacement school in 1971. The attendance area of the new Dike was also expanded to include a portion of the Quincy attendance area ('70: 100%, 895/805). All of the schools involved in these changes were racially impacted at the time of these changes; that is, they were surrounded by schools which were likewise overwhelmingly black. Considering the age of the schools in this immediate area, new construction was certainly justified in light of the new policy on financing construction. The construction of these two schools, however, was an affirmation of the neighborhood school policy in context where its segregatory effects were manifest.

■ The arrangements made following the destruction of Hayes were made in a different factual context than those for Giddings. First, the school officials did not determine to replace Hayes, although they did subsequently build a replacement school

for the adjacent Sterling. Second, Hayes was not racially impaced, as was Giddings. Yet, the ultimate reassignment of Hayes students was to two overwhelmingly black schools: Longwood ('68: 99.6%, 504/770; '69: 99.8%, 635/770) and Carver ('68: 99.4%, 717/875; '69: 99.6%, 733/875). The initial reassignment was likewise to these two schools plus Dike and Jane Addams. For some reason, school officials chose not to use the resource of Sterling (79.56%, 416/700) or Waring (1.56%, 358/630) for the displaced students. No explanation is given for the failure to use the available space at Sterling. Safety considerations are cited as the reason for not using Waring. In reaching a conclusion with regard to the failure to use the resources of these schools, the court takes note of two facts. First, for a semester after the fire at Hayes, students were assigned to Jane Addams, a vocational school. The court understands that such an assignment decision reflects an undesirable departure from normal administrative practice of grouping students generally according to age. Second, both Waring and Sterling were replaced in the 1970s, Waring in conjunction with Case and Sterling in conjunction with Marion. The court assumes that these replacements were in the preliminary planning stage at this time. The details of these replacements are discussed elsewhere in the opinion, but at this point, it is appropriate to note that their planning resulted in maintaining existing patterns of racial isolation. In view of these facts, the court concludes that utilization of these schools, even on a temporary basis, was rejected because school officials chose not to assign students from an all black school to schools where there were significant white enrollments.

## BEEHIVE

At the outset of the trial, plaintiffs indicated that their presentation and analysis would focus on certain illustrative areas of the Cleveland School District. These areas were believed to reflect evidence of the more egregious segregative conduct on the part of the defendants. One of these geographical sub-divisions, lying in the southeast corner of the city, was the so-called "Beehive" area. The elementary schools contained in that area are: Beehive, Gracemount, Williams, deSauze, Cranwood, and Moses Cleaveland.

Plaintiffs' allegations with regard to the Beehive area date back to 1938. In that year, an optional zone was created whereby students who lived in a certain portion of the Miles ('40: 0.6%, 538/700) attendance area could attend Moses Cleaveland ('40: 7.4%, 1065/1120). This optional zone continued in existence until 1963. In 1962 Miles was 7.9% black and had a capacity of 614/700 while Moses Cleaveland was 79% black and 1047/1120.

The analysis of this incident is complicated by the fact that it pre-dates the racial percentage and enrollment figures provided the court. For instance, the local school board indicated that this optional zone was created for the purpose of relieving overcrowding at Miles in 1938, which the board states had an enrollment of 1048 in that year. The first year for which data is available is 1940, and in that year Miles' enrollment was 538. No reason is given for this precipitous drop in enrollment during the intervening two-year period. In addition, the local board's statement that the optional zone was terminated in 1963 appears to be contradicted by the 1967 school map which shows the area in question as an optional zone within the Cranwood attendance area. Cranwood, as of that time, had become a full K–6 school. The optional zone, as it appears on the 1967 school map, allows upper elementary school children living in this area the option of attending either Moses Cleaveland or Miles rather than their assigned school, Cranwood.

Aside from the factual discrepancies mentioned above, the dominant question raised by this incident is why the school authorities opted to remedy the overcrowding at Miles through the use of an optional zone rather than a boundary change. The school Board's choice of an optional zone is made even more curious by the fact that its

own figures indicate that Moses Cleaveland was twice as close to the affected area as was Miles. While the route to Moses Cleaveland was intersected by railroad tracks, these same tracks were crossed by children going to Beehive.

The question of why the local Board chose to relieve overcrowding through the vehicle of an optional zone rather than a boundary change was a recurring one throughout this litigation. Such optional zones are inherently suspect when, as here, there existed a notable difference in the percentage of black students enrolled in the sending and receiving schools. That disparity in racial composition existed with regard to this optional zone up until its purported termination in 1963.

The absence of pre-1940 data also hampers the analysis of the 1940 closing of Gracemount ('41: 0%, 78/ ?). The school remained closed for one year, and reopened in 1941 as a K–4 school, it is impossible to ascertain the relationship between the 1939 and 1940 enrollments and whether a significant reduction in enrollment precipitated the closing.

During the year that Gracemount was closed, its pupils were sent to Moses Cleaveland ('40: 7.4%, 1065/1120; '41: 7.4%, 1012/1120). The question presented is why the children were sent instead to Beehive ('40: 23.0%, 406/1015) which was some 300 feet closer to Gracemount. Moreover, in order for a pupil to get to Moses Cleaveland from the Gracemount attendance area, both East 154th Street and Harvard must be crossed. To reach Beehive, however, children could travel side streets to Lee Road. Then children from only half of the attendance area would have to cross Lee Road. That presumably would be accomplished directly in front of the school where a crossing guard could be stationed. Although Gracemount was closed for but a single year, the ineluctable conclusion is that the local Board chose to reassign them to a considerably more identifiably "white" school which was further away, rather than to a more "black" school, that could be

reached by a shorter, more direct and presumptively safer route.

In terms of racial consequence, in the period from 1940–41, Beehive's black percentage rose from 23.02% to 30.03%. During that same period, Moses Cleaveland's black percentage remained virtually unchanged (7.42%–7.41%). Had the 65 white pupils then attending Gracemount been introduced into the Beehive student population, its 1941 black percentage would have risen only to 25.5%, rather than 30.03%. Despite the fact that the local board chose to send the Gracemount pupils to what was perceived to be a "white" school rather than to the increasingly black Beehive, the continuing racial effect of this course of action appears to have long since dissipated.

The apparent attention to racial impact is also evident with regard to the creation in 1940, of an optional zone from Moses Cleaveland ('40: 7.4%, 1065/1120) to Corlett ('40: 3.1%, 524/630). While this optional zone is still in effect, its effect appears to have been to contribute somewhat to the racial isolation at the sending school, Moses Cleaveland, at least until 1961. During the 1940s, Moses Cleaveland was becoming increasingly more black while the receiving school, Corlett, was experiencing a very low, relatively stable black enrollment ('40: 3.05%, '50: 2.7%). When Moses Cleaveland became majority black in 1959, Corlett had a black enrollment of only 14.8%.

While the safety considerations offered by the local Board in defense of the creation of the optional zone are not persuasive, the continuing racial effect of the zone on the sending and receiving schools is negligible. Neither school can be construed as a "white haven" since at least 1967 when Moses Cleaveland and Corlett were 97.9% and 99.25% black, respectively.

Another optional zone was created in 1942 from Cleaveland ('42: 9.5%) to Beehive ('42: 71.6%). According to the defendants' local Board's response, only seven houses were within the optional area. In addition, on its face, the optional zone appears to be integrative in effect. Of course, the issue is what the actual effect was. If most or all

of the residences involved were occupied by black families, the effect would not have been integrative. But particularly at this small scale, neither the court nor the parties can determine the race of the public school children in the affected area.

In 1943 the board chose to add temporary classrooms at Gracemount (0%, 241/?). The board, in its response, indicates that these classrooms were added to accommodate the rising enrollment at Gracemount. As an abstract proposition, then, additional space was probably required. What is significant is that the board chose to construct at Gracemount ('43: 0%) rather than effect a simple boundary change with the adjacent Beehive ('43: 33.6%, 423/1015), Cleaveland ('43: 7.2%, 997/1190), or Rickoff ('43: 11.3%, 870/1155). P.X. 74 capacities are used for purposes of analysis since P.X. 223 reveals no construction at these schools between 1943 and 1951.

Since all of the above schools had plenty of available pupil stations, the only rationale for the addition of temporary classrooms at Gracemount was to increase its capability as a "white enclave" and eliminate the possibility of its white students having to be reassigned to "blacker" schools. In 1951, Gracemount was still 0% black while Beehive was 84.8%, Moses

Cleaveland was 25.7%, and Rickoff was 29.9% black.

In July, 1944, the attendance area of Beehive was reduced because the area east of Ingleside Road and south of Garden Boulevard ceded from the City of Cleveland and annexed itself to the City of Warrensville Heights. Since the area annexed became part of the Warrensville Heights School District, the Beehive attendance area was contracted accordingly. The result was clearly a segregative one as Beehive went from 33.6% black in 1943 to 71.6% black in 1944. The role of the State in this matter will be discussed *infra*.

In 1944, Cranwood (0%; 119/175) underwent a modification whereby two classrooms were turned into a gymnasium and, as a result, its capacity was diminished.

To evaluate the significance of this action, it is necessary to understand the enrollment situation in this area of the district and the apparent policies of the school officials at this time. In 1944, there were three elementary schools, Beehive, Moses Cleaveland and Miles, and two primary schools, Gracemount and Cranwood, enrolling students from the southeast corner of the city, in that year, the record includes the following data on these schools:

| | Proportion black | enrollment/capacity |
|---|---|---|
| Beehive | 71.6% | 730/1015 |
| Cleaveland | 9.5% | 979/1120 |
| Miles | 0% | 466/700 |
| Cranwood | 0% | 119/?175 |
| Gracemount | 0% | 293/? |
| Total | | 2487/3010 |

Apparently because of the relatively large attendance zones in this section of the district the school officials decided to operate primary schools so that younger school children would not have to walk long distances. The court draws this conclusion because at least during the 1940s, the three elementary schools had sufficient capacity for the entire enrollment of the area.

The area is bisected by the Erie Railroad tracks, which form a boundary between the Cranwood miles and Moses Cleaveland at-

tendance areas and which cut across the Beehive attendance zone and part of the regular Miles attendance zone. Beehive was located north of these tracks which meant that children from a large area south of these tracks had to cross them on their route to school. During the course of the trial, the point was made many times that the school officials considered crossing railroad tracks to be highly undesirable for elementary children.

In 1944, both the enrollment at Beehive and the percentage of black students in that enrollment jumped dramatically. The court understands the factors in this rise to have been the opening of a public housing estate in the southwest portion of the Beehive area. It was in this same year that Cranwood was remodeled resulting in a diminution of its capacity. One might reasonably wonder why measures were not taken to diminish the dangers to primary-age children in the southern section of the Beehive area by having them attend Cranwood which was not substantially further from the southwestern area of the Beehive area than Beehive itself and would have eliminated the danger of crossing railroad tracks. Instead of adopting such a course of action which would have also been integrative, the school authorities took positive action to make such a course of action less viable by decreasing the capacity of Cranwood.

In 1945, an optional zone was created from Beehive (80.77%) to Moses Cleaveland (12.6%). While at first glance this would appear to be an integrative act, it most likely was not. It would seem that the affected area was a predominantly white residential area since it was contiguous with the Gracemount attendance area and Gracemount was 0% black. The local board attempts to explain this optional zone as necessary to relieve overcrowding. If such was the case, a boundary change would have been a far more efficacious method for solving the problem. Instead, the optional zone appears to be an "escape valve" whereby white students can choose to attend a predominantly white school rather than the predominantly black school to which they otherwise would have been assigned.

The school board effected two boundary changes and created an optional zone in 1947. The first boundary change was from Moses Cleaveland ('47: 19.0%, 914/1120) to Beehive ('47: 82.9%, 789/1015), and the second was from Beehive (82.9%) to Gracemount (0%). The optional zone ran from Beehive (82.9%) to either Moses Cleaveland (10.9%) or Gracemount (0.0%).

Although the school Board attempts to explain the creation of the optional zone as an attempt to deal with overcrowding at Beehive, such explanation is inconsistent with the facts. The boundary change from Moses Cleaveland to Beehive increased the allegedly already overcrowded Beehive area and is thus irreconcilable with the purported need for an optional zone. It is analogous to letting pupils out the front door while bringing them in through the back.

Although difficult to ascertain, one can only surmise that the area contained in the Beehive—Moses Cleaveland—Gracemount optional zone was racially transitional and the board was affording whites in the area an escape valve. The dual nature of the optional zone was necessitated by the fact that Gracemount was only a K–3 school. Moses Cleaveland was thus made available to accommodate white upper elementary pupils.

In 1949, an additional eight classrooms were added to Gracemount (0%, 849/840).

Perhaps the best introduction to the analysis of this incident is a statistical breakdown of the area before, during, and after the addition to Gracemount:

| 1948 Utilization Rate | | % Bl. | 1948 | % Bl. | 1949 | % Bl. | 1950 |
|---|---|---|---|---|---|---|---|
| 135.6% | Gracemount | 0% | 814/600 | 0% | 989/600 | 0% | 1064/840 |
| 77.2% | Beehive | .85% | 784/1015 | 83.9% | 856/1015 | 83.5% | 265/1015 |
| 88.4% | Cleaveland | 24.8% | 991/1120 | 22.9% | 896/1120 | 22.3% | 786/1120 |
| 57.6% | Rickoff | 21.2% | 666/1155 | 21.2% | 666/1155 | 25.2% | 589/1155 |
| | | | 2441/3290 | | 2418/3290 | | 2240/3290 |
| | | | −849 | | −876 | | −1050 |

Once again, as an abstract proposition, Gracemount was overcrowded and, theoretically, required an addition. A review of the surrounding schools however, reveals a large surplus of available pupil stations. Given the vast disparity in the racial percentages of Gracemount and the other three schools, it can only be concluded that the decision not to re-district so as to send some Gracemount children to these other schools was racially motivated.

The racial impact of the decision to build at Gracemount is readily apparent. It enabled that school to accommodate more students, all of whom were white, and thereby maintain its racial identifiability. Moreover, the failure of the Board to utilize the available pupil stations precluded the introduction of additional white pupils at Beehive ('48: 85%) which would have assisted in minimizing that school's racial identifiability.

■ Thus, the construction of an addition at Gracemount had the natural, probable, foreseeable and actual effect of perpetrating the extremely segregated character of the southeast portion of the school district.

In 1949, yet another optional zone was created from Moses Cleaveland (22.9%, 896/1120) to Corlett (3.2%, 472/630). This optional zone is still in effect.

Once again we are dealing with an optional zone between two schools of widely disparate racial composition which raises the question of whether it was a vehicle for whites to escape attending what was perceived to be a black school.

The board offered two explanations for creating the option: pupil convenience and overcrowding at Moses Cleaveland. Corlett was clearly closer to the optional zone and therefore, presumably, more convenient. But if convenience was the objective, the board ought to have shifted the Corlett boundary so as to convenience all of the pupils in the optional zone rather than those choosing to utilize it.

Similarly, the optional zone cannot be explained by crowding at Moses Cleaveland since in 1947 it was 896/1120, or had 224 available pupil stations.

Between 1949, the year of the creation of the optional zone, and 1940, the black population at Corlett decreased from 3.18% to 2.74% while Moses Cleaveland decreased from 22.88% to 22.26%. The black percentage at Corlett, however, remained highly stable, not exceeding 15% until 1960. Moses Cleaveland, however, had a rapid increase in black population surpassing 15% in 1947 and reaching 64.7% in 1960. Thereafter, both schools became predominantly black.

As was made clear in the earlier discussion of the 1940 Moses Cleaveland—Corlett optional zone, at least until 1960, this optional zone ran from what was becoming an identifiably black school (Moses Cleaveland) to what was an identifiably white school (Corlett). The effect of the optional zone during this period was to provide an escape valve for whites and contribute to the racial segregation at the two schools.

The Edward M. Williams school opened as a K–4 school and 0% black in 1952. The opening of a new school necessitated the redrawing of school attendance areas so as to "carve out" an attendance area for Williams.

In order to accommodate Williams, the north and east boundaries of Beehive (87.3%) were contracted and the east boundary of Gracemount (0.4%) was also contracted. In addition, an option was created whereby 5th and 6th graders in the portion of the Beehive area assigned to Williams could instead attend Gracemount.

In 1954, the grade structure at Williams was changed from K–4 to K–6 and the east boundary of Gracemount was contracted at the 5th and 6th grade levels.

While the boundaries of Williams were drawn to achieve an entirely white school, it should be noted that the black population in this part of the city appears to have been concentrated more in the south than in the east. This is evidenced by the significant drop in the black population at Beehive when Clara Tagg Brewer opened in 1954.

Significant, too, is the factual context surrounding the 1952 option for 5th and 6th graders in the Beehive area to attend Gracemount. Given the fact that Beehive was under enrolled by 40 pupils in 1952 and Gracemount was over enrolled by 148 in that year, the only rational explanation for an optional zone that allowed student movement from the under enrolled to the over enrolled school is the providing of an escape valve for whites.

In anticipation of the 1954 transition of Williams from a K–4 to a K–6 school, the school board in 1953 constructed an additional eight classrooms at Williams ('53: 0%, 203/250).

As is shown below even before becoming K–6, Williams remained substantially under enrolled:

```
1953 0% 203/250
1954 0% 239/490
1955 0% 280/490
```

The construction of the additional classrooms at Williams enabled the upper elementary students residing in that area to return to Williams. These pupils must have all been white since Williams remained 0% black until 1960.

Beehive, on the other hand, was predominantly black (82.4%) and had become over-enrolled (1101/1015) in 1953. The combination of Williams going K–6 and the opening of C. T. Brewer in 1954 relieved the overcrowding at Beehive ('54: 54.9%, 1173/1015; '55: 53.9%, 604/1015). The whites went to Williams while the blacks went to Brewer which opened 99.1% black and 718/560.

It is clear that there existed clear racial identifiability between Gracemount, Williams, and Cranwood on the one hand, and Beehive, Brewer, and Moses Cleaveland on the other. This condition existed well into the 1960s when the board was well aware of the inherently suspect nature of black schools and white schools being maintained side by side.

| | Gracemount | Williams | Cranwood | Beehive | Brewer | Cleaveland |
|------|-----------|----------|----------|---------|--------|------------|
| 1952 | .4% | 0% | 0% | 87.3% | [12] n.o. | 28.3% |
| 1953 | 7.1% | 0% | 0% | 82.4% | n.o. | 29.3% |
| 1954 | 2.7% | 0% | 0% | 54.9% | 93.4% | 30.1% |
| 1955 | 5.8% | 0% | 0% | 53.9% | 99.1% | 35.0% |
| 1956 | 8.0% | 0% | .5% | 60.7% | 98.3% | 39.8% |
| 1957 | 11.8% | 0% | .5% | 57.4% | 100.0% | 44.3% |
| 1958 | 27.3% | 0% | .9% | 53.4% | 98.8% | 47.6% |
| 1959 | 46.6% | 0% | .5% | 55.3% | 98.3% | 51.1% |
| 1960 | 56.6% | 0% | 5.0% | 61.7% | 99.5% | 64.7% |
| 1961 | 74.6% | .2% | 9.8% | 68.4% | 99.5% | 73.0% |
| 1962 | 87.4% | 14.3% | 15.7% | 80.2% | 99.6% | 79.1% |
| 1963 | --- | --- | --- | --- | --- | --- |
| 1964 | 93.2% | 39.4% | 26.6% | 85.9% | 99.6% | 85.8% |
| 1965 | --- | --- | --- | --- | --- | --- |
| 1966 | --- | --- | --- | --- | --- | --- |
| 1967 | 99.8% | 99.4% | 64.8% | 97.4% | 100.0% | 97.9% |

A review of the area reveals that the above condition did not occur adventitiously, but rather was the result of Board action.

The addition to Williams so as to convert it from K–4 to K–6 might have been explained as an effort to standardize the grade structure through the system. It should be noted, however, that Cranwood (K–3) was closed and the new Cranwood built in its place was kept a K–3 school from 1958 until 1968.

Under these circumstances, the 1953 addition to Williams can only be viewed as a means for whites to remain there and not have to attend the majority black Beehive. It is significant that the Board chose to commit building resources at Williams when there was a great deal of room at Beehive ('55: 604/1015; '56: 741/1015) created by the opening of Brewer. ('55: 718/560, 99.1%). It would not have been unreasonable for 5th and 6th graders to

12. Not opened.

walk approximately 5600' to Beehive. The obvious effect would have been integrative since the Williams area was all white and Beehive was majority black. The building resources could also have been put to better use elsewhere in the city where there was acute overcrowding (e. g. Hough), as such overcrowding was not present here.

In 1955, Clara Tagg Brewer opened 93.4% black. The Brewer attendance area was taken from the southwest portion of the Beehive area ('53: 82.4%; '54: 54.9%).

Brewer was purportedly opened to relieve overcrowding at Beehive. The effect of its opening, however, was to drastically reduce the percentage of black at Beehive. That such might have been the primary objective of the board is indicated by the fact that Brewer opened 158 over capacity while Beehive suddenly became under enrolled by 411. Essentially, the board traded one over enrolled school for another.

Brewer continued to operate over capacity until 1957, when the Seville Homes housing project was closed. During this same period, Beehive continued to operate substantially under capacity. If, in fact, the board was genuinely concerned with overcrowding, readjustment of pupil assignment policy should have been effected so as to distribute students more equitably and utilize facilities more efficiently. If, instead, the goal of the board was the containment of blacks, the situation at Brewer reflected the substantial achievement of this objective.

The conclusion that the board was pursuing a policy of containment in the Beehive area is further supported by the situation at Gracemount. During this same period, that school was over capacity and overwhelmingly white (2.71%–7.96%). Yet the local Board made no effort to direct some of these students to Beehive (54.92%–60.71%) which had available pupil stations. In fact, the racial impaction was being encouraged by the Beehive to Gracemount optional zone. Consistent with this policy was the maintenance of tiny Cranwood at the periphery of the Beehive and Brewer zones.

Cranwood had a capacity of only 175, and remained less than 1% black through 1959.

In 1957, the board terminated the optional zone from Moses Cleaveland (44.3%) to Beehive (57.39%) that had been created in 1954. At the same time, changes were effected in the already existing optional zone from Beehive (57.3%) to either Gracemount (11.84%) or Moses Cleaveland (44.3%). The western part of the option remained in effect, that is to say, pupils living there could continue to choose to attend either Gracemount or Moses Cleaveland. The eastern portion of the optional zone was reduced in the southwest and maintained in the east with the new option to attend Williams (0%) and not Gracemount or Moses Cleaveland. Finally, in 1966, the optional zone from Beehive ('64: 83.9%) to Williams ('64: 39.4%) was reduced.

The 1957 termination of the Moses Cleaveland to Beehive optional zone appears not to have had a negative racial impact on the area.

The continuation of the western part of the Beehive to Gracemount—Moses Cleaveland optional zone is difficult to justify on other than racial grounds since the sending school (Beehive) was under enrolled by 275 while one of the receiving schools (Gracemount) was over enrolled by 30 students. Moses Cleaveland was under enrolled by 392 pupils at the same time.

With regard to the change in the optional zone, from Beehive to Williams, both schools were under enrolled, but Beehive to a considerably greater degree. The defendants' assertion that Beehive was overcrowded cannot be substantiated after the opening of Brewer in 1955 through 1964. Since Williams remained 0% black until 1961, the effect of the optional zone was clearly segregative. Any student who exercised his option to attend Williams from 1957–61 must have been white since Williams racial percentage remained unchanged at 0%. The clear effect of this option was to maintain or increase the racial impaction at both Beehive and Williams.

The reduction of the Beehive–Williams optional zone in 1966 may have been effect-

ed for legitimate administrative reasons or because the option had fulfilled its purpose as an escape valve for whites living in the Beehive area.

In 1958, the Cleaveland School Board constructed a permanent facility on the site for the Cranwood primary schools ('57: 0.49%, 212/175; '58: 0.94%, 213/175).

In the words of the local defendants, Cranwood, which consisted solely of portable structures from 1927 to 1958, was "a neighborhood K–3 school of longstanding." An examination of construction decisions for Cranwood may shed some light on the local defendants' use of the term "neighborhood school." To understand the significance of these decisions, it should be noted that Cranwood had shared boundaries with Moses Cleaveland and Beehive, both of which had significant black enrollments from at least 1940 forward. Its students, however, were assigned to the upper elementary grades at Miles school, which like Cranwood, did not have a significant number of black students enrolled until the early 1960s. Further, in the early 1950s, the school authorities decided to build a new elementary school in the southeast corner of the district. This school, Clara Tagg Brewer, opened 93.4% black. While Brewer and Cranwood do not in fact share a boundary, being separated by a small wedge of the Beehive attendance area, they may be thought of as essentially adjacent schools. It is painfully clear that at the time Brewer was being planned, school authorities were

also aware of the fact that some permanent structure should be provided for the Cranwood students. The choice of a construction site near Seville between 143rd and 147th streets would have allowed for the construction of a single integrated school. Instead, school officials during the 1950s built two permanent structures in this area, one an extremely small, virtually all-white school with an abnormal grade structure and the other a virtually all-black school which three years after its opening was operating with 221 available pupil stations. This figure happens to be greater than the entire Cranwood enrollment in the year that school officials authorized the construction of the new permanent Cranwood.

As with the other construction in the southeast corner of the district in the 1950s, at least some of this construction seemed unnecessary to provide adequate space for the children attending school in the area. The over building seems to have been the result of an effort to provide "white" schools in an area where black and white neighborhoods would otherwise fall within the same attendance areas. Some part of the available capacity in this area can be attributed to the closing of a public housing estate in the Brewer attendance area, but plainly not all of it. At a time when other parts of the school system were experiencing woeful overcrowding, the following figures reveal an odd sense of priorities in committing additional construction resources to this area:

| | construction date | enrol./cap. | % bl. | enrol./cap. | % bl. |
|---|---|---|---|---|---|
| Beehive | 1916 | 740/1015 | 57.4% | 715/1015 | 53.36% |
| Brewer | 1953 | 339/560 | 100.0% | 342/568 | 98.8% |
| Cleaveland | 1925 | 728/1120 | 44.3% | 680/1120 | 47.6% |
| Cranwood | 1957 | 212/175 | 0.47% | 213/175 | 0.94% |
| Gracemount | ? | 870/840 | 11.84% | 829/840 | 27.26% |
| Williams | 1951 | 440/490 | 0% | 494/490 | 0% |
| Total | | 3329/4200 | | 3272/4200 | |

One thing should be made clear. The court is not suggesting that all construction activity in this area was inappropriate. It recognizes that this was an area where new homes were being constructed. Rather, the court concludes that less construction was

required and could have resulted in more integration.

Plaintiffs allege that in 1958 an addition was constructed at Gracemount (27.3%, 829/840). In its response, the board states

that the purpose was not to add new classroom space but rather to replace a temporary unit already existing at the school. P.X. 74 reveals that this construction, however the defendant might characterize it, resulted in an additional 105 pupil stations at Gracemount. Noteworthy, too, is the fact that the board, in its own response, states that the enrollment at Gracemount was steadily decreasing for the five year period immediately preceding the construction.

It is also significant that Gracemount, in 1958, was not overcrowded (830/840). Given the fact that schools in the Hough area were bursting at the seams in 1948, it is difficult to explain the decision to add unnecessary classroom space to a school that was not overcrowded and whose enrollment had been steadily decreasing.

An analysis of the surrounding schools, once again, is revealing:

| | 1958 | | 1959 | |
|---|---|---|---|---|
| Rickoff | 93.3% | 970/1150 | 16.8% | 993/1155 |
| Cleaveland | 47.6% | 748/1120 | 51.7% | 1158/1120 |
| Beehive | 53.4% | 668/1015 | 55.3% | 754/1015 |
| Williams | 0% | 468/490 | 0% | 491/490 |

Since all of the above schools (with the marginal exception of Williams) were operating well below capacity, the only reason for construction at Gracemount would be to add capacity so as to foreclose the possibility of some of its students being re-assigned to Rickoff, Moses Cleaveland, or Beehive, all of which had substantially higher percentages of black students.

In 1962, a boundary change was effected whereby part of the Beehive (80.2%) attendance area was transferred to Brewer (99.6%). This process was repeated in 1964 when the racial percentages of the two schools were 83.9% and 99.6%, respectively.

These boundary changes appear to have had only a minimal impact on the racial isolation at Brewer and otherwise appear to reflect a reasonable utilization of the two schools involved. In addition, the boundary changes reduced the number of school children who had to cross the Erie Railroad tracks.

Noteworthy, though, is the School Board's sense of priorities with regard to overcrowding in this general area during the time period involved. While slight overcrowding at Beehive precipitated these boundary changes, nothing was done to relieve serious overcrowding at Cranwood ('62: 15.7%; '64: 26.6%). Cranwood had a capacity of only 175 and was overenrolled by 67 in 1962, and by 92 in 1964. Moses Cleaveland ('62: 79.1%; '64: 85.8%) was under capacity in these same years by 73 students and 34 students. It would appear that the board was unwilling to adopt the boundary change approach so as to relieve the Cranwood overcrowding for fear that assigning pupils to an identifiably black school would contribute to the "tipping" of the neighborhood.

In 1967 the Emile B. deSauze school opened 93.4% black with an enrollment of 528 and a capacity of 840. Assuming deSauze was opened in 1966, it most probably was planned around 1964, or at the very least, using 1964 data. The following chart depicts the area-wide situation at that time.

| | 1964 | enrollment/capacity |
|---|---|---|
| Brewer | 99.6% | 482/560 |
| Moses Cleaveland | 85.8% | 1086/1120 |
| Gracemount | 93.2% | 610/945 |
| Williams | 39.4% | 561/490 |
| Beehive | 83.9% | 1048/1015 |
| Cranwood | 26.6% | 267/175 |
| | | 4054/4305 |

As the above chart shows, the area had approximately 251 pupil stations available in 1964 which might reasonably have been viewed as insufficient to accommodate growth in student population in the area. Thus, it was reasonable to construct an additional school in the area. The issue, however, is the site selection for the new school.

The board, in its response, states that deSauze was built to relieve overcrowding at Beehive, which, in 1964, was only marginally overcrowded. By placing deSauze in the extreme southeast corner of the city, its student population could come only from Beehive ('64: 83.9%) and Brewer ('64: 99.6%). Under these circumstances, deSauze was predestined to, and did in fact, open predominantly black ('67: 93.4%).

At the same time that Beehive went slightly overcapacity, the situation at Cranwood was much more severe ('64: 26.6%; 267/175). If deSauze had been placed in the vicinity of Oakdale and East 154th Streets, it could have absorbed the overcrowding at Beehive, as well as the excess students from Cranwood. The result would have been an integrated school, not a foreseeably and predominantly black school.

It should also be noted that Cranwood became a full K–6 school in 1968 and that this change necessitated an addition to the school. Yet another addition was built in 1969. It must be assumed that the decision to convert Cranwood to a K–6 school was made well in advance of its implementation. Had deSauze been constructed between Brewer and Cranwood, the need for the construction of additions at Cranwood could have been obviated.

The year 1967 was also marked by the construction of the Adlai E. Stevenson school (99.3%, 680/875). In order to create an attendance area for Stevenson, several boundary changes were effected. A portion of the Williams (99.4%, 354/560) was given to Stevenson as was part of the Gracemount (99.8%, 945/945) area. Both Moses Cleaveland (97.9%, 1174/1120) and Rickoff (99.8%, 1083/1155) contributed part of their attendance areas to Gracemount.

By this time, the affected area had become virtually all black so that these actions did not actively add to the racial impaction of the area. There simply were no integrative alternatives to be found, and the underlying problem of overcrowding was resolved by these actions. It is indeed ironic that the absence of integrative alternatives was in large measure due to the prior segregative acts of the Board, which refused to make step-by-step boundary changes while there remained a significant proportion of white students in the area schools.

Cranwood became a full K–6 school in 1968 when an addition consisting of 9 classrooms was opened. At that time, Cranwood was 82.5% black with an enrollment of 575. As a result of the change in grade structure, a boundary change was effected so that 4th–6th graders in the Cranwood attendance area could now attend Cranwood rather than Miles (51.58%, 747/700) and Moses Cleaveland (98.05%, 1177/1120).

It should also be noted that in 1967, prior to the addition at Cranwood, some Cranwood students were transported to deSauze (93.37%, 528/840). All of the above actions appear defensible, especially since the only integrative alternative would have been Miles (51.6%) which was overcrowded and, in fact, the school from which the Cranwood K–4–6's were retrieved.

In 1968, some Cranwood (82.5%, 623/600) students were assigned to deSauze (99.05%, 317/840) where space was available. In 1969, an additional 12 classrooms were constructed at Cranwood, which in that year had an enrollment of 821. Given the enrollments of the surrounding schools, the addition appeared necessary, there being no viable integrative alternatives to the construction. Once again, these specific actions by the Board appear defensible.

Finally, in 1969, part of the attendance area for Beehive (98.6%, 888/1015) was transferred to deSauze (100%, 354/850).

This action by the Board points up the problems created by deSauze's site selection which was alluded to in the analysis of that school's construction.

The board states that this action was taken to relieve overcrowding at Beehive and had the added advantage of allowing pupils in the affected area to attend school without having to cross the railroad tracks that bisect the Beehive attendance zone.

Whether Beehive was actually overcrowded in 1969 is questionable. According to PX 39, Beehive had 888 pupils while the board places the figure at 1006. Neither figure exceeds Beehive's PX 74 capacity of 1015.

Although this action eliminated the need for some Beehive pupils to cross the railroad tracks, a large portion of the Beehive area was south of the tracks and children living there were not so fortunate. The placement of deSauze was in complete disregard for safety considerations which the board had stressed so strongly.

If deSauze had been constructed in the area of Oakdale and E. 154th Street, much would have been achieved.

First, the school would have drawn its student population from Beehive and Cranwood, and opened integrated. Second, the railroad tracks would have become a natural boundary and no student attending either Beehive or the relocated deSauze would have had to cross those tracks.

It is difficult to understand how the reasonableness of the above analysis escaped the board, unless it was deliberately ignored. Students in the present deSauze area can walk to Brewer by using side streets to reach Tarkington, which dead ends at Brewer. Had deSauze been located as the court suggests, it would have eliminated the crossing of the railroad tracks and provided the board with an integrated school together with the potential to relieve overcrowding at several others.

## SOUTHEAST CORRIDOR

For purposes of analysis, the court has focused the evidence by considering the conduct of school authorities as it related to discreet geographical areas of the school system. In developing a chronological understanding of how conditions evolved in each area, the court has then been able to compare what was happening in different areas at different times. Any method used to organize such a voluminous record at some point must be recognized to be somewhat arbitrary. The focus of activity with regard to student assignment decisions shifted gradually over the years. Thus, the next grouping of incidents to be considered is perhaps the most difficult to understand, as it involves a geographical area where the conduct examined did not radiate from a center, but rather involves incidents occurring along a corridor between the Central and Beehive areas, considered *supra.*

The first incident in this area considered in the plaintiffs' proofs was the creation in 1928 of two contiguous optional zones, one allowing students from Lafayette ('40: 38.4%) to attend Rice ('40: 0.77%), if they so chose, and the other allowing the reverse option. The data is not available to analyze the effect of these options when they were created. Their continuance from 1940 to at least 1964 appears to have had a foreseeably segregative effect as Rice was less than 5 percent black through 1959 and only 12.4 percent black in 1964. Meanwhile Lafayette was more than 50 percent black from 1944 on and more than 90 percent black from 1954 on. Since the options created a situation where children exercising the option from each zone might literally cross each other's path, there appears to be no convincing safety explanation for this zone. The explanation of local school authorities that it might have been the result of parental pressure to have children attend the older Rice school, which the parents might have attended as children themselves, is unconvincing since Lafayette had been open nine years at the time of the creation of the optional zone, according to P.X. 223.

In 1938 an optional zone was created allowing children from a portion of the Rickoff ('40: 8.9%) attendance area to go to Fulton ('40: 11.78%), if they so chose. Again there is no data which allows the court to assess the impact of this action at the time it was taken. However, in con-

trast to the dual optional zones just discussed, the creation of this particular zone appears to have been neutral in terms of racial effect. Both schools were experiencing a general gradual increase in the proportional black enrollment which was roughly parallel. It does not appear that the effect of the zone was to allow white students to attend a plainly identifiable white school nor to channel black students to an identifiably black school rather than the school to which they would normally be assigned. The termination of the zone in 1960 also appears justified, as the sending school was underenrolled while the receiving school was somewhat overenrolled. The pattern of allowing Rickoff students various other options, discussed below, however, does suggest that this action should not be judged separately, but as part of the series of decisions made with regard to Rickoff. This is done, *infra.*

In 1940, three optional zones were created in this area, the effect of which was to contribute to the identification of the sending school as the "black" school and the receiving school as the "white" school in each instance. The first of these zones allowed children from an area of the Cleaveland (7.4%, 1065/1120) attendance area to go to Corlett (3.1%, 524/630). During the 20 year period from 1940 to 1960, this zone gave white children residing in the affected area the option of avoiding Cleaveland which was becoming progressively more black during the 1940s. That the zone did not operate in an integrative manner is evident from the fact that Corlett's black enrollment remained very small during the 1940s and in fact dropped from 3.05 percent in 1940 to 2.7 percent in 1950. When Cleaveland became more than 50 percent black in 1949, Corlett had a black enrollment of only 14.8 percent. The argument of the local defendants that the zone was created because of safety considerations is unconvincing. Where safety is the true concern, the convincing response is a boundary change.

The second optional zone created in 1940 was from Rickoff (8.9%, 932/1155) to Dickens (5.5%, 636/1015). From the following enrollment figures, it is obvious that the zone operated as an escape valve for white students in the affected area until at least the late 1950s:

| | '40 | '45 | '50 | '55 | '60 |
|---------|-------|-------|-------|-------|-------|
| Rickoff | 8.9% | 14.0% | 25.1% | 70.7% | 97.5% |
| Dickens | 5.5% | 7.2% | ·8.6% | 31.9% | 88.2% |

Again the proffered safety explanation of the local defendants is unconvincing, all the more so since the zone created the safety hazard of having to cross 140th Street, apparently at least a major local traffic artery, for the students exercising the option.

The third optional zone also involved Rickoff, allowing children from yet another part of the attendance area to go to Corlett (3.1%, 524/630), if they so chose. While it is true that the receiving school in this instance was closer to the affected area, the safety factors on which the Board relies are not persuasive. This is particularly so in view of the numerous options which were being created for various parts of the Rickoff area at this time. Again the suggestion that parental desire to have children attend the same elementary school which the parent might have attended does not seem persuasive when the sending school had been open for such a considerable period. Parental pressure may have been involved, but the generating circumstances appear to be other than those suggested by the local defendants. Since Corlett remained a predominantly white school until the 1950s, while Rickoff became increasingly black, the effect of the continuation of the zone was plainly segregative for a period of at least 20 years.

Four of the five optional zones considered thus far in regard to the corridor area appear to have been calculated to remove whites from schools which were becoming increasingly black. The absence of convinc-

ing racially neutral explanations for the creation of these zones points strongly to the conclusion that this was not only the foreseeable effect, but the purpose of these actions. Such a conclusion is further bolstered by the fact that there is no suggestion that problems of overenrollment existed at any of the sending schools to explain the sudden interest in creating optional zones in this area. These four optional zones are apparently still in existence. Now all of the schools involved are overwhelmingly black, so the continuing direct effect of these zones as contributing factors to the present racial isolation existing in Cleveland schools must be viewed as *de minimis*. This does not undo, however, their indirect contribution to the current residential segregation. Had school authorities not acted so as in essence to direct white students away from certain schools, families with school age children might have made different decisions with respect to staying in the general area or moving into it. A notable characteristic of the corridor area, which the present discussion addresses, was that there were a number of schools in the area which had some degree of stable integration over significant time periods. This suggests that for some time the underlying residential patterns in this area were developing in a fairly integrated way. The actions of school authorities in channelling white students away from some schools in such circumstances must be viewed as contributing to the designation of certain residential areas as "black neighborhoods," i. e. portions of the attendance area of schools such as Rickoff and Lafayette. Thus the actions of the school officials appear to have contributed to racial residential concentration, which might not otherwise have developed. This type of relationship between the actions of school officials and emerging residential patterns is discussed in greater detail, *infra*.

In 1944, the Lafayette (53.5%, 583/1085) to Rice (0.9%, 532/1120) optional zone was expanded. That the intent in expanding this zone was not to promote integration at Rice by encouraging the transfer of some black students from Lafayette is clear from the fact Rice remained less than 50 percent black until 1967, 23 years after the creation of this option. The foreseeable effect was to give white students in the affected area an escape valve from the increasingly black Lafayette to the overwhelmingly white Rice. The only explanation offered by the local defendants was that Rice was the "parent" school, Lafayette having opened later, and that parents would want their children to attend the school which other members of the family had attended. This explanation is similar to that offered to explain the 1928 creation of the dual optional zones between Lafayette and Rice. Clearly the court must conclude that the local defendants were desperate in making such an argument. While school loyalties do develop, they are not so intense at the elementary school level in common experience to cause an otherwise unnecessary assignment decision 25 years after the "new" school had opened.

In 1941 yet another optional zone was created, allowing students in an additional portion of the Lafayette (38.4%, 593/1085) attendance area to go to Rice (2.0%, 565/1120). This time the local defendants indicate while the reason for creating the optional zone is unknown, it did permit children in the affected area to ride the 116th Street bus to Rice. They do not, however, attempt to explain why children would need to ride a bus to a school which was 3800 feet from the center of the affected area, when they lived approximately 1600 feet from the school to which they were originally assigned. The reason for the creation of this optional zone, as well as the three previous optional zones affecting these two schools is apparent when one reviews the proportional black enrollment at the two schools, as set forth below:

| | Rice | Lafayette |
|------|------|-----------|
| 1940 | 0.66% | 38.40% |
| 1941 | 0.55 | 40.84 |
| 1942 | 0.8 | 43.8 |
| 1943 | 0.9 | 48.8 |
| 1944 | 0.9 | 53.5 |
| 1945 | 1.13 | 58.46 |
| 1946 | 1.45 | 65.40 |
| 1947 | 1.03 | 69.06 |
| 1948 | 1.99 | 72.07 |
| 1949 | 1.23 | 74.51 |
| 1950 | 1.48 | 78.33 |
| 1951 | 2.0 | 78.4 |
| 1952 | 2.4 | 86.5 |
| 1953 | 2.3 | 89.4 |
| 1954 | 2.41 | 91.58 |

Plainly the racial isolation at these two neighboring schools did not just happen. It was the result of the manipulation of assignment patterns within a supposedly racially neutral neighborhood school program.

In 1951, an optional zone was created allowing students in a certain portion of the Fulton ('51: 38.8%, 518/700) attendance zone to go to Rickoff ('51: 29.9%, 625/1155).

Frankly, this action presents an analytical puzzle. If the local defendants' description of the area affected by this boundary change is accurate, the affected area was not contiguous to the attendance area of the receiving school, according to the 1947 map showing attendance boundaries. No explanation for the creation of such an unusual option has been proffered by the local defendants. The sending school was plainly closer to the affected area than the receiving school. There was no problem of overcrowding at the sending school. Both schools appear to have been enrolling an increasing number of black students. The receiving school did have a smaller percentage of black students, however, and the reasonable conclusion appears to be that white students in the affected area were being afforded the opportunity to attend a "whiter" school, if they so chose. Because of the above noted peculiarities, however, the court reaches this conclusion with less certainty than it has in its analysis of other alleged incidents.

Students in a portion of the Mt. Auburn (1.4%, 289/700) attendance area were given the option of attending Woodland (8.1%, 614/595) from 1952 until 1967. (The plaintiffs indicated that the option ran in the opposite direction, but this is not in accord with the 1967 school boundary map.) The defendants argue that this zone had an integrative effect, inviting the assumption that the affected area was a predominantly white residential area. If this assumption is correct, so is the defendants' argument.

Certainly the option seems justified in terms of distances, being approximately 2200 feet closer to the receiving school than to the sending school. On the other hand, the action seems odd in view of the fact that the sending school was operating at approximately 40 percent of its capacity, while the receiving school was slightly over-enrolled. Without information on the predominant racial composition of the affected area, which is not available to the court, it is not possible to determine whether this action was racially neutral, integrative, or segregative.

In 1954, students living in a specified part of the Lafayette (91.6%, 701/1085) area were given the option to attend Mt. Pleasant (19.5%, 559/665). In reviewing this zone, it should be noted that the explanation of the school authorities based on distances appears to be founded on faulty measurements. While the local defendants say that Lafayette was 3,000 feet from the middle of the affected area, the court measures the distance at roughly 2300 feet; similarly the distance to Mt. Pleasant was said to be 1,600 feet, but the court measures that distance at a minimum of 1,700 feet from the affected area. While these figures would mean that Mt. Pleasant was approximately 600 feet closer to the center of the affected area, such a relatively short savings in walking distance surely could not justify having the children cross Kinsman, a major thoroughfare, if safety were the paramount consideration which the local defendants have steadfastly maintained it to be. Further, the optional zone can not be justified in terms of overenrollment. The only apparent explanation is the disparate proportion of black enrollment at the two

schools. In 1954, Lafayette was 91.6% black. Although specific information on who lived in the affected area is not available, the court concludes that apparently when its black enrollment reached 90% plus at Lafayette, the school authorities decided to provide an escape valve to Mt. Pleasant for some of the white children.

In 1955, two optional zones were created giving students from specified portions of the Boulevard (8.2%, 462/700) and Revere (0%, 848/1015) attendance areas the choice of attending Mt. Pleasant (25%, 544/665). These two zones appear to have been justified, since the receiving school was considerably closer to the affected areas than either of the sending schools. Moreover, the fact that the options ran from less black to more black schools appears to refute any suggestion that these actions were taken to isolate blacks at the sending schools. The only possibly sinister view of these actions would arise from the possibility that they were taken in reaction to black families moving into the affected areas. There is little to support such an inference in the record, and the court will not indulge in such speculation.

The next incidents which involve this area included in the plaintiffs' proofs deal with incidents which occurred in the 1960s. The first was a "step-by-step" boundary change in 1960. A portion of the Fulton (100%) attendance zone, which was 43 students over capacity was transferred to Rickoff (97.5%) which had some 71 available pupil stations. A portion of the Rickoff attendance area was then transferred to Cleaveland (64.77%), which was approximately 305 students under capacity.

This action by the board points up its willingness to engage in, or at least its awareness of, the step-by-step method of relieving overcrowding. Unfortunately, its decision to utilize this procedure was often selective and appeared based more on racial considerations than the efficient use of underenrolled schools.

With regard to the specific action taken, it would appear that there were more integrative alternatives that were equally convenient. As to the first boundary change, Dickens (88.2%) located southwest of Fulton, had 201 pupil stations available, while as to the second, Corlett (27.8%) located southwest of Rickoff, was 252 students under capacity. In 1962, a boundary change which shifted a portion of the Mt. Pleasant ('61: 91.1%, 740/665; '62: 94.4%, 710/665) area to Revere ('61: 0.3%, 731/1015; '62: 15.8%, 895/1015) was made. This change had an integrative effect and appears to represent a distinct change in the school authorities' earlier pattern of being unwilling to relieve overcrowding of a predominantly black school through utilization of underenrolled white schools. While the school authorities appear to have done no more than was absolutely necessary to relieve overcrowding at Mt. Pleasant for that year, it was clearly a step in the right direction.

The forward thrust represented by the 1962 Mt. Pleasant-Revere boundary change was parried soon by the addition of seven classrooms and two kindergartens to Mt. Pleasant in 1964. As a result of the addition, a portion of the Revere (25.1%, 926/1015) attendance area was shifted back to Mt. Pleasant (96.9%, 770/910—post addition capacity estimate). The addition was perhaps an effort to anticipate the probability of growing enrollments in this area, but immediately its effect was to produce two underenrolled, adjacent schools, one of which was plainly identifiable as a "black" school and the other as a "white" school. Since the addition would have been planned very shortly after the 1962 boundary change, a reasonable conclusion is that the addition was planned to forestall the necessity of transferring additional students living in the Mt. Pleasant attendance zone to Revere and to reverse the 1962 boundary change. Such a conclusion is supported by noting the more pressing need for additional classroom space in other parts of the school system at this time and the appar-

ently high priority which was given this addition in the construction program begun in the mid-1960s. To some extent, the segregative effect of 1964 Revere-Mt. Pleasant boundary change may have been mitigated by a second boundary change transferring part of the Corlett (76.0%, 663/630) attendance area to Revere. Assuming that it was not essentially a "white pocket" which was so transferred, this boundary change suggests an integrative effect may have been accomplished. In light of the other circumstances surrounding this series of boundary changes, however, the court can not easily make the assumption that white students were not being skimmed from the Corlett population. In view of the absence of data as to the racial composition of the affected residential area, the court refrains from drawing any conclusion as to this specific boundary change.

Another 1964 addition of 14 classrooms and one kindergarten was built at Fulton (99.7%, 738/1190—post addition capacity estimate). This addition triggered a series of step-by-step boundary changes, including transferring portions of Rickoff (99.7%, 1229/1155) to Fulton, of Gracemount (93.2%, 1012/945) to Rickoff, of Cleaveland (85.8%, 1086/1120) to Rickoff, and of Gracemount to Cleaveland. At this point, the southern portion of the area under consideration, where these schools are located, had become predominantly black. This meant that there were no integrative alternatives to relieve the overcrowding which had developed at several of the schools. What is notable about the series of changes was the flexibility which school officials exhibited in making boundary changes once they no longer apparently had to consider whether the changes would result in moving black students into predominantly white schools. Such an approach to resolving overcrowding continued to be resisted and rejected by school officials where the areas involved included both overcrowded black schools and underenrolled white schools, as evidenced by the 1967 changes affecting Mt. Auburn.

An addition of eight classrooms was built at Revere ('67: 84.6%, 1302/1295—post addition capacity estimate) in 1966. Clearly some action was necessary to deal with the growth in enrollment at Revere, and the schools to which plaintiffs suggest Revere students might have been transferred generally were operating very close to their capacities in 1964. Basically, this area had developed in such a way that by 1967, there were no integrative alternatives.

The absence of integrative alternatives is again brought to light by a 1967 boundary change transferring a portion of the Revere attendance area to Corlett (99.3%, 1070/ ?). This change appears to have been precipitated by the construction of an addition at Corlett. However, since the court does not have information on the size of the addition, there is no way to estimate accurately the capacity of Revere. As a result, the court only can note that the theoretically available integrative alternatives were presented by Miles Park (4.9%, approximately 500/490), Woodland Hills (39.0%, 464/420) and Miles (39.2%, 791/700), all of which were themselves operating above capacity.

In 1967, two optional zones were terminated in the northern portion of this corridor, one between Irving (100%, 1055/980) and Woodland (80.0%, 616/595) and another between Mt. Auburn (53.6%, 379/700) and Woodland. The defendants' explanation of these cancellations is based on the overcrowding at the receiving school, Woodland. This explanation assumes, however, that such overcrowding was a recent phenomenon. In fact, Woodland had been overcrowded since 1957, although not as seriously as it apparently was in 1966. But since the school authorities contend that they were acting to alleviate overcrowded conditions, it appears that a step-by-step boundary change should have been employed to use some of the available space at Mt. Auburn to alleviate the continued overcrowd-

ing at Irving. One possible explanation for not having so acted is that Woodland's southern boundary was already very close to the school. But as noted above in reference to the boundary changes which occurred after the 1964 addition to Fulton, where the schools which potentially could be involved in step-by-step boundary changes were all clearly identifiable as "black" schools, the approach was employed liberally. The failure to use this technique appears to indicate an intention to maintain the "white" identification of Mt. Auburn, if at all possible.

The suspicious selectivity of school officials in sometimes dealing with overcrowding by building additional classrooms and sometimes choosing to change boundaries with a resulting isolation of white students from black students continues to be evident as late as 1969. In that year, school officials transferred part of the attendance area of Woodland Hills ('68: 49.5%, 473/420; '69: 63.2%, 533/420) to Union ('68: 0%, 410/490; '69: 0%, 438/490). Since Union had no black enrollment in the year which the change took effect, it must be concluded that the area affected by the boundary change was white. While it is true that increasing overcrowding at Woodland Hills justified some corrective action, it must be questioned whether the primary intent of the school officials was to deal with the overcrowding problem, which was not resolved, or to allow white children to attend a white school. If the object was to relieve overcrowding, surely school authorities would not have been content with a situation where Woodland Hills became increasingly overcrowded, while Union continued to be underutilized.

In 1971, the school officials undertook a series of boundary changes as a result of overcrowding at Boulevard, Revere and allegedly at Mt. Auburn. These changes included transferring portions of Mt. Auburn ('70: 92.04%, 578/700; '71: 99.5%, 583/700 to Rice ('70: 80.25%, 623/1120; '71: 86.2%, 636/1120) and to Boulevard ('70: 93.99%, 833/700; '71: 95.7%, 721/700), portions of Boulevard to Mt. Pleasant ('70: 99.8%, 838/910—post '64—addition capacity estimate; '71: 99.4%, 1031/910), portions of Revere ('70: 97.4%, 1642/1295—pre '71 addition capacity estimate; '71: 98.6%, 1527/1575—post '71: addition capacity estimate) to Mt. Pleasant, portions of Woodland Hills ('70: 75.25%, 578/ ?; '71: 84.8%, 796/ ?) and a portion of Boulevard to Woodland Hills. These changes also were apparently related to the opening of additions to Revere and Miles in 1971. There is also some indication in P.X. 223 that an addition might have been made to Woodland Hills in 1970, although there is no other indication of such an addition in the record of this case. These changes were in response to changing enrollment patterns in the area and indicate a flexibility in adjusting boundaries which the school officials frequently seem to develop once an area has become largely black.

The fluidity of boundaries in this area after it had become predominantly black is underscored by yet another boundary change, which transferred a portion of Revere (99%, 1521/1575—est.) to Corlett (99.7%, 916/1120), in 1972 just one year after the substantial redistricting described above. While clearly the change could have been of little consequence as far as racial impact, it is a notable example of the changed behavior of school officials toward boundary changes once an area has become predominantly black.

The final incident concerning this area with which the plaintiffs' proofs dealt was the 1975 construction of a replacement for the Woodland school, which opened as the Buckeye-Woodland school. The predecessor school had been destroyed by fire in 1970, and for a period, its students had been assigned to Observation, which then became known as Woodland-Observation. The school opened overwhelmingly black. There appears to have been no potential site which would have produced a markedly more integrative result, as is indicated from the figures for the surrounding schools:

| | Date Constructed | % black (1973) | 1974 enroll/ Ex. 74 cap. |
|---|---|---|---|
| Irving | 1883 | 99.37% | 616/980 |
| Wayne | 1914 | 89.05% | 638/665 |
| Rice | 1904 | 91.07% | 838/1120 |
| Mt. Auburn | 1922 | 99.09% | 650/700 |

While the schools listed above appear to have had sufficient theoretical capacity to accommodate the 350 students who were attending Woodland-Observation in 1974, the age of those buildings clearly supports the decision of school officials to go forward with new construction in this area. The only question which can be raised with regard to this incident is basically a paraphrase of the ultimate question in this case, whether any new school in Cleveland opening in 1975 should open with a student body which is more than 97 percent black.

## HOUGH–DUNHAM AREA

The area on the east side of Cleveland bounded by E. 55th street on the east, E. 107th street on the west, Superior Avenue on the north, and Euclid Avenue on the south is commonly known as the Hough area. Up until the middle 1950s, the Hough neighborhood was a primarily white neighborhood that was characterized by large homes and little or no public housing. In the late 1950s, the combination of a rapidly increasing population and a concomitant housing shortage caused many of the large homes in Hough to be modified so as to become multiple family dwellings. The transition from single family homes to small apartment buildings was aided considerably by significant real estate speculation in the area. (see discussion of residential patterns, *infra.*)

The schools in the Hough area at the present time can be divided into two distinct groups for the purposes of analysis. Each group consists of an older "core" school surrounded by four "satellite" schools. The first group is Hough, surrounded by Morgan, Orr, Martin, and Raper. The second is Dunham, surrounded by Wade Park, Attucks, Ireland and Rockefeller. Standing alone, but intimately involved in the Hough area, is the Bolton Elementary School. In recounting the relevant history of the Hough area, reference will necessarily be made to some schools not mentioned above.

Plaintiff's first allegation with regard to the Hough area dates back to 1933 when an optional zone was created from Giddings ('39: 98.9%) to Dunham ('39: 1.2%). Because of the vastly disparate racial percentages of the two schools, this optional zone would ordinarily require close scrutiny. But the absence of any pre-1939 data makes both analysis of this incident as well as discernment of its continuing effect virtually impossible.

A similar problem arises with regard to the 1933 optional zone from Bolton to either Hough or Observation. Later incidents involving Bolton, however, can be analyzed. For instance, the 1941 optional zone from Observation (52.88%) to Bolton (99.02%) as well as the 1944 optional zone from Bolton (94.67%) to Orr (50.23%) appear to reflect the school board's choice of the most integrative alternatives available. A similar comment is warranted with regard to the alteration of the Bolton-Hough-Observation optional zone in 1944. When Charles Orr opened in 1944 (as "Hough-Relief") the eastern portion of the optional zone was altered to allow pupils to attend either Orr or Bolton. The western portion of the optional zone remained essentially unchanged in that children were allowed to attend Hough, but not Observation. This seems an entirely reasonable approach given the fact that both Bolton and Orr appear to have been under capacity in 1955.

An optional zone was created in 1939 from Observation (50%) to Murray Hill. A second such option was created in 1952. The board's safety explanation would dictate a boundary change rather than an optional zone. The racial percentages of the schools' respective student bodies strongly suggest that these options were the result of the rising black enrollment at Observation.

In 1939, an addition was constructed at Dunham ('40: 1.2%). Six classrooms were added and in 1940, Dunham was still 297 pupils over capacity. Thus, the addition appears to have been totally justified. The alternative suggested by plaintiffs, Giddings (99.3%), could only have accommodated 39 additional pupils and the board's safety arguments are well taken in not using Giddings to relieve the overcrowding at Dunham.

Another apparently racially neutral act by the Board was the 1940 addition to Wade Park (0.1%, 816/700). Wade Park was indeed overcrowded at that time and while Hodge (0%) and Sowinski (5.4%) were under enrolled by 213 and 284, respectively, they appear to have been dismissed as viable alternatives because of distance rather than racial considerations.

In 1940, an optional zone was created whereby students living in the Hough (4.8%, 1127/1015) attendance area could, instead, attend Wade Park (.1%, 816/700). The optional zone was purportedly created to relieve overcrowding but the receiving school was also overcrowded. It is thus possible that the option was intended to provide an escape valve for whites at Hough who would not tolerate the presence of any black students.

Plaintiffs are apparently arguing that Sowinski (4.74%) should have been utilized to relieve the overcrowding at Hough. Given the racial percentages of the schools involved, such a course of action would not have had a significantly more integrative racial effect. The other schools suggested by plaintiffs were too far away to be considered viable alternatives, despite their apparent under enrollment.

Similarly, there appeared to be no integrative alternatives in 1941, when a boundary change transferred part of the Quincy (99.5%, 736/665) attendance area to Giddings (99.7%, 721/775), or in 1951, when part of the Quincy (99.5%, 737/665) area was transferred to Bolton (98.0%, 925/1050).

In 1942, an optional zone was created from Quincy (98.9%, 751/665) to Bolton (99.4%, 982/1050). While the local board attempts to justify this optional zone on the grounds that it eliminated the need for children to cross Cedar Road, it appears that the exact opposite was true. It also appears that Irving (69.2%, 467/600) was closer to the affected area than either of the two schools involved and was therefore a viable integrative alternative that was either not considered, or considered and not chosen.

In the same year (1942) an optional zone was created from Sowinski ('42: 4.9%, 563/875; '61: 59.6%, 988/875) to Hodge ('42:0%, 475/735; '61: 34.9%, 680/735). This option was terminated in 1961.

According to the calculations of the local defendants, the sending school was closer to the affected area than was the receiving school. However, the local defendants explain that the optional zone was created to eliminate the necessity of having young children cross E. 79th Street. The affected area was the only part of the Sowinski attendance area located west of E. 79th St. Had this end been accomplished by a boundary change, the proffered safety rationale would be quite plausible. The use of an optional zone coupled with the rising proportion of black enrollment at Sowinski suggests that safety was not the sole consideration. It is possible that this option was created in response to pressure to allow the children in the affected area to attend the all-white Hodge.

The termination of the zone in 1961 was accomplished by transferring the affected area to the Hodge Attendance area. As noted above, safety considerations do support such a boundary change. As in 1942, Hodge, the receiving school, continued to be

the more identifiably "white" school in 1961. However, both schools affected by the 1961 termination were statistically well integrated. Furthermore, the 1961 Sowinski enrollment exceeded the school's capacity. The boundary change was, therefore, warranted as a way of evening enrollment pressure.

In 1943, an optional zone was created whereby students living in a very small part of the Doan (15.5%, 552/490) attendance area could instead attend Wade Park (0.4%). The explanation proffered by the board is one of safety, but such considerations seem equally pertinent to other parts of the Doan area not included in the optional zone. The percentage of black students at Doan had risen from 2.1% in 1940 to 15.5% in 1943 and this fairly rapid increase suggests that the parents of white pupils may have considered the neighborhood to be "tipping" and demanded a means of escape. This inference is not contra-indicated by the fact that the school board would create an optional zone for such a minute geographical area.

This option was terminated in 1958 when both schools were more than 90% black. According to the board, this was in keeping with their policy of terminating an optional zone when the receiving school became overcrowded.

In 1944, an optional zone was created from Hough (5.2%, 1049/1015) to Doan (23.1%, 502/490). The option continued in effect until the opening of Charles Orr School in 1959. At that time Hough was 87.9% (1346/1015) and Doan was 98.1% (1185/805). Therefore, the option was from Orr to Doan.

Defendant school board is quick to point out that the option was from a predominantly white school to a predominantly black school. This fact, standing alone, is not dispositive of the effect of the optional zone or the foreseeability of such effect.

Shortly after the creation of this option zone, the black percentage at Hough dropped slightly to 6.0% in 1945, and 5.29% in 1946. During that same period, Doan's black percentage rose steadily to 33.7% in 1945, and 37.7% in 1946. It is difficult to determine whether these variations in racial percentage were the direct or partial result of the optional zone in question. The local board disclaims any knowledge of the racial composition of the optional zone, or of those students who exercised the option.

One additional comment is here required. Optional zones could operate in a segregative manner in at least two ways. The first, obvious, and probably more common effect would be to provide an escape valve for whites to avoid attending what was perceived at a "blacker" school. The second, and perhaps more subtle, segregative effect would be to encourage those black students who were attending a predominantly white school to exercise the option in favor of a more identifiably black school. Thus, an optional zone from a "whiter" school to a "blacker" school, rather than being integrative, would instead increase the racial identity of the schools involved.

East Madison (5.7%, 458/250) elementary school was remodeled in 1948, resulting in the loss of two classrooms which became an auditorium. East Madison's enrollment and racial percentages remained fairly stable after the renovation in question:

| 1949 | 7.6% | 460/250 |
| 1950 | 7.7% | 469/250 |
| 1951 | 6.7% | 511/220 |
| 1952 | 7.4% | 471/220 |

Thus the effect of this board action on both East Madison and the surrounding schools appears to have been racially neutral. Stanard ('48: 4.6%; 392/545; '49: 4.2%, 381/545), Wade Park ('48: 1.9%, 701/700; '49: 2.2%, 713/700), and Hodge ('48: 3.1%, 521/735, '49: 2.2%, 508/735) all continued to experience stable racial and numerical enrollments.

The overcrowding experienced by the Hough area schools began to peak in the mid-1950s. In 1954, a boundary change was effected transferring a portion of the Hough (48.49%, +502) attendance area to Dunham (47.74%, +234) and Wade Park (41.2%, +506).

The purported justification for this boundary change was the undisputed over-

crowding at Hough. The "remedy" selected by the board was to distribute the excess pupils in two other, already overcrowded, schools. The obvious alternative was a step-by-step approach whereby available space could be created at Wade Park and Dunham by adjusting their northern boundaries with the nearby or adjacent Case (10.5%, −99), Stanard (10.3%, −199), East Madison (10.8%, −70), and Sowinski (8.2%, −456). The board argues that these schools were too far from the affected area but chooses to ignore the step-by-step boundary changes which it utilized when it suits their purpose.

By failing to so involve the predominantly "white" schools on the periphery of the Hough area, the board was "advertising" its intent to contain the burgeoning black population in overcrowded, and therefore, presumably sub-standard schools.

Because of the severe overcrowding in the Hough area, there was a flurry of board-initiated action between 1952 and 1957. In 1952, some classes at Hough (22.7%, +299) were housed at Addison Junior High School. In 1953, portable classrooms were placed at Wade Park (26.6%, +382). Also in that year, a boundary change was effected from Hough (36.4%, +439) to Wade Park (26.6%, +382). An addition was built at Wade Park (41.2%, +506) in 1954. At the same time, yet another boundary change was effected from Hough (48.5%, +502) to Wade Park (41.2%, +506). In 1956, more portable classrooms were placed at Wade Park (70.3%, +407) and classroom space was rented in non-school owned facilities. Finally, in 1957 the sixth grade classes at Wade Park (85.2%, +655) were sent to Addison Junior High (69.8%, −285).

What emerges from this pattern of activity is an implosion of black students into Hough and Wade Park. At least three elementary schools Hodge (4800′), East Madison (3800′) and Sowinski (3800′) were within a reasonable walking distance, particularly for upper elementary students. That they were available to remedy some of the overcrowding is clearly evidenced by the following figures:

| | '53 | | '54 | | '56 | | '57 | |
|----------|-----|------|-----|------|-------|------|------|------|
| | en. | cap. | en. | cap. | en. | cap. | en. | cap. |
| Hodge | 3.1% | −201 | 3.4% | −230 | 3.27% | −284 | 2.0% | −331 |
| Sowinski | 5.8% | −462 | 8.2% | −456 | 36.1% | −175 | 44.2% | − 96 |
| E.Madison | 10.8% | +194 | 10.8% | − 70 | 16.2% | − 48 | 18.5% | − 74 |

It was patently absurd for the board to attempt to relieve the overcrowding at Hough by the 1953 and 1954 boundary changes with the equally overcrowded Wade Park. The fact that they partook of such folly is evidence of the zeal with which they sought to contain the black student population. This is particularly true when Hodge (6500′) and Sowinski (4800′) were within walking distance, at least for upper elementary students, from the area affected by the 1953 boundary change. These two schools were 6800′ and 5800′ respectively, from the area affected by the 1954 change.

It should be noted that the use of junior high school facilities for the housing of elementary school pupils while perhaps justified by the overcrowded conditions, is considered educationally unsound.

In 1955, the Charles Orr school opened 40.2% black and 425/315. A boundary change was effected whereby part of the Hough ('54: 48.4%, 1561/1015; '55: 53.9%, 1406/1015) attendance area was transferred to Orr. Also an option was given to some Orr students to attend Doan. ('55: 89.3%, 951/595).

Given the uniform condition of overcrowding throughout the Hough area, the construction of Orr seems totally justified. But the board seemed content to operate both Orr and Hough at well above their capacity when Observation (90.9%, −434) and Sowinski (28.5%, −438) were substantially under capacity and 4700′ and 8700′ respectively, from Orr. It would seem that under these circumstances, any reluctance

to employ short-run transportation would be overshadowed by the intense overcrowding at Hough and Orr.

In 1944, a portion of the Wade Park ('54: 41.2%, 1358/840; '55: 54.4%, 1385/840) attendance area was transferred to Sowinski ('54: 8.2%, 439/875; '55: 28.5%, 681/875). This action was commendable for two reasons: first, it relieved the overcrowding at Wade Park, and second, it had an integrative result on Sowinski. Unfortunately, the excess capacity at Sowinski could not be fully utilized since it would require moving the southern boundary of the Sowinski attendance area to within a few blocks of Wade Park.

In 1944, an optional zone was created from Orr (50.2%, 663/315) to Doan (89.3%, 983/805). Since the option ran from an integrated school to a predominantly black school, it would not appear to have been created as an escape valve for whites. Since both the sending and receiving schools were overcrowded, the only possible explanation for the optional zone would be to allow certain pupils who had started school at Doan to finish there, rather than transfer to the newly opened Charles Orr.

In 1956, portable classrooms were installed at Bolton (96.24%, 1222/1050). This action appears wholly justified since there existed no viable integrative alternatives. Observation (93.1%, 509/910) had available space and was adjacent to Bolton, but was also predominantly black. Other elementary schools with available space were beyond reasonable walking distance and could only assist in relieving overcrowding in the Hough area had the board chosen to utilize short-run transportation.

Waring (8.99%, −53) elementary school received an addition in 1956 that did not involve classrooms. Only an assembly room and some new office space were added to the school's physical plant. This incident suggests that the board had a strange sense of priorities. At a time when the area schools were experiencing a rapid increase in black enrollment and at times were over enrolled by 500 or more students, the board chose to devote part of its limited construction budget "to improve facilities" at an under enrolled, over-whelmingly white school.

In 1956, an addition was built at Charles Orr (56.1%, 663/525) to relieve the overcrowding at Hough (61.3%, +476). On this basis, the construction of additional classroom space at Orr was clearly justified. The question presented, however, goes to the board's narrow focus on the solution. Observation, at this time, had 403 available pupil stations, but was approximately 93% black, and this may have contributed to the board's reluctance to consider it as a possible aid in relieving the Hough overcrowding. The board argues that part of Observation was being used to house the Bureau of Visual Education and therefore, the apparent excess space was not available at all. The board, however, was free to relocate the B.V.E. and given the acute overcrowding in the Hough area, perhaps should have. In any case, it cannot rely on its own administrative decision which contributed to the overcrowding, as a defense to that overcrowding. Under these circumstances, it is difficult not to conclude that the addition at Orr was constructed in an apparent effort to insulate that school and Hough from the significantly more black schools to the south, Bolton (96.2%, −102) and Observation (93.1%, −434), which had available classroom space.

Both Dunham and Wade Park were deeply affected by the flurry of board activity in the 1950s. In 1953, four portable classrooms were placed at Wade Park (26.6%, +382). In 1954, six classrooms were added to Wade Park, which was then 41.2% black and some 506 students over capacity. From 1955–61, relay classes were held at Dunham. In 1956, 4 portable classrooms were placed at Dunham ('55: 55.8%, +379; '56: 70.1%, +491) and portables were also placed at Wade Park ('44: 54.4%, +335; '56: 70.3%, +407). In 1957, 12 Dunham classes and a Wade Park sixth grade were sent to Addison J.H.S. while a Wade Park kindergarten was housed in a rented space.

The use of portable classroom facilities and the farming out of elementary school classes to junior high schools is, at least, as arguable, albeit educationally unsound, method for dealing with overcrowded conditions. Had only these practices been followed, and had they fully resolved the overcrowding then existent, then the local board might only be guilty of poor judgment. But the fact of the matter is that these actions failed to alleviate the overcrowding problem partly as a result of not involving adjacent, predominantly white schools that had available classroom space. These circumstances, and the inferences that may be drawn from them, cannot withstand a charge that blacks were being contained in designated schools.

This conclusion is further buttressed by the board's use of relay classes which all parties agree provide the students with a substandard, or therefore unequal, education.

The busing of black pupils to predominantly black schools is also highly suspect. Once resort was had to the transportation of students, the only reasons for not sending pupils to nearby, predominantly white schools, that were operating under capacity are racial considerations. Dunham could have been serviced by Case, Stanard, and East Madison while Wade Park could have been assisted by East Madison, and Sowinski.

Sixth grade classes at Dunham elementary school were sent to Addison Junior High School in 1947 and in 1949, eight demountable classrooms were added to the physical plant. In 1950, four more portable classrooms were added at Dunham (89.9%, 2042/1645) and in 1960 Dunham pupils were housed in rented facilities.

The incidents occurring at Dunham, when reviewed in isolation, appear to be arguably justified in light of the severe overcrowding problem. But the same schools are constantly being described as "overcrowded" while a different group of schools is continuously being described as "too far to walk" or "not adjacent." The following table is indicative of the patterns that have developed and from which there has been little or no deviation.

| | 1958 | |
|---|---|---|
| Dunham | 89.9% | 2365/1645 |
| Hough | 84.9% | 1539/1015 |
| Bolton | 94.8% | 1327/1190 |
| Giddings | 99.6% | 1007/915 |
| | | 6238/4765 |
| | | +1478 |
| utilization rate | | 130.9% |

| | 1958 | |
|---|---|---|
| Hodge | 1.7% | 443/735 |
| E. Madison | 23.9% | 407/490 |
| Sowinski | 43.0% | 884/875 |
| Stanard | 36.6% | 505/595 |
| Case | 17.2% | 421/525 |
| Waring | 14.4% | 475/630 |
| | | 3135/3850 |
| | | −715 |
| utilization rate | | 81.4% |

From the above, it is clear that the cluster of predominantly black schools were vastly overcrowded and yet the Board continued to adhere to a "neighborhood school policy" that resulted in children (particularly black children) being educated in churches and storefronts.

The predominantly white schools, however, had no such problem. Only one of these schools, all of which occupied the perimeter around the black schools, was even marginally overcrowded, and then only by 9 students (Sowinski, 43.0%, 884/878).

■ There is no justification for black schools to be at 130.9% capacity while nearby white schools were at only 81.4% capacity. Adherence to a neighborhood school policy under these circumstances had the effect of creating or perpetrating racial segregation in these schools. Moreover, the vast disparity in utilization reflects an equally wide difference in the quality of education being provided. Under these circumstances, the schools were not only separate, but also unequal.

The use of boundary changes or short-run transportation was mandated by the unconscionably disparate treatment being afforded black and white children.

At some point, the failure of the Board to deviate from its "neighborhood school policy" can be viewed only as a conscious and deliberate choice to contain the black school children of Cleveland in racially identifiable schools.

The point was clearly reached in 1958 with regard to the schools discussed above. Any discussion of walking distance, railroad tracks, or busy streets must give way in the face of the invidious discrimination then being practiced.

In 1959, the local board constructed Crispus Attucks school. The need for the construction is not questioned. The method by which the board redistricted so as to create an attendance area for the new school, is, however, subject to attack.

As had been previously discussed, the opening of a new school necessarily involved the redistricting and reassessment of existing school attendance zones. After allocating an area for Attucks (1668/945) that school, as well as the other predominantly black Hough (1346/1015), Dunham (2238/1125), and Wade Park (1882/1155) were all over capacity (collectively, by about 2000 pupils in 1959). This condition, not merely allowed to exist but, in fact, created by the board upon the opening of Attucks, stands in stark contrast to the nearby predominantly white schools, Hodge (0%, 423/735), Sowinski (43.1%, 822/875) and East Madison (29.2%, 422/490), all of which had available space.

The board argues that these schools were too far for pupils to walk. This argument is predicated on measurements from Crispus Attucks to the particular school rather than from the closest neighborhood that might be affected by a boundary shift. East Madison, for example, is only 4000' walking distance from the overcrowded Wade Park, and clearly closer to the northern boundary of that school.

In January, 1961 Rockefeller elementary school (98.6%, 1281/1225) opened, and the following boundary changes were effected: a portion of the Dunham ('60: 95.4%, 1937/1645; '61: 96.4%, +333) and Wade Park ('60: 96.42%, +779; '61: 100%, +614) areas were assigned to Rockefeller. Another part of the Wade Park area was assigned to East Madison ('60: 32.2%, –69; '61: 46.3%, +48) as was a portion of the Hodge ('60: 0%, –311; '61: 34.9%, –271) area. In addition, 1961 marked the use of relay classes at Rockefeller along with the transportation of some of its students to Marion (38.4%, –191).

These last two events appear to have been an attempt by the Board to ameliorate Rockefeller's overcrowding, which was present from its opening. Once again, however, the Board appeared reticent to utilize the resources of under enrolled, predominantly white schools such as Hodge ('60: 34.9%, –271). There also appeared, however, to be some relaxation of the rigidity of this policy as was evidenced by the interaction between Wade Park and East Madison.

In 1961, relay classes were held at Daniel Morgan (98.4%, 1548/1085) and some students from that school were housed in rented facilities. In addition, a boundary change was effected from Morgan to Sowinski ('60: 49.4%, 909/875). The following table is illustrative of the situation:

| | 1961 | | | 1962 | |
|---|---|---|---|---|---|
| Hodge | 34.9% | 464/735 (271) | 28.1% | 662/735 | |
| Sowinski | 59.6% | 949/875 | 49.9% | 835/875 | |
| Morgan | 98.4% | 1608/1085 | 99.4% | 1461/1085 | (+376) |
| East Madison | 46.3% | 538/490 | 46.6% | 553/490 | |
| Stanard | 53.1% | 592/595 (3) | 55.5% | 535/595 | |
| Case | 13.5% | 445/525 (80) | 13.3% | 431/525 | |
| Waring | 20.8% | 467/630 (163) | 21.0% | 493/630 | |
| | | (517) | | | |

At the outset, it should be noted that both relay classes and the use of non-school facilities for instruction are considered educationally unsound. The implementation of these methods to relieve overcrowding is considered a last resort.

There is no doubt that Morgan was overcrowded and that some steps had to be taken to relieve that condition. The Board chose relay classes, the rental of parochial school classroom space, and a single boundary change with Sowinski.

In 1961, Hodge, Stanard, Case, and Waring had 517 available pupil stations. These schools ranged from well integrated (Stanard, 53.1%) to identifiably white (Case 13.5%). Had the board initiated a step-by-step series of boundary changes, the entire overage at Morgan (523 students) could have been assimilated into the available pupil stations (517) with an integrative result. Instead, Morgan found itself 99.4% black and 376 students over capacity the very next year (1962). Thus, virtually nothing was achieved by the 1961 board action.

It is highly likely that a step-by-step series of boundary changes among Sowinski, Hodge, East Madison, Stanard, Case, and Waring would have allocated the available pupil stations so as to relieve the overcrowding at Morgan with a minimum of inconvenience to the pupils involved. Some additional short run transportation might also have been required. That, however, would have been a small price to pay to eliminate relay classes, and the inferior educational opportunity that they offer. There is no reason why black children must endure relay classes and rented facilities, while a "white" school 5700' away, (Hodge) has 271 available pupil stations. In this case, the black children were not even afforded separate but equal facilities.

In 1962, Margaret Ireland School (95.4%, 1085/1085) opened, having taken its attendance area from Dunham (99.2%, 1543/1125), Rockefeller (97.5%, 1026/945) and Attucks (98.1%, 953/945).

The thrust of the plaintiffs' argument with regard to this incident appears not to go to the construction of Ireland, for again it was clearly required. Instead, they challenge the redistricting process by which yet another overwhelmingly black school was created from three other such schools. Left untouched were the boundaries of Case (13.3%) and Stanard (55.5%).

During the first year of Ireland's operation, it was over enrolled by 83 students and Dunham was over capacity by 107 students. At the same time Case was under enrolled by 94 students, and Stanard was under capacity by 60 students. The board contends that part of Case was being used as a dental clinic (which raises yet another issue, that of selective utilization) but offers no explanation as to Stanard. ^

The board also argues that for any of the students from the predominantly black schools to go to Stanard or Case, they would have to cross E. 55th Street, but fails to note that the Stanard attendance area itself is bisected by E. 55th Street and that such a safety problem was considered acceptable for those students.

The year 1962 marked not only the opening of Ireland, but also of Raper (99.4%, +163). In order to accommodate the new school, a portion of the Daniel Morgan ('61: 98.4%, +523; '62: 99.4%, +370) attendance area was assigned to Raper. Part of the Sowinski ('61: 59.6%, +74; '62: 49.9%, −40) area was transferred to Morgan and a portion of the Dunham ('61: 96.4%, +333; '62: 99.2%, +1) area was assigned to Ireland. Rockefeller '61: 99.6%, +347; '62: 97.5%, +163) and Wade Park ('61: 100%, +614, '62: 99.4%, +335) both transferred part of their attendance areas to Dunham. Wade Park and Crispus Attucks ('61: 96.97%, +600; '62: 98.1%, +115) also contributed part of their attendance areas to Raper, as well as to Dunham. The local board's response to this incident indicates that a portion of the Orr attendance area was transferred to Raper but it would appear instead that it was Hough that was involved. Finally, in 1962, both relay and transportation classes were held at Charles Orr.

The above actions represent the selective use of the step-by-step approach to adjusting boundaries so as to create an attendance area for a new school or to relieve overcrowding. The Sowinski to Morgan boundary change requires close scrutiny

since it both lowered the percentage of black students attending that school and resulted in under utilization of that facility. Since a similar result was achieved at Hodge and Stanard in 1962, there exists a strong influence that blacks were being contained, even at the cost of inefficient or underutilization of resources.

In January, 1963, the Mary B. Martin (97.0%, 1148/1085) school was opened, drawing its attendance area from that of Hough ('62: 98.4%, 1218/1015; '63: 1307/1015). Because of Martin's mid-year opening, and the unavailability of data for the period immediately thereafter, it is impossible to fully assess the impact on the overcrowding at Hough. The apparent effects of the opening of Martin included the retrieval of Hough's sixth grade class being housed at Addison Junior High School (1957), the termination of relay classes (1961), and the cessation of busing Hough students to Murray Hill (1962).

In 1963, a boundary change was effected whereby a portion of the Bolton ('62: 98.4%, 1329/1190) area was assigned to Giddings (100%, 851/1155) and Quincy (100%, 906/805). In 1967, the Giddings ('64: 99.6%, 1048/1155) elementary school was totally destroyed by fire. Its attendance area was assigned to Bolton (100%, 1046/1190). The Giddings school was replaced in 1970, and a boundary change was effected whereby part of Bolton (99.1%, 751/1190) was transferred to the new Giddings ('71: 98.2%, 624/1155).

In their response to this incident, the local defendants contend that both Giddings and Quincy had sufficient space in 1963 so as to assist in relieving the overcrowding at Bolton ( + 173 in 1962). But in what would have been the planning year for this boundary change (1962), Giddings and Quincy were over enrolled by 34 and 132 students, respectively. The over enrolled status of Quincy continued into 1963, when it was 118 pupils over capacity.

The board apparently chose not to employ Observation (93.3%) in the resolution of this problem which is curious in light of the fact that it was under enrolled by 323 pupils in 1962. The choice of this alternative would have had only a slight integrative effect, but would have resulted in a far more efficient utilization of resources and, therefore, presumably a better quality educational experience.

The 1967 boundary change from Giddings to Bolton seems entirely defensible given the sudden need to house the Giddings students displaced by fire and the fact that the facilities at Bolton, even with the additional pupils, were not over taxed.

With regard to the replacement of Giddings, and the subsequent boundary change with Bolton, the following figures should be considered:

| | | X74 Cap. | '67 | '68 | X223 Cap. | Const. Dates |
|---|---|---|---|---|---|---|
| 1. | Attucks | 99.6% 945 | 925 | 877 | 1015 | 1959 |
| 2. | Bolton | 100.0% 1190 | 1046 | 1041 | 1330 | 1971 |
| 3. | Burroughs | 99.7% 1225 | 932 | 832 | 1295 | 1911 |
| 4. | Carver | 98.9% 875 | 732 | 717 | 980 | 1953 |
| 5. | Dike | 100.0% 805 | 638 | 258 | 1085 | 1971 |
| 6. | Hough | 100.0% 1015 | 884 | 732 | 1085 | 1887 (closed in '75) |
| 7. | Ireland | 96.0% 1085 | 850 | 695 | 1190 | 1961 |
| 8. | Irving | 100.0% 980 | 1055 | 985 | 1170 | 1883 |
| 9. | Martin'68 | 100.0% 1085 | 893 | 791 | 1190 | 1962 |

| | X74 Cap. | '67 | '68 | X223 Cap. | Const. Dates |
|---|---|---|---|---|---|
| 10. Orr | 98.8% 525 | 403 | 454 | 525 | 1954 |
| 11. Quincy | 100.0% 805 10,455 | 895 9,253 | 732 8,114 | 1015 | 1896 |
| ( Giddings) | 1155 | | | 1190 | 1968 |

As is apparent from the above table, by 1967 the schools in the Hough area had become either totally or overwhelmingly black. In addition, the latter part of the 1960's was marked by a pattern of consistently decreasing enrollments. When Giddings was destroyed by fire, its enrollment was completely absorbed by neighboring schools. Under these circumstances, it is difficult to fathom why a replacement school was built, particularly when such school was unnecessary and destined to open overwhelmingly black.

When the Giddings fire occurred in 1967, Ireland (96%, 840/1085) and Attucks (99.6%, 925/945) were also called upon to accept part of the Giddings student body. Immediate action was required and these schools had available space. Case (8%) and Waring (11.3%) also had available pupil stations, but were considerably more distant from the affected area than Ireland and Attucks. The decision not to involve Case and Waring did have the effect of containing the black student population but under the circumstances, was administratively reasonable and justified as a short-term measure.

In 1970, a portion of the Sowinski (75.56%, 1056/875) attendance area was transferred to Charles Lake (100%, 878/1085). In that same year, the Sowinski area was further reduced by assignment of a portion of that area to Daniel Morgan (100%, 1003/1085).

The first boundary change, between Sowinski and Lake, appears to have involved only park land, and thus had no impact on the assignment of students to the two schools. As a result, a racially neutral effect can be ascribed to that act.

The second boundary change, however, was clearly segregative. The portion of the Sowinski attendance area transferred to Morgan lay south of Superior Avenue and encompassed a not insubstantial area. Yet the optional zone resulted in a maximum of only 2 white students attending the previously 100% black Morgan. Assuming more than 2 pupils exercised the option, which is likely given the size of the area involved, this means that blacks were leaving the whiter Sowinski to attend the blacker Morgan, thereby increasing the racial identifiability of the two schools. Moreover, Hodge ('70: 28.9%, 633/735) appears to have presented an integrative alternative.

In 1971, the Bolton replacement school (99.5%) opened, replacing the old Bolton (00.06%) and Observation (99.6%). The Woodland ('70: 90.66%, 600/595) school also was destroyed by fire in 1971, the students being sent to the old Observation until the new Buckeye-Woodland school could be built. Plaintiffs' exhibit 286–7 offers a confused recitation of the facts of this incident.

The wisdom of, or even necessity for, replacing observation must be questioned in light of the available space at the adjacent Murray Hill ('68: 0.8%, –847) and Anthony Wayne (45.1%, –170) in 1968, presumably the planning year for this replacement school. The utilization of these facilities would have had an integrative effect, although it should be noted that by 1971, Wayne had become 80% black. Under these circumstances, the decision to have a combined replacement for two schools that were over 99% black strongly suggests that at least one of the board's motives was containment. This conclusion is further buttressed by the following statistical analysis of the schools surrounding the two replaced schools:

| | | | X74 Cap. | X223 Cap. | Initial Construc. | Enroll. '68 | '69 |
|---|---|---|---|---|---|---|---|
| 1. | Bolton | 99.7% | 1190 | 1330 | 1971 | 1041 | 854 |
| 2. | Observation | 99.2% | 910 | | | 391 | 348 |
| 3. | Murray Hill | 0.8% | 1085 | 1190 | 1909 | 238 | 235 |
| 4. | Anthony Wayne | 45.1% | 665 | 840 | 1914 | 495 | 496 |
| 5. | Woodland | 83.6% | 595 | 735 | 1892 | 617 | 538 |
| 6. | WashingtonIrving | 100.0% | 980 | 1170 | 1883 | 985 | 935 |
| 7. | Quincy | | 805 | 1015 | 1896 | 732 | 626 |
| 8. | Giddings | | (1000) | 1190 | 1968 | | |
| 9. | Attucks | 99.2% | 945 | 1015 | 1959 | 877 | 696 |
| 10. | Martin | 100.0% | 1085 | 1190 | 1962 | 791 | 804 |
| 11. | Hough | 99.7% | 1015 | 1085 | 1887 | 732 | 792 |
| 12. | Orr | 98.7% | 525 | 525 | 1954 | 443 | 443 |
| | | | 8700 | 11385 | | 7353 | 6767 |

In addition, the placement of the replacement school in the southeast corner of the new combined attendance zone casts some doubt on the meaning and continued validity of the neighborhood school concept.

The second incident chronicled in this exhibit, the fire at Woodland and the sending of its students to Observation, cannot be properly analyzed because of the absence of essential information. Thus, it is impossible to assess what, if any, racial effect it had.

In 1972, a portion of the Dunham ('71: 99.6%, 748/1645; '72: 100%, 445/1645) attendance area was transferred to Attucks ('71: 100, 456/945; '72: 100%, 502/945.)

The board, in its response to this incident, states that this boundary change represented the first step towards the closing of Dunham. That closing is discussed more fully, *infra.*

It should be noted, however, that in attempting to justify their failure to involve East Madison ('72: 50.1%), the board states that in order to reach East Madison from Dunham, pupils would have to cross Superior Avenue. The 1967 map, however, shows that a significant portion of the East Madison attendance area *already* lay south of Superior Avenue. Apparently the board was willing to tolerate this condition in some circumstances, but not in others.

In 1975, Dunham ('73: 100%; '74:290/1645) elementary school, which was built in 1883, was closed. Its student body was dispersed among (1) Attucks ('73: 100%; '74: 459/945), (2) Ireland ('73: 98%; '74: 489/1085), (3) Rockefeller ('73: 99.8%; '74: 414/945), and (4) Wade Park ('73: 100%, '74: 570/1155).

The incident involves the closing of a 100 year old, 100%, black school and the reassignment of those pupils to four surrounding schools that are newer, but all 98%–100% black. The four schools to which the students were sent surround Dunham and that makes them appear to be the logical choice.

On the periphery of this area, however, lie Case ('73: 0%, 221/1190), Stanard ('73: 44.6%, 220/700), and East Madison ('73: 46.6%, 470/805). It is noteworthy, that in 1975, two years after the filing of this lawsuit, these three schools are still being preserved as identifiably "white" and protected from any incursion by black students.

First of all, it should be noted that even after the Dunham pupils are dispersed to the receiving schools, those four remaining

schools have 1943 empty pupil stations. While Attucks (1959), Ireland (1961), Rockefeller (1959) and Wade Park (1956) were all built during rapidly rising enrollments, it would appear that there could have been some consolidation of school attendance zones that would achieve greater integration and economy.

Secondly, the closing of Dunham forced the Board to re-evaluate the area's attendance zones and must have revealed the following: (1) Dunham shared a boundary with East Madison. There were sufficient pupil stations in E. Madison (470/805) to accommodate all the pupils from Dunham (290/1645). The use of short run transportation would have placed students from a 100% black school in a school that was 46.6% black; hereby achieving significant integration. (2) Rockefeller ('73: 99.8%, '74: 414/945) shared a boundary with Stanard ('73: 44.6%, 220/700). A large portion of the Stanard attendance zone lies south of Superior Ave. Thus, elementary children have to cross Superior Avenue to get to Stanard whereas they could reach Rockefeller merely by traversing side streets. Given the Board's primary concern over safety and the available space at Rockefeller, there is no possible explanation for these children to continue to attend Stanard, except to maintain the racial identifiability of the two schools. It must be remembered that this occurred in 1975 and children were assigned to a school that was further away, thereby violating the "neighborhood school policy," over a less safe route to avoid an obvious integrative alternative.

In 1974, the Hough ('73: 100%; '74: 502/1015) school was closed and the children sent to (1) Orr ('73: 100%; '74: 261/525,) (2) Raper ('73: 100%; '74: 527/1085), and (3) Martin ('73: 100%; '74: 404/1085).

When the decision to close Hough was made, enrollments in this area had dropped to the point that there was clearly no need to operate this school which had been constructed in 1893. The decision to assign the children from Hough to three of the six surrounding schools was a reasonable one in view of the available space at those three schools. In fact, there appears to have been sufficient space at Raper and Martin alone to house all of the children from Raper, Martin, Orr and Hough. While there was also ample available space at Doan ('73: 99.6%; '74: 490/805), Bolton ('73: 98.43%; '74: 678/1190) and Morgan ('73: 99.87%; '74: 791/1085), none of these choices would have been significantly more integrative. Thus there were no viable integrative alternatives consistent with the school officials' adherence to the "neighborhood school" policy. This conclusion, however, does not end the inquiry. For this incident, particularly when considered in light of other school closings and openings in this same year, is symptomatic of some of the basic problems growing out of the Cleveland Board's application of the neighborhood school policy, at least since 1954. First, there was apparently never any established policy as to what constituted a neighborhood school either in terms of the total desirable enrollment in a school or in terms of the geographical unit to be served by a school. Exhibit 74 indicates that there were elementary schools with capacities of 140 (Louisa May Alcott) at one end of the spectrum and 2030 (Tremont) at the other end. The irregularly shaped attendance zones vary radically in total included area, as a comparison of the S.E. Howe and Euclid Park areas readily reveals. The court recognizes that many of the Cleveland schools are old structures and that many of the boundaries follow natural or man-made features which suggest a logical dividing point. But the building program of the 50s, 60s and 70s does not appear to have proceeded toward any rationalization of the ephemeral neighborhood school policy. During the 1950s and 1960s, there was a large in-migration of families with school-age children first into the Hough area and then into the Glenville area. As the testimony at trial, on which both the plaintiffs and the local defendants place reliance, made clear, particularly in the Hough area the density in population was the result of conversion of the existing housing stock into smaller living units. Frequently, these

conversions were in violation of housing code provisions regulating the maximum number of families and individuals who could occupy a structure in safety and health. The structures which were converted were generally older frame houses and apparently some older apartment buildings. The existing schools in the Hough area were clearly incapable of handling the crush of students generated by these changes. The school officials responded to the serious problems of overcrowding in a number of ways, including double session classes, use of portable classrooms and rented classroom space, assignment of upper elementary classes to junior high school buildings, construction of additions to existing schools, transportation of students for a relatively brief period, and finally construction of new schools. All of these measures except transportation, were taken to implement the neighborhood school policy, that is to have children attend school in their own neighborhoods, however, that term might be construed in a particular context. Given the age of the housing stock and the high incidence of families renting in the area, it must be questioned whether but for the racial makeup of these "neighborhoods," school officials would have decided to make so many permanent capital investments in new school plants in this area. Plainly given the age of schools such as Hough, some new school construction was in order. But the concentration of such construction in areas of where the housing stock was in obvious decline suggests an absence of the usual planners' concern for the long-term need for capital improvements or some influence overriding this concern. Such an inference would be unwarranted if there had not been an option to this concentration of construction, that is transportation to under utilized schools on the perimeter of these neighborhoods. Looking either at system-wide figures for enrollment and capacity or at such figures for the area of the system east from downtown and north of Euclid Avenue, it becomes clear that the overcrowding was a localized problem for which many resources existed if there was the will to use them.

In 1974, the new Wade Park elementary school, consisting of 30 classrooms and two kindergartens was opened. In 1973, Wade Park was 100% black and had 612 pupils in attendance.

This incident is remarkable because it took place in 1975, two years after the filing of this lawsuit.

Wade Park ('73: 100%) was closed and a replacement school built because of Wade Park's age (build in 1898), according to the Board. The new school was apparently built virtually next door to the old building. There also appears to have been a boundary change effected with Dunham ('73: 100%) as a result of the closing of that school. Under these circumstances, there was no way that the new school would not present a mirror image of the old school's racial composition. Thus, it was totally foreseeable that the new Wade Park would open 100% black.

To the north of Wade Park, and contiguous therewith, are East Madison ('73: 46.6%, 513/490) and Hodge ('73: 35.4%, 594/735). These schools were build in 1889 and 1904, respectively, and were also prime candidates for replacement. Had Wade Park, East Madison, and Hodge all been replaced with a single, centrally located school, in a consolidated attendance zone, such school would have been 61.7% black and 38.3% white (based upon 1973 enrollments and racial percentages for the three schools). Given the fact that, in 1974, enrollments were steadily declining, a single integrated school for approximately 1719 students should have been a prime objective. Instead, Wade Park was built to open foreseeably 100% black, and to accommodate 612 pupils.

A look at the 1967 school map shows how Wade Park, East Madison, and Hodge form a triangle and how a school placed in the middle of the triangle would not have been much more inconvenient for any of the students involved. This incident, occurring in 1974, is clearly an overt act of containment.

It should be noted that East Madison and Hodge were, in 1945, being operated as

highly successful integrated schools. They had maintained relatively stable student populations and the area appears to offer a prime example of an integrated educational experience.

The fact remains, however, that the 612 students at Wade Park are racially isolated. No matter how commendable the integration at East Madison and Hodge, the clear segregation at Wade Park must be condemned. The consolidation of Wade Park, East Madison, and Hodge might have slightly altered the first two schools racial balance. But most importantly, it would have broken the racial stranglehold on Wade Park and enabled those pupils to participate in an integrated learning experience. It was this objective that should have been pursued most ardently.

In 1974 the new Marion-Sterling (97.8%, 660/ ? school was opened. One year later, Waring ('73: 3.2%; '74: 270/630) was closed with the pupils being transferred to the new Case ('71: 1.85%; '73: 221/ ?).

These events take on added significance because of the fact that they occurred in 1973–75. In 1975 Waring ('73: 3.2%; '74: 270/630) was closed. Waring had been built in 1884 and quite obviously was antiquated. The old Waring and old Case ('73: 9% 246/1190 areas were combined with all the pupils being sent to the new Case elementary school.

In 1973 the Board closed Marion (built in 1883; '72: 94.3%) and Sterling (built in 1869); '71: 98.8%) and opened the new Marion-Sterling ('73:97.8%).

It should be noted that Stanard (built in 1884; '73: 44.6%; 276/700) was not closed.

The first question is whether the new schools were needed at all. The entire 1973 enrollments of Waring, Case, Stanard, Rockefeller, Ireland, Carver, and Marion-Sterling could have been assigned to Rockefeller, Carver, and Ireland with 176 pupil stations left over. These three schools were relatively new, having been built between 1953–61. Given the fact that by 1973 enrollments had decreased sharply, the construction of two new schools (Case & Marion-Sterling) is itself questionable.

Assuming, however, the need for the two schools, the choice of the schools to be closed as well as the new school site selection was such as to create two segregated schools.

It is painfully clear that closing Marion ('72: 94.3%) and Sterling ('72: 98.8%) and building Marion-Sterling directly in the middle would cause it to open as a predominantly black school, which it did ('73: 97.8%).

Similarly, combining the old Case attendance zone ('73: 0%) with the closed Waring zone ('73: 30%) had the natural, probable, foreseeable, and actual result of causing the new Case school to open predominantly white.

Had Stanard ('73: 44.6%; 276/700, built in 1884) been paired with Case, instead of Waring, the resulting school would have been approximately 26% black (based upon 1973 percentages and enrollments). Stanard was the same age facility as Waring.

Had Waring been paired with Marion and Sterling, the resulting school would have been approximately 68% black as opposed to 97.8% black (based upon 1973 percentages and enrollments). Had both the alternatives been pursued, two relatively integrated, as opposed to clearly segregated schools would have been built and an additional 79 year old building would have been replaced.

Defendant makes much of the fact that children from the Waring area would have to cross several large streets to reach Marion-Sterling, as the reason for not pairing the two schools. But Marion-Sterling was constructed between Cedar and Central so that even its own children have to cross these two busy thoroughfares. Under these circumstances, defendants' argument loses much of its cogency.

Some final comments are required with regard to the local school board's utilization of the Murray Hill school. This school was built in 1909 and from 1952 through 1963 was rated by school authorities as having a

basic capacity of 1085. From 1940 forward, its enrollment has generally declined as indicated by the enrollment figures at five-year intervals.

| | | | | | |
|---|---|---|---|---|---|
| 1940: | 947, | 0% | 1960: | 384, | 0% |
| 1945: | 494, | 0% | 1964: | 313, | 0% |
| | | | (1965 figures not available) | | |
| 1950: | 760, | 0% | 1970 | 262 | 15.26% |
| 1955: | 530, | 0.57% | 1974 | 173 | 24.33%('73) |

As the accompanying racial percentages indicate, it is only in recent years that Murray Hill has had a significant percentage of black students enrolled. During the late 1950s and early 1960s, its enrollment was consistently less than one-half of its basic capacity. As testimony at the trial revealed, for a relatively brief period some of this available capacity was marshalled for the use of students who were transported from overcrowded, predominantly black schools.

By 1971, the theoretically available pupil stations which numbered 846 (1085 minus 239) were not actually available, school authorities point out, because space in Murray Hill had been rented to the county, classes for the educably mentally retarded were conducted there, and the school district's audio-visual division was located on the school's third floor. The above description, particularly in its use of passive verbs, imitates the explanations offered by school officials. The particular mode of expression obscures a basic aspect of each of these situations. That is, these conditions which made space at Murray Hill unavailable for regular elementary students not from the immediate neighborhood did not just spring into existence one day. They were the result of conscious administrative decisions. Particularly in the late 1960s, unused classroom space was becoming widely available throughout the system as a result of stabilizing or dropping enrollments and the ambitious school construction program underway. It is thus surprising to find such a concentration of special functions at a single older school.

These were not the only administrative actions bearing on Murray Hill which could be characterized as out of the ordinary operating procedures. Murray Hill has had an unusual grade structure throughout its history. Rather than including the typical kindergarten through sixth grade complement of classes, it has consisted of kindergarten through eighth grade. Yet at least as early as 1947, as the local defendants pointed out in response E–151, it has been the policy of the Cleveland School District to assign seventh and eighth grade pupils to junior high schools. At trial, testimony was offered in justification of this anomaly in grade structure. The reason given was that access to a junior high school from the Murray Hill area was obstructed by railroad tracks and streets with extremely heavy vehicular traffic. Yet again from response E–151, we see that railroad tracks and traffic problems in other areas of the city did not block the transfer of seventh graders to junior high schools.

The court concludes that the many administrative anomalies which characterized the operation of Murray Hill School had been motivated by a desire to allow white seventh and eighth grade children an opportunity to attend a largely "white" school and further motivated to the end of eliminating space at Murray Hill for the reassignment of children from predominantly "black" schools, should the problems of overcrowding which plagued parts of the school system in the 1950s and 1960s reoccur.

## GLENVILLE AREA

To the north and east of the Hough area lies a community commonly known as Glenville. It is bounded on the north by the City of Bratenahl, and on the south by Wade Park Drive. Its western boundary is Rockefeller Park, and its eastern boundary is the New York Central tracks at approximately East 131st Street. There are some sixteen elementary schools clustered within the Glenville area.

On more than one occasion, the eyes of the community were fixed on Glenville. In recounting the events that transpired there, it will occasionally be necessary to refer to other incidents that occurred either on the periphery of the area, or had some tangential effect on it. These collateral incidents will be alluded to, but are discussed more fully elsewhere.

In 1939, an optional zone, which is still in effect, was created from Rosedale ('40: 4%) to Murray Hill ('40: 0%). At that time Rosedale was overwhelmingly white and remained less than 10% black through the 1940s. Its racial composition changed rapidly. By 1956 it was 90% black. Murray Hill did not become more than 1% black until 1967. As a result, the continuation of this optional zone from 1950–67 had the effect of providing an escape valve for whites from the increasingly black Rosedale. Given the racial percentages of the two schools at the time of the creation of the option, racial considerations would appear to have been secondary to the safety factors cited by the board. In addition, the present effect of this option appears to be integrative as the optional area is now primarily black and the main source of Murray Hill's black enrollment ('73: 24.33%).

The year 1939 also marked the creation of an option zone from Doan ('40: 2.1%, 514/490; '53: 81.6%, 825/490) to Standish ('40: 5.89%, 849/1050) ('53: 89.3%, 944/1050). As with all optional zones, the absence of data as to the number and race of students exercising the option makes proper assessment of its racial impact extremely difficult. This is especially true where, as here, there is also no date whatsoever for the year that the option was created.

The optional zone now in question appears to encompass only a single block. Initially, the schools involved reflected approximately the same racial makeup, and in 1953, when the option was terminated, both schools were predominantly black. Regardless of what racial impact this optional zone might have had at the time of its inception, it appears to have long been dissipated.

In 1943, an optional zone was created whereby part of the Observation (55.1%, 352/910) attendance area was assigned to Rosedale (2.9%, 690/910). The area covered by the option was a single block consisting primarily of commercial and institutional structures. Although it would seem that very few children were affected by the option, it would appear that the effect of the option was segregative, given the racial percentages of the schools involved.

It should be noted that in 1956 a second option was created, covering essentially the same area, but allowing students to go from Observation (93.1%) to Murray Hill (0.0%). Rosedale, in 1956, was 90.81% black. This second option points up several relevant factors. If the original option was created for safety reasons, as the board contends, the reasonable option (or, more appropriately, boundary change) would have been to the very proximate Murray Hill. Murray Hill, however, was not involved until the two schools in the 1943 option had become more than 90% black. Since the racial percentage at Murray Hill fell from 0.63% in 1956 to 0.22% in 1957, one can only conclude that the creation of the second option did not have an integrative effect.

In 1945, an optional zone was created from Observation (68.7%, 265/910) to Doan (33.7%, 540/490). The board's proffered explanation that the option was created for safety reasons is not persuasive. While students would have to cross E. 105th and Euclid to reach Observation from the affected area, a single crossing guard would have significantly lowered, if not eliminated, the hazards involved. Moreover, the option required the children to travel a longer distance, through Wade Park which itself was intersected by the serpentine Liberty Boulevard. The board asserts that students could avail themselves of public transportation to get to Doan without encountering vehicular dangers but does not indicate why such public transportation could not be used to get to Observation.

■ This purported explanation for the optional zone becomes even less convincing when one considers that the option ran

from a severely under enrolled school to a significantly overcrowded school. As is evidenced by the following figures, Observation was experiencing decreasing enrollments characterized by increasing black percentages. Doan, on the other hand, had a rising student population which was also marked by an increasing black percentage, although not to the same extent as Observation.

| | | '44 | | '45 |
|---|---|---|---|---|
| Doan | 23.1% | 502/490 | 33.7% | 540/490 |
| Observation | 64.2% | 288/910 | 68.7% | 265/910 |

It is thus clear, that the option ran from an under enrolled, majority black school to an overcrowded, majority white school. Under these circumstances, it must be concluded that the option was created for racial reasons since there exist no cogent administrative or educational rationale.

In 1947, an optional zone was created whereby a minute portion of the Columbia ('47: 64%, 656/665) attendance area was transferred to Holmes ('47: 8.7%, 760/945).

This optional zone is immediately suspect because of the wide disparity in the racial composition of the two schools involved. Anytime children are allowed to move out of a 64% black school into an 8.7% black school, the problem of a "white escape valve" must be explored.

It is significant that only one building is involved. The defendant admits that the optional zone for this building, whether a single or multiple family dwelling, was created as a result of parental pressure.

In 1947, the Columbia attendance zone stopped on the South side of St. Clair Avenue. Thus, pupils who availed themselves of this option had to cross St. Clair to get to Holmes. Thus, the optional zone cannot be based on safety considerations since the route the students took was, in fact, less safe.

Neither can the option be explained by overcrowding at the sending school, Columbia ('47: 656/665) although Holmes also had room ('47: 760/945).

The suspect nature of this option is made even more clear by the northern boundary of the Columbia attendance area in 1947. In the exact area that is the subject of this option, the boundary is extremely jagged, going up one block and down another. It is not at all unreasonable to infer that the boundary was managed to keep "black" streets in Columbia ('47: 64%) and "white" streets in Holmes ('47: 8.7%).

It is difficult to accept the board's reason for the option as convenience since the attendance area itself had children who were closer to Holmes going to Columbia and vice versa.

Holmes (12.8%, 751/945) was again involved in the creation of an optional area in 1948, when part of its attendance area was assigned to Chesterfield (0.32%, 630/735). The option was terminated in 1958, in conjunction with the opening of Pasteur (98.7%).

The area affected by the optional zone appears to consist of only one block, containing about 19 homes. Since both schools were substantially under enrolled, the option could not have been created to relieve overcrowding. As with any optional zone, a safety argument is not convincing as pupils not given the option, or those having been given it, who do not choose to exercise it, are exposed to the same hazards cited by the defendants as justification for the creation of the optional zone. The data on black enrollment suggests that for at least a five year period after its creation, this optional zone provided an escape valve to a substantially less black school:

| | '48 | '49 | '50 | '51 | '52 | '53 |
|---------------|--------|--------|-------|-------|-------|-------|
| Chesterfield | .32% | 1.28% | 2.0% | 2.4% | 7.6% | 22.2% |
| Holmes | 12.78% | 14.97% | 18.9% | 27.6% | 42.3% | 53.4% |

The termination of the optional zone in 1958 seems totally justified as the newly opened Pasteur is located directly between Holmes and Chesterfield.

In 1951, Iowa-Maple opened 0% black as a K–3 school. At the same time, an optional zone was created from Iowa-Maple to Hazeldell (2.2%). This optional zone was terminated in 1963. Finally, a 1951 boundary change was effected among Holmes (27.67%), Iowa-Maple, and Hazeldell.

The initial construction of Iowa-Maple seems entirely reasonable. Although Holmes (27.6%, −131) and East Clark (1.1%, −153) both had considerable space available, and Holmes presented an integrative alternative, their distance from the affected area was prohibitive. Iowa-Maple was built for primary (K–3) students, and it is not reasonable to require such young children to travel the respective distances of 7200′ and 7400′ to Holmes and East Clark. Thus, the construction and placement of Iowa-Maple filled a clear need. The only possible critique of the action is the under enrollment of Hazeldell and Iowa-Maple through the mid 1950s. This condition, however, was not so marked as to characterize the construction of Iowa-Maple as a racially evasive act.

Similarly, the optional zone between Iowa-Maple and Hazeldell appears to have been a racially neutral act. Given the racial percentages of the two schools, the option had a negligible racial impact on each.

By the same token, the boundary change among Iowa-Maple, Holmes, and Hazeldell appears wholly justified. The thrust of this action was to have the school attendance area boundaries conform with the natural barrier formed by Rockefeller Park, and appears to have been devoid of racial motivation.

It should be noted that the apparent prior practice of the board was to have upper elementary students from the Iowa-Maple area walk to Holmes. This severely undercuts the board's protestations that the available space in Iowa-Maple was beyond the reach of the Glenville students and was thus not available to assist in relieving the overcrowding that developed there during the 1950s.

In 1953, two classes at Parkwood (89.9%, +100) were housed at Patrick Henry Jr. High (51.7%, −361). This incident was not addressed by the board in its response. In 1954, an addition was constructed at Parkwood ('53: 89.9%, +100; '54: 92.3%, −49).

Given the close physical proximity of Parkwood, Chesterfield, and Rosedale, those schools may be considered as a single planning unit, and this incident becomes susceptible to area-wide analysis. In 1953, presumably the planning year for the Parkwood addition, this area was not over enrolled, as the following figures indicate:

| | | '53 | | '54 |
|--------------|-------|-------|------|--------|
| Parkwood | +100 | 89.9% | −49 | 92.3% |
| Chesterfield | − 66 | 22.2% | − 7 | 40.97% |
| Rosedale | − 81 | 65.6% | −104 | 74.1% |

The school authorities chose to send elementary school pupils from Parkwood past Chesterfield, where there was available space, to a junior high school in contravention of both sound educational policy and the board's often-expressed concern that children should attend the school nearest their home. Moreover, despite far more acute overcrowding problems elsewhere in the city at this time, the board decides to

commit much needed construction resources at Parkwood. Both of these actions evince an intent by the board to contain blacks at Parkwood so as not to contribute to the further "tipping" of the Chesterfield and Rosedale attendance areas.

In 1954, three additional classrooms were constructed at Doan (83.7%, 941/595). Despite this addition, there still remained serious overcrowding at that school. Such overcrowding could have been further alleviated by utilizing the available pupil stations at Rosedale (74.1%, –104) and possibly Parkwood (92.3%, –49). While neither of these alternatives would have been significantly more integrative, they would have provided, at least, more equal school facilities and a higher quality educational experience for the students attending the predominantly black Doan.

In an attempt to cope with the rising student population, the board placed portable classrooms at Rosedale in 1954, 1956 and 1957.

The threshold question presented by this incident is whether portable classrooms were necessary in 1954. The following chart shows that while student enrollment at Rosedale was increasing, it was not until 1955 that the student population exceeded the 1952 capacity.

| | proportion black | enrollment/capacity |
|---|---|---|
| 1952 | 50.2% | 694/910 |
| 1953 | 65.6% | 717/910 |
| 1954 | 74.1% | 859/1050 |
| 1955 | 84.2% | 981/1050 |
| 1956 | 90.8% | 1051/1190 |
| 1957 | 90.0% | 1186/1400 |

It would appear that in 1956 the overcrowding at Rosedale warranted Board action. Instead of portable classrooms, plaintiffs suggest that interaction with three schools—Parkwood, Chesterfield, and Murray Hill—was the better choice.

Parkwood had approximately 53 pupil stations available in 1956. Because of its racial composition, however, it would not have presented an integrative alternative ('56: 98.5%).

Chesterfield also had available pupil stations in 1956 (–20), but was also identifiably black (84.7%). Thus, it too was not a particularly integrative alternative.

Murray Hill, however, presents a vastly different picture. In 1956, it had approximately 618 available pupil stations and was only .6% black. It was contiguous with the Rosedale district, but the Board would minimize the significance of that fact.

In its response, the Board states that children from Rosedale were not transferred to Murray Hill because they would have to cross Wade Park and Euclid Avenues and walk through a railroad underpass. In this regard, several observations are necessary.

First, Wade Park Avenue dead ends in the Rosedale attendance zone and is far less of a major thoroughfare there than it is further west. Secondly, some children in the Rosedale area already have to cross Wade Park in a northerly direction to reach Rosedale. It is difficult to see why children can cross Wade Park from South to North, but not vice versa. Thirdly, the problem of crossing Euclid Avenue could easily be resolved through the assignment of one or more crossing guards at key intersections. Finally, the fact that the children would have to walk *under* railroad tracks, and *through* an underpass, pales in significance compared to the fact that a 90.1% black school (Rosedale) was next to a .6% black school (Murray Hill).

It should be noted that Murray Hill lies approximately 4500' walking distance from the center of the Rosedale district. There are several attendance zones (e. g. East Clark, Euclid Park) that require pupils to walk farther. In a metropolitan school district such as Cleveland, it must be expected that busy streets and other obstacles will have to be negotiated by pupils on their way to school. It is one function of the

School Board to facilitate the crossing of these streets and obstacles and not utilize them as reasons for ignoring integrative alternatives.

In 1955, an addition, consisting of five classrooms and one kindergarten, was constructed at Columbia (95.2%, 949/665). By this time, there was virtually no space available at any of the schools within a reasonable walking distance of Columbia. Thus, absent any inclination to utilize short run transportation, the building of the addition appears reasonable.

Additions were also constructed at Holmes in 1955 (74.8%, +328) and 1947 (90.1%, +376) that resulted in eleven new classrooms at that school. Given the overcrowded conditions, the additions seem justified. But these additions did not fully resolve the overcrowding problem at Holmes and the board was unwilling to involve the adjacent Hazeldell ('55: 2.7%, −111; '47: 5.4%, −185) in attempting to alleviate the problem. This persistent reluctance to involve a predominantly white school, to which there was apparently easy access from the southwest corner of the Holmes attendance area, indicates an intent on the part of the school board to contain blacks at Holmes. Iowa-Maple ('55: 0%, −79; '57: 1.9%, −93) also presented an integrative alternative for resolving the overcrowding at Holmes, but perhaps was too far away for any non-transportation remedy.

Like most other schools in Cleveland during the mid 1950s, Doan elementary was also experiencing severe overcrowding. In an attempt to alleviate the problem, relay classes were introduced at Doan in 1955. In January, 1956, that school's kindergarten class was housed in rented facilities. At that point, Doan was 89.8% black and 502 pupils over capacity. In December 1956, five more Doan classes were farmed out to rented facilities. Finally, in 1957, the board constructed six additional classrooms at Doan (95.3%, +377).

The board's resort to such educationally unsound vehicles as relay classes and rented facilities might be viewed somewhat less harshly, had they fully resolved the basic problem of overcrowding. If such action was indeed a "last resort", the obvious containment of the black student population might be viewed as an unavoidable, albeit abhorrent, side effect. Such, however, was clearly not the case.

At the same time as black pupils were being educated in inferior conditions, reasonably nearby schools, some of which presented integrative alternatives (Sowinski and Murray Hill) and some of which did not (Rosedale and Observation) were not pressed into service, despite their available pupil stations which lay idle. Under these circumstances, the implementation of relay classes, which deprive the pupil of even a minimally acceptable education, cannot be justified. This practice, in the face of practicable alternatives, constituted an outright theft of those students' rights to even an equal educational experience, and can be explained only as the manifestation of an intention to contain blacks, at all costs.

This pattern of behavior continued into 1956, when the board placed portable classrooms at Chesterfield ('55: 61.8%, +74, '56: 84.7%, −20). The use of portables in this instance strongly suggests an intent to contain blacks given the available space at the then adjacent Hazeldell ('55: 1.7%, −111; '56: 3.1%, −177). The overcrowding at Chesterfield was far less acute than that of Hough and west Glenville schools. That the portable classrooms then available were sent to Chesterfield, rather than the other areas of far more pressing need, supports the conclusion that school authorities sought to contain blacks in the Holmes area. This conclusion is further buttressed by the available space at adjacent Parkwood ('56: 98.5%, −53) and Rosedale ('56: 90.8%, −78). Although utilization of these facilities would not have had a markedly integrative effect, it would have indicated an administrative intention to maximize the efficient use of resources, wherever they might be found.

In 1956, Rosedale lost a portion of its attendance area when that area seceded from the City of Cleveland and became a

part of the City of East Cleveland. The critical issue here was the role of the State Board of Education, and for a discussion of that issue, see *infra*.

Other Glenville elementary schools were undergoing the same kind of turmoil as a result of the overcrowding of the 1950s. In 1953, two Parkwood (89.9%, +100) sixth grade classes were sent to Patrick Henry Jr. High School. In 1954, one Columbia (93.6%), class was also sent to Patrick Henry Jr. High School and another class was sent to Empire Junior High School. In 1956, four portable classrooms were added to Parkwood ('55: 95.04%, +25; '56: 98.5%, −53), and four portable classrooms were placed at Standish ('55: 91.7%, +142; '56: 90.8%, +50). Also in 1956, two additional Parkwood classes were sent to Patrick Henry and two Standish classes were sent to Empire Junior High School.

By the school board's own calculations, Rosedale and Hazeldell are 3000' and 4800', respectively, from the Parkwood school itself, and clearly closer to portions of the Parkwood attendance area. Such walking distances are not unreasonably excessive, particularly for upper elementary children. Both schools had available space during the 1950s with Rosedale offering a somewhat integrative alternative through 1955 and Hazeldell presenting such an opportunity through 1959.

The obvious question, in view of the above circumstances, is whether portable classrooms and the use of junior high school facilities represented an effort by the board to contain the black student population so as not to contribute to the "tipping" of Hazeldell or accelerate the racial change in the Rosedale area.

On the basis of the facts presented, this question cannot be definitively answered. The overcrowding at Standish might have been dealt with by utilizing available space at Sowinski (4100' away) and Hodge—but was not. At the very least, however, there exists a negative inference from the board's decision to select less integrative and less educationally sound alternatives that were, perhaps, more convenient.

One of the most crucial issues raised at trial with regard to the Glenville area was the board's construction program during the ten year period from 1959–68. Over the course of that decade, the following schools were built: Morgan (1959), Pasteur (1959), Lake (1961), Landis (1963), Howe (1965), and Forest Hills Parkway (1968).

As with many other actions isolated by the plaintiffs, the planning and construction of Morgan and Pasteur were most defensible acts given the burgeoning enrollments in the Glenville area at this time. In fact, using the June 1958 enrollment figures in response E–114 and the exhibit 74 capacity figures, the five schools from which the Morgan attendance zone was drawn were over enrolled by a total of 1683. Certainly, the basic capacity of Morgan, 1085 pupil stations, was needed. The questions which arise have to do with the failure of the school authorities to more evenly distribute the students among these schools; Sowinski, which had a black enrollment of 43% in 1958 and 43.1% in 1959, enrolled 852 students and 830 students respectively in each of those years in a school plant which had a basic capacity of 875. Such conditions when considered by themselves are quite close to ideal. However, they must be viewed in the following statistical context.

| | enroll/ cap. | utiliz. rate | % bl: | enroll/ cap. | utiliz. rate | % bl. |
|---|---|---|---|---|---|---|
| Charless Orr | 671/525 | 128% | 74.8% | 547/525 | 104% | 84.1% |
| Doan | 1232/805 | 153% | 96.9% | 990/805 | 123% | 98.1% |
| Hodge | 443/735 | 60% | 1.7% | 400/735 | 54% | 0.0% |
| Hough | 1444/1015 | 142% | 84.9% | 1344/1015 | 132% | 87.9% |
| Wade Park | 1859/1155 | 161% | 92.1% | 1623/1155 | 141% | 96.3% |

The introduction of the figures for Hodge school which shared a long boundary with Sowinski leads to the conclusion that the neighborhood school policy was not neutrally applied when the school officials redrew school boundaries on the opening of Daniel

Morgan. Had there been a racially neutral reassessment of how to utilize the available school facilities in this general area, one must conclude that the available space at Hodge would have been pressed into the solution of the continuing overcrowding problem. The high correlation between low utilization rates and low proportions of black enrollment suggest purposeful behavior aimed at maintaining the white identity of certain schools. If school authorities had been concerned with the comparability of neighborhood schools, these types of disparities would not have been tolerated the year that a new school opened in the area.

Turning to the opening of Louis Pasteur, similar observations must be made. There can be little question as to the need for the school. Again using the June 1948 enrollments in response E–114 and exhibit 74 capacity figures, the over enrollment of the four schools from which the Pasteur attendance zone was carved was 859. However, the problem is focused when one realizes that in 1959, relying on exhibit 74 enrollment and capacity figures, these four schools plus Pasteur had over enrollments totalling 981. Under these circumstances, a racially neutral application of the neighborhood school policy would have seen such enrollment pressure more evenly distributed to nearby schools such as Iowa-Maple (15.6%, 292/385) and Hazeldell (15.9%, 1089/1190). While such boundary adjustments might not occur under normal circumstances because of what might be termed inertia, the opening of a new school by definition creates a situation of flux and is a natural time for reexamination and changes. The failure to make reasonable boundary changes in these circumstances suggests an explicit rejection of such alternatives. This plainly seems the case in not adjusting the Iowa-Maple and Hazeldell boundaries to handle some of the students crowding Holmes and Pasteur.

By 1961, when Charles Lake opened, all of the schools in the immediate area had enrollments which exceeded their capacities. Lake was planned to relieve the overcrowding at Holmes and Standish. However, by the time it opened, all three schools were substantially overcrowded, though not as drastically as Holmes and Standish had been in the two previous years. In fact, all of the schools in the Glenville area had enrollments higher than their stated capacity, in most cases substantially higher. Looking just at the schools listed in exhibits 293–13 and 293–14 and response E–117, Lake, Holmes, Standish, Iowa-Maple, and Hazeldell were over enrolled according to exhibit 74 figures by a total of 830. The first three of these schools had black enrollments 99% or more, Hazeldell of 68.5% and Iowa-Maple of 48.1%. At the same time, Memorial (2.6%), Brett (2.7%) and Longfellow (30.1%) had 1275 theoretically available pupil stations on the basis of exhibit 74 capacity. While it is clear that these three schools were beyond a reasonable distance for an elementary child to walk, they were "nearby" if bus transportation was considered. Whatever the justification provided by the "neighborhood school policy" in other circumstances, the juxtaposition of these two areas with such contrasting enrollment circumstances makes clear that the effect, if not the deliberate purpose of school authorities' decision not to employ short-run transportation to fully resolve overcrowding problems in Glenville schools, was to contain black children in overcrowded and, therefore, unequal facilities, while space went unused in schools which maintained a primary identification as white schools. While the failure to use such a short-run transportation strategy might not reflect a conscious decision where assignment patterns are stable, the opening of a new school is a natural time for the reevaluation of assignment policies. There is evidence in the record that the construction of Lake School focused the growing community concern over both the racial isolation in the Cleveland system and the widespread problem of overcrowding in predominantly black schools and leaders in the black community viewed transportation as part of the solution to both problems. Viewing all of this, it is clear that the rejection of such proposals was an omission to act which maintained segregation of black students in inferior, i. e. overcrowded facilities.

The Landis School opened in 1963 with a black enrollment of 99.9% black in a total enrollment of 1138. Its capacity was 1085. The necessity for the school could be demonstrated by pointing to the fact that "nearby" schools, i. e. Doan, Parkwood, Columbia, Holmes, Pasteur, Rosedale and Chesterfield, all of which had domino like boundary changes as a result of the opening of Landis, were over enrolled by a total of 1552 in 1961. Thus, if children were to attend schools which were not overcrowded, clearly additional facilities were needed. One way to provide such additional space was to build a new school. But as the testimony at trial made clear, such a solution took time, even when such construction was accelerated. In the meantime, another solution was to utilize available space elsewhere. In 1961, three schools in the general area, Murray Hill (0%), Longfellow (30.1%), and Brett (2.7%) had 1545 theoretically available pupil stations in 1961. Factoring in the enrollment situation at East Madison (46.3%, 583/490) there would still have been 1452 available pupil stations at those three schools. While some busing was undertaken from 1962 to 1964, the evidence indicates that it was not such as to take full advantage of the opportunity to equalize enrollments at just above optimum use in all of these schools. Instead, the evidence indicates that there was a rush to complete Landis to allow for the termination of a significant portion of the busing which was undertaken. As the local defendants note in response E–114, upon the opening of Landis, the transportation of Holmes students to Longfellow ended. The court is without the benefit of enrollment figures for the exact period when the busing ceased, but a comparison of the 1961 Holmes enrollment, 1597, and its 1964 enrollment, 1647, suggests that this cessation was premature. Similarly, the school authorities decided to terminate transportation of Chesterfield students to Murray Hill upon the opening of Landis. The available enrollment figures suggest that the overcrowding at Chesterfield had been nearly eliminated. But, again, looking at the distribution of students in the almost totally black schools of Glenville, particularly those affected by the opening of Landis, there was a total over enrollment of 942 in 1964. (This does not include a figure for Landis School itself for which 1964 enrollment figures were not supplied). In the same year, the predominantly white schools, Murray Hill, (0%), Brett (4.4%) and Longfellow (37.2%), near the edge of Glenville had a total available basic capacity of 1491. If East Clark (48.8%) which was over enrolled is included in the determination of the available capacity of this group of schools, the figure drops to 1434. Finally, in assessing the various boundary changes which occurred in the step-by-step adjustments accompanying the opening of Landis, perhaps the most notable is the one which did not occur between Rosedale and Murray Hill, despite the fact that, as the local defendants acknowledge, Rosedale did not receive substantial relief from overcrowding until 1965. In summary, while the construction of Landis was defensible, the implementation of assignment policies pursuant to its opening were segregatory in effect. It appears that under the rubric of the neighborhood school policy, there was a rush to concentrate black pupils in generally overcrowded, predominantly black schools, despite the availability of space in nearby predominantly white schools.

In 1965 the Board opened Howe, Roth, and Bethune elementary schools. These schools opened 99.1%, 99.1% and 100% black, respectively. When these schools were planned, presumably in 1963, there was justifiable concern among school officials over the rapidly increasing elementary school population. Relevant, too, was the apparent mobility of the population which had recently migrated out of Hough and into Glenville. Thus, as an abstract planning proposition, there was a need for additional pupil stations in the Glenville area.

The analysis of the Glenville area, as a single entity, is somewhat hampered by the absence of statistical data for the years 1963, 1965, and 1966. The following chart, however, is representative of the situation during the critical period.

| | Percent. | 1964 enroll/cap. | Percent. | 1967 enrollment/capacity |
|---|---|---|---|---|
| Roth | | | 99.1 | 1324/ |
| Howe | | | 99.1 | 782/ |
| Bethune | | | 100. | 740/ |
| Lake | | 1162/1085 | | 1103/1085 |
| Chesterfield | | 990/945 | | 884/945 |
| Columbia | 99.9 | 964/875 | 100. | 742/875 |
| Doan | 99.2 | 963/805 | 99.2 | 620/805 |
| Hazeldell | | 2313/1190 | | 620/1190 |
| Iowa-Maple | | 1249/1085 | | 1404/1085 |
| Landis | | 1138/1085 | ('63) | 938/1085 |
| Pasteur | 99.9 | 1173/945 | 99.9 | 896/945 |
| Standish | | 1159/1190 | | 1062/1190 |
| Holmes | 99.0 | 1647/1330 | 99.9 | 1156/1330 |
| Parkwood | 99.5 | 1010/1050 | 99.6 | 816/1058 |
| Rosedale | 99.7 | 1576/1400 | 99.9 | 1088/1400 |

The above schools are those grouped together in the 1965 School Housing Report as being in the Glenville area. In 1964, these schools had a total enrollment of 15,344 which was 2359 over their theoretical capacity. Thus, based upon actual 1964 figures, Glenville, at that time, required 2359 additional pupil stations to meet its present needs. Coupled to this was the School Board's projection, contained in its 1965 Housing Report, that the Glenville enrollment would reach 17,000 in 1967. Thus, the construction of Roth, Howe, and Bethune appears justified even though the actual 1967 enrollment for the Glenville area was only 14,872 or some 1518 under capacity. Viewed in a vacuum, the additional 3405 pupil stations provided by Roth, Howe and Bethune appear defensible.

As has been previously noted, the opening of a new school necessarily requires re-evaluation and revision of existing attendance zones. The fact that two of the new schools would open 99.1% black and the other 100% black could not have escaped the attention of the Board. In its various responses, the Board has mentioned its "step-by-step" method for relieving overcrowded conditions. The Board, however, chose to construct a new school, Bethune, virtually next door to an existing school, Rosedale (99.9%), rather than take an additional "step" into the Murray Hill (0%) area. In 1964 Murray Hill had only 313 students in a building with a capacity of 1085 and which had the potential for a highly integrative result. This alternative would have required the crossing of Euclid Avenue and walking under some railroad tracks. The former problem could have been solved through the use of a crossing guard while the latter is only of minimal significance.

It is difficult to see how the site selection of Bethune can withstand a charge of containment. The Board in its response, says that the Bethune district was formed from the Rosedale area. In fact—both the Bethune and Rosedale attendance zones are coterminous. This construction of a "double-deck" attendance zone is indefensible when the zone is contiguous with a zone that has over 700 available pupil stations (Murray Hill). The result is two 99% black schools "piggy-backed" next to a 0% black school.

The 1961 opening of Charles Lake (98.98%, + 70) precipitated a far-reaching series of boundary changes, as well as other board initiated action. A portion of the Holmes ('60: 97.76%, + 730; '61: 99%, + 248) and Standish ('60: 99.67%, + 239; '61: 99.60%, + 75) attendance areas were transferred to the newly opened Lake. Part of the Parkwood ('60: 99.5%, + 14; '61: 99.4%, –31) area was assigned to Columbia ('60: 99.8%, + 273; '61: 99.9%, + 182), and a part of Columbia, in turn, was assigned to Standish. Relay classes were held at Columbia in 1959, and 1960, and for one semester in 1962, 70 Columbia students were bused to Murray Hill. Finally, a por-

tion of the Pasteur ('61: 99.9%, +414; '61: 99.7%, +214) attendance area was assigned to Holmes.

These actions by the board are yet another example of the use of rippling boundary changes so as to distribute overcrowding burdens more evenly. While such action was not a total panacea for the student overpopulation problem, it did prove to be a highly useful technique which the board had eschewed during the 1950s.

Noteworthy, however, was the situation at Sowinski (49.6%, +74) and Hodge (34.9%, –271) in 1961. The failure of the board to utilize these schools strongly suggests that step-by-step boundary changes were selectively employed and that the rippling effect of these changes was deliberately halted at school boundaries that the board considered racial barriers.

In 1965, the Captain Arthur Roth ('67: 99.1%, 1324/1155) school opened having had its attendance area carved out of Hazeldell ('64: 94.6%, 2313/1190). In 1968, however, the situation was reversed, and part of Roth ('68: 99.5%, 1177/1155) was returned to Hazeldell (99.7%, 1079/1190).

The construction of Roth appears highly justified, given the extreme overcrowding at Hazeldell, which lay directly to the North. By the same token, the boundary change between the two schools was mandated by the availability of the new facilities. By 1968, the situation at Hazeldell had become sufficiently relieved to allow it to reclaim part of the area it had transferred to the newly opened Roth in 1964.

Proper analysis of this incident, and its ramifications, is hampered by the absence of statistical data for 1963, 1965, and 1966. For example, Iowa-Maple, to the North of Hazeldell, appears to have sustained a tremendous increase in its black population during that period which may have been either a cause or effect of the opening of Roth and the resulting boundary change.

This absence of data also relates to the 1963 addition to Iowa-Maple ('62: 77.0%, 736/1085; '64: 89.9%; '63: 1249/1085).

The addition of these 24 classrooms allowed Iowa-Maple to become a K–6, rather than K–3 school. As a result, the 4–6th graders in the Iowa-Maple attendance area no longer had to attend Hazeldell ('62: 85.8%, 2388/1190; '64: 94.6%; '63: 2313/1190).

While the board actions obviously helped minimize the overcrowding problem, one must question its failure to go further. By this point in time, school authorities had begun to utilize busing elsewhere in the system to relieve overcrowding. There was available space at Longfellow ('62: 31.2%, 369/700; '64: 37.2%, 428/700) which was easily within reach of short-run transportation, although beyond walking distance. Because of the gaps in the statistical data for the mid-60s, it is not possible to determine whether the acute overcrowding at Hazeldell continued after the expansion of Iowa-Maple.

Between 1963–68, five Holmes ('62: 98.9%, +334, '64: 99%, +317) kindergarten classes were housed in rented facilities. This was in addition to the 1959 transfer of seven Holmes classes to Glenville Junior High School.

Although the rental of non-school owned facilities might evince an intent to contain black pupils in this area, there is simply insufficient data to make such inference conclusive. Such practice is counterproductive, both educationally and integratively, and could be condoned only in the complete absence of alternatives. It further appears that this action did not fully resolve the overcrowding problem and this fact further clouds the issue of motivation.

In 1968, Forest Hills Parkway opened with a proportional black enrollment of 99.6%. Because of the unavailability of data for 1965 and 1966, the court is unable to reconstruct the context in which the initial planning of this school took place. The local defendants have noted that it was planned to relieve overcrowding at Roth, Hazeldell and Iowa-Maple. This justifica-

tion must be evaluated in light of the data available to the court. The court has considered data for 1964, 1967, 1968 and 1969 for the schools in the area.

ENROLLMENTS

| | Capacity | 1964 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|
| Bethune | [13] | not open | 740 | 710 | 661 |
| Chesterfield | 945 | 990 | 884 | 820 | 796 |
| Columbia | 875 | 964 | 742 | 686 | 648 |
| Doan | 805 | 963 | 620 | 546 | 580 |
| Hazeldell | 1190 | 2313 | 1317 | 1079 | 977 |
| Holmes | 1330 | 1647 | 1156 | 1091 | 941 |
| Howe | [13] | not open | 782 | 761 | 750 |
| Iowa-Maple | 1085 | 1249 | 1404 | 904 | 869 |
| Lake,Charles | 1085 | 1162 | 11031 | 991 | 962 |
| Landis | 1085 | 1138(68) | 938 | 898 | 830 |
| Pasteur | 945 | 1173 | 896 | 830 | 798 |
| Parkwood | 1050 | 1010 | 816 | 773 | 718 |
| Roth | [13] | not open | 1324 | 1117 | 1110 |
| Rosedale | 1400 | 1576 | 1088 | 1030 | 1000 |
| Standish | 1190 | 1159 | 1062 | 1115 | 992 |
| Forest Hills Parkway | 665 | not open | not op. | not op. | 850 |

| Totals: 1964: | 12985 | 15344 | 14872 | 13351 | 13482 |
|---|---|---|---|---|---|
| 1967: | 16390 | (includes Bethune,Howe, and Roth) |
| 1969: | 17055 | (includes Forest Hills Parkway) |

In light of the foregoing figures, it must be questioned whether the construction of Forest Hills Parkway School was necessary at all. While the elementary schools to the east of Forest Hills Park, i. e. Iowa-Maple, Hazeldell and Roth, were over enrolled, there was sufficient capacity in schools in the Glenville area to provide adequate space for all elementary students. Indeed the concentration of construction in the Glenville area from 1959 onward had by 1967 resulted in 1518 theoretically unused pupil stations. This calculation does not even consider spaces available in the further distant schools in the northeast corner of the city.

Assuming that step-by-step boundary changes through the Glenville area could not have obviated the construction of yet another school in that area with the consequent impaction of black students, the more serious question arises of whether the site selection for Forest Hills Parkway was intentionally segregative. During the 1960s the enrollment at East Clark was growing at a significant rate ('60: 777; '67: 990; '68: 1113). In fact, in 1966, an addition of four classrooms was constructed at East Clark, which had previously had a theoretical capacity of 770. The initial planning of this addition and of the construction of Forest Hills Parkway Elementary school was presumably essentially simultaneous. Thus school officials were aware of overcrowding not only at Roth, Hazeldell and Iowa-Maple, but also at East Clark. The court assumes that the 1966 addition to East Clark raised its theoretical capacity to 910 (770 + (35 × 4) = 910). The problem of overcrowding at East Clark was obviously not fully resolved by this addition. Selection of a site to the east of Iowa-Maple could have been as effective in relieving overcrowding on a step-by-step basis as was the site actually used to the west. At the same time, it could have also served to fully relieve the overcrowding at East Clark. Most significantly for the focus of inquiry in this case, a school which has as part of its attendance area a portion

13. The individual capacities of Bethune, Howe, and Roth are not known. However, the court has determined the aggregate capacity of these three schools to be 3405. This figure was deduced from the discussion of the capacity of the schools in this area in the 1965 housing report and the known capacity figures from P.X. 74 of other schools in the area.

of the East Clark ('68: 42.49%) attendance area might have opened less segregated than did Forest Hills Parkway. The site selection for Forest Hills led to the clearly foreseeable result of opening a segregated school, when a reasonable integrative alternative appeared to be available. This pattern of site selection which heightened racial isolation even where integrative alternatives existed appears to have become a practice of school officials in the 1970s, as discussed *infra.*

In 1969, an optional zone was created whereby part of Holmes ('68: 99.8%, 1091/1330; '69: 99.9%, 941/1330; attendance area was assigned to Forest Hills Parkway ('68: 99.6%, '69: 100%, 840/____). This option is still in effect.

This optional zone, in and of itself is of little significance. It does, however, point up the problems in the site selection of Forest Hills Parkway, as discussed more fully, *supra*, in the analysis of the Glenville elementary school construction.

In 1970, a boundary change was effected from the Charles Lake (100%, 878/1085) area to Sowinski (7.56%, 1056/875). In that same year, part of the Sowinski area was transferred to Daniel Morgan (100%, 1003/1085).

The school board indicates that the area encompassed by the first boundary change involved only parkland, having no bearing on the assignment of students, and thus no racial effect.

The second boundary change, however, appears to have had a segregatory effect. The area taken from Sowinski (75.56%), when added to Morgan (100%) reduced the latter's black percentage by only .2% (Morgan was 99.8% black in 1971). Hodge ('70: 28.9%, 633/735) appears to have presented an integrative alternative.

## NORTHEAST AREA

The area to the east of Glenville, for analytical purposes can be considered in connection with the Glenville area, in regard to only the events from the late 1960s to date. However, to gain a proper perspective on the local defendants' treatment of this area, separate discussion of the area taking into consideration decisions of school officials dating back to the 1940s is appropriate. The nucleus of such an analysis is Longfellow school which in 1940 had a significant proportion of black students (12.4%). Other schools in the vicinity of Longfellow had the following proportional black enrollment in 1940:

```
Brett 2.69%
East Clark 2.40%
Memorial 0.99% ,
```

When compared with the systemwide average of 14.48 percent black enrollment in regular public schools in 1940, this suggests that the underlying residential patterns in this area were more integrated than most other areas of the city.

The first action of the local defendants concerning this area included in the plaintiffs' evidence is the transfer in 1946 of the seventh grade classes formerly conducted at Longfellow (18.5%, 361/700) to Collinwood (2.9%, 1138/3548), which was then operated as both a junior and senior high school. In the court's view, this action appears to have had an integrative effect. To have acted otherwise would have subjected the board to the charge of containing junior high school students at Longfellow, a significant portion of whom would be black.

What is interesting about this incident is the board's explanation that "where possible, junior high school students, e. g., the 7th grade, who were in elementary schools were sent to junior high schools." The board's persuasive argument with regard to this action calls attention to its inconsistency in failing to apply such a policy to Murray Hill. While Murray Hill is not included in the geographical area now being treated, this does seem the appropriate time to make a few observations about the seventh and eighth grade classes which continue to be conducted at Murray Hill. In 1946, when the board indicates it was attempting to make its grade structuring uniform for schools throughout the system, the Murray Hill (0%) elementary school attendance area was included in the attendance area of Fairmount Junior High School (58.6%). In

the year that this case was filed, 1973, had Murray Hill (24.3%) not provided seventh and eighth grades, the students in those classes would have been assigned to Davis Junior High School (100%). The unusual grade structure maintained at Murray Hill for at least 30 years after school officials had eliminated such arrangements in all other schools in the district reasonably must be judged to be a blatant effort to provide white students with the opportunity to attend a clearly identifiable white school.

In 1947, an optional zone was created permitting students in a portion of Longfellow (23.3%, 407/700) to attend Memorial (1.6%, 488/1015), if they so chose. The affected area was located in the northern portion of the Longfellow area, and the local defendants contend that it was substantially closer to Memorial. This argument overlooks the fact that the option was given to only one street and that there were portions of Longfellow further north of the affected area which would have been even further from Longfellow and closer to Memorial, yet the students in this area were not given the option. Further, the alleged safety hazard on which the defendants rely, the crossing of 140th Street, was one which confronted students from a large area of Longfellow attendance zone who were not given any options.

In fact, the local defendants' attempt to argue that safety considerations were a significant consideration in this decision calls attention to the anomalous southern boundary of Longfellow. That boundary followed a railroad track on its eastern half, but on the western portion dropped down to include a residential area much of which was considerably closer to East Clark (1.0%) than to Longfellow. The court does not have data on the racial composition of this residential area. However, it does find this portion of the boundary highly suspect in light of the school officials' oft-expressed concern about having children cross railroad tracks. In fact, an examination of the the theoretical number of pupil stations in East Clark, Memorial and Longfellow in light of their 1947 enrollments reveals that had school officials chosen to do so, they might have operated two moderately integrated schools in this area, instead of two virtually all-white schools and one "black" school. Specifically, the theoretical capacity of East Clark and Memorial totalled to 1785, while the 1947 enrollments of these two schools plus Longfellow totalled only 1496. The specific data for all three schools for 1947 is:

| | enrollment/capacity | % black |
|---|---|---|
| East Clark | 401/770 | 1.0% |
| Longfellow | 407/700 | 23.3% |
| Memorial | .488/1015 | 1.6% |

Since the northeast corner of the city was characterized by fairly large attendance zones, the attendance areas which would have resulted had such an approach been adopted would not have been greater than the average in that area. Further, had the school officials chosen to operate only East Clark and Memorial, they could have drawn the boundary between the two attendance areas to correspond precisely with the railroad tracks, thereby eliminating the apparent safety hazard which this created for children in the most southerly portion of the Longfellow area. The court concludes that this particular optional zone is a minor manifestation of the school officials' general inclination to contain at least the black elementary students in this area at Longfellow to the extent possible, at the same time allowing at least some of the white students assigned to Longfellow the opportunity to attend a "white" school.

The next specific action which involved Longfellow was in 1963 when the attendance boundary for East Clark ('62: 4.0%, 850/770; '64: 4.3%, 843/770) was shifted to assign a portion of the area to Longfellow ('62: 31.2%, 369/700; '64: 37.2%, 428/700). Certainly the enrollment figures for the two schools at this time bear out the necessity for some action to relieve the overcrowding at East Clark. Looking only to the percentage of black enrollment at the

two schools, the action was seemingly integrative. However, comparing the relative stability of that percentage figure at East Clark after the change would have been effective with the increase in that figure at Longfellow, it may not be reasonable to rest with this superficial conclusion. Another factor to be considered in this scrutiny is that the boundary change increased the portion of the Longfellow attendance area which was south of the railroad tracks in the area. Finally, Longfellow was not the only school adjacent to East Clark which apparently had space available for use in dealing with the overcrowding problem at East Clark. Brett ('62: 2.94%, 579/1010; '64: 4.4%, 563/1010), which was located to the east of East Clark, was operating at slightly over half capacity. Under these circumstances, the court believes that it is warranted in speculating that the particular action which was taken to relieve overcrowding at East Clark might have focused on a residential area which had been or was becoming significantly black. If this were so, the legitimate action of school officials in dealing with a recognized problem would be tainted as the foreseeable effect of such action would be the further isolation of black students in the area at Longfellow.

In 1964, a portion of the Longfellow attendance area which was in the vicinity of a freeway construction site was designated as an optional zone, allowing the students in the area the choice to attend Memorial. The explanation of the local defendants that this zone was created because of safety considerations associated with the freeway construction seems to be factually supported.

In 1966, an addition of four classrooms was constructed to deal with the continued overcrowding at East Clark. The court estimates that this action increased the theoretical capacity of East Clark from 770 to 910. This addition has been discussed, *supra*, in relation to various construction decisions which were made in Glenville in the mid and late 1960s.

The persistent problem of increasing enrollment at East Clark and the resulting overcrowding precipitated yet another boundary change in 1969, shifting an additional portion of the East Clark ('68: 42.5%, 1113/910; '69: 57.7%, 1094/910) area to Longfellow ('68: 42.5%, 409/700; '69: 35.8%, 486/700). As was the case with the 1963 boundary change, the need for some action to relieve overcrowding was clear. Again, however, the question arises of whether the alternative of utilizing the available space at Brett ('68: 5.05%, 475/1010; '69: 4.97%, 462/1010), which was clearly the more integrative option, was rejected in an effort to maintain the white identification of Brett. The fact that Brett's proportional black enrollment had dropped from 13.98% in 1967 to 5.05 percent in 1968 would support such an inference. Further the explanation of the local defendants as to why Longfellow was chosen as the receiving school cuts against their insistence that safety was their overriding consideration.

The walking distance from the center of the affected area to both Longfellow and Brett was virtually the same. In its response, the board says that Brett was not considered as a receiving school because of safety factors involved. The board conveniently ignores the fact that the decision it made required students to cross railroad tracks, near what board documents call a railroad yard. The purported danger involved in the route to Brett is a "five-point" intersection, where E. 152nd Street and St. Clair meet. The dangers presented in crossing city streets can be met by use of crossing guards. In the court's view, guarding against the dangers presented by the attractive nuisances of a railroad yard and other industrial uses along the route to Longfellow is not as easily accomplished.

The local defendants also argue that there was no available space at Brett because the County was renting "numerous" classrooms for the training of the mentally retarded. Assuming that all of the available classrooms had been rented to the County, it was the board which chose to enter

into this arrangement, perhaps to preclude just such integrative actions as a boundary change with East Clark.

Finally, school officials began construction of East Clark Relief in 1975. This incident is among the most damning evidence in the record. The planning of this school presumably has taken place since the filing of this suit. East Clark Relief was constructed to relieve overcrowding at East Clark ('73: 93.2%, 1174/910). The relief school is located on Woodworth Ave. in the extreme southwest corner of the East Clark attendance zone. As a result, it will draw its students from that area, and reflect the existing racial composition of East Clark, and perhaps from the Iowa-Maple ('73: 100%) attendance area. Thus, there was no doubt that East Clark Relief would open predominantly black.

To the east of East Clark, and contiguous therewith, lies Brett ('73: 4.1%, 410/1010). The surplus students at East Clark could have been assimilated by Brett without overcrowding at either school. The result, quite obviously, would have been enormously integrative. Instead of constructing East Clark Relief, the board might have bisected the East Clark and Brett attendance areas, along a line coterminous with St. Clair Ave. This would have assigned one "white" quadrant and one "black" quadrant to each school thereby integrating both schools.

Moreover, by making St. Clair Ave. the boundary between the two schools, no child attending those schools would have to cross that thoroughfare. It should be noted that approximately half of the Brett students currently must cross St. Clair Ave. The integrative alternative recognized by the Court would have eliminated that hazard.

The board, in its response, makes reference to the fact that Brett was built on shale, and its floors have buckled. If such is the case, a reasonable solution would have been to build a new school which would replace Brett, which was built in 1919, and provide relief for East Clark. Instead of constructing a new integrated school through redrawing of boundaries, the board has chosen to build a new predominantly black school, on the very border of the district.

The pattern followed by the board with regard to East Clark Relief is the same as that followed with Marion-Sterling, Rosedale and Bethune, the replacement of Wade Park, and others. Even more disturbing than the obvious containing effect of East Clark Relief is the fact that its construction, like many other segregative acts of the board, occurred almost on the eve of trial. By that time, any integrative alternative should have been seized by the board. Failure to do so can only be interpreted as a conscious segregative choice by the board.

## WEST SIDE

One of the areas of the Cleveland School District that was in issue at trial lies on the west side of the city. As has been noted earlier, and stipulated by the parties, the city of Cleveland suffers from severe residential segregation. Virtually all the blacks live on the east side. There is, however, a small pocket of blacks on the west side—a vestige of the grouping of black laborers at a railroad depot in that area.

The area, and schools in question, was not analyzed in detail at the actual trial, but like many other allegations, received full treatment in the board's written responses to the plaintiffs' allegations. The area in question is relatively small, when compared with the east side, but it managed to generate considerable board action.

In 1930, an optional zone was created from Longmead to Hawthorne, and in 1975, this optional area was incorporated into the Brooklawn area.

The analysis of this incident requires an overview of the racial composition of the schools involved:

| | 1940 | 1950 | 1960 | 1970 |
|-----------|----------|----------|---------|--------|
| Longmead | 12.8% | 13% | 14.7% | 22.4% |
| Hawthorne | 5.1% | 7.7% | 6.0% | 5.8% |
| Brooklawn | not open | not open | 49.6% | 53.7% |

What is here involved, therefore, is an optional zone from a school with a greater percentage of black students to a school with a lesser percentage of black students, which requires closer scrutiny.

In its response, the Board does not allege any overcrowding at Longmead which necessitated the creation of an optional zone. Instead, the board states that the option was created because Hawthorne was closer and safer to reach from the affected area. The intersection of 130th Street and Bellaire and a railroad trestle are cited as the primary safety factors.

As has been stated on numerous occasions, it is clear that an optional zone, in and of itself, does not alleviate safety problems. If, in fact, safety was the major consideration, a boundary change along Bellaire would have been more rational. The choice of a single street for the optional zone is puzzling since a large area of the Longmead attendance zone still had to cross Bellaire and the tracks to get to school.

A review of the 1967 school map points up the inconsistency in the Board's position.

Brooklawn opened as a K–3 school. Yet the Board created an optional zone for these children in the Brooklawn area to instead attend Longmead. In order to get to Longmead, these pupils must cross 130th Street and Bellaire and walk under the railroad tracks. It would seem that the Board alternatively emphasized and then subordinated the safety hazards presented by 130th Street and Bellaire and the railroad tracks.

Since the safety argument presented by the Board in justification for this optional zone is not persuasive, it must be concluded that the option, from a blacker school to a whiter school was racially motivated. The fact that Longmead continued to rise in black percentage while Hawthorne remained highly stable seems to support this conclusion.

In 1955, Tom Johnson (0%, 455/350) was constructed drawing its students from Longmead (17.14%, 998/770).

To understand the import of the construction of Johnson, the following data for the 1954 school year is significant:

| | proportion black | enrollment/capacity |
|----------|------------------|---------------------|
| Agassiz | 1.34% | 673/700 |
| Garfield | 0% | 564/410 |
| Hawthorne| 8.4% | 726/700 |
| Jones | 0% | 448/560 |
| Longmead | 20.21% | 998/770 |
| Ward | 0% | 573/630 |
| | | 3982/3770 |

As the above figures indicate, a problem of overcrowding had developed in this area, with Longmead, Garfield and Hawthorne bearing the brunt of it. The situation was not significantly changed in 1954 from what presumably was the planning year for Johnson, 1952. In that year, the enrollments at Longmead, Garfield and Hawthorne were 906, 568, and 722, respectively. Under these circumstances, new construction was appropriate. The particular response of the Board, however, in choosing to construct Johnson in a corner of the school district where it could only serve to relieve the problems of Longmead is the first anomaly presented by this Board action. The second odd characteristic of this site choice by the Board was that it missed the opportunity to cure the safety hazard presented by the railroad tracks which separated the northern portion of the Longmead attendance area from the school. Instead of redefining the Longmead attendance area as that area for all practical

purposes bounded by three sets of railroad tracks (there appears to be no residential development south of the C.S.L. tracks or east of the B & O tracks) and the city limit, the school authorities for some reason constructed a second school within this area and tolerated the continued bisection of the Longmead area by C.C.C. and the St. L. tracks. Not only was the northern portion of the Longmead area separated from the school by railroad tracks, it was also separated by a large industrial triangular tract. Reasonable application of sound administrative policies would have dictated a different site selection for the new Johnson school, one available not only for solving overcrowding at Longmead, but also at Hawthorne and Garfield.

When the above factors are considered in light of the fact that Johnson opened as a totally white school, though its parent school had a significant black enrollment, the court concludes that the Johnson site was intentionally selected to open as a white school at the expense of other desirable administrative considerations.

In 1957, Brooklawn opened as a K–3 school with optional zones running to that school from Hawthorne, Agassiz, and Longmead. Finally, in 1972, an addition was constructed at Brooklawn.

The effect of the opening of Brooklawn is best shown by the following chart:

| | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|
| Agassiz | 2.3% 357/700 | 2.95% 679/700 | .95% 630/700 | 1.01% 597/700 |
| Hawthorne | 8.7% 773/700 | 10.04% 759/700 | 4.3% 668/700 | 4.04% 642/700 |
| Longmead | 17.4% 776/700 | 15.07% 888/770 | 9.4% 746/700 | 9.09% 605/770 |
| | 2166/2170 | 2326/2170 | 2044/2120 | 1844/2120 |

| | 1959 | 1972 | 1973 | 1974 |
|---|---|---|---|---|
| Aggassiz | 1.32% 531/700 | 1.87% 534/700 | 1.72% 522/700 | 431/700 |
| Hawthorne | 4.04% 644/700 | 4.03% 728/700 | 4.08% 710/700 | 635/700 |
| Longmead | 12.05% 616/770 | 24.9% 547/770 | 22.7% 507/770 | 477/770 |
| | 1789/2120 | 1809/2120 | 1739/2120 | 1543/2120 |

| | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|
| Brooklawn | ---- | ---- | 47.7% 358/315 | 45.8% 371/315 |

| | 1959 | 1972 | 1973 | 1974 |
|---|---|---|---|---|
| Brooklawn | 41.8% 42/315 | 58.1% 344/385 | 57.6% 403/ n.a. | 420/ n.a. |

Number of blacks

| | 1956 | 1957 |
|---|---|---|
| Agassiz | 20 | 6 |
| Hawthorne | 79 | 28 |
| Longmead | 139 | 70 |
| | 238 | 104 |
| Brooklawn | ---- | 170 |

The Board, in its response, states that Brooklawn was constructed because of crowding at the three schools that ultimately contributed to its enrollment. In 1954, presumably the planning year for an elementary school that opened in 1957, Agassiz was slightly under capacity, Hawthorne was slightly over capacity and Longmead was virtually at capacity. One year later, the situation became more critical, particularly at Longmead. Given the rising enrollments throughout the school district, the construction of an additional school appears to have been warranted.

The opening of Brooklawn, however, caused precipitous drops in the black percentages of the three schools from which its attendance area was taken. As is shown by the above chart, the practical effect of the opening of Brooklawn was to take the vast majority of black students attending three schools and concentrate them, instead, in a single school.

Significant, too, is the fact that Brooklawn was constructed with a much smaller capacity than its neighboring schools. It was this smaller size that caused it to open 47.7% black in 1957 while no other schools in the area was more than 10% black. Under these circumstances, Brooklawn would have to be considered racially identifiable even though it might be considered "integrated" in a purely statistical sense.

The black population on the West side of Cleveland in 1957 was extremely small and highly concentrated. Brooklawn was constructed virtually in the middle of that small community and therefore, opened foreseeably more black than any of the surrounding schools. The reciprocal effect of the opening of Brooklawn on those schools was to significantly reduce their black percentage and enhance their racial identifiability as "white" schools. The end result was racial impaction, racial isolation, and blatant containment of black pupils. Such action can only be deemed deliberate.

In its response, the Board states that the Brooklawn site had been owned by the board for 26 years. Even if true, this fact is no justification for the construction of a racially identifiable school. The Board of Education is possessed of the power of eminent domain and need not feel constrained to construct schools on property previously owned.

It is also difficult to understand why, in 1957, when the Board was delineating the attendance area for the newly opened Brooklawn, it simultaneously created optional zones in the three adjacent schools. The board states that these optional zones were closer to Brooklawn and therefore more convenient. One of the optional zones in the Hawthorne area is virtually equidistant between that school and Brooklawn. Notwithstanding that fact, if convenience was the reason for the creation of the options, those areas should have simply been included in the Brooklawn area. It would seem that the reason for the exclusion of these areas from the Brooklawn attendance zone, and their inclusion in optional zones to that school, is that they were transitional areas and whites were being provided with a means to avoid the identifiably black Brooklawn. Since all of those optional zones are still in effect, there is little doubt of their continuing impact.

In 1972, an addition was constructed at Brooklawn, and commencing in that year, one grade was added to Brooklawn annually until it became a full K–6 school in 1974. In its response, the Board states:

"The grade structure changes were made in this way so that a prospective fourth grader could stay at Brooklawn. To have made Brooklawn K–6 all at once would have required the removal of children from Hawthorne, Agassiz, and Longmead to Brooklawn and this was not done so as not to disturb the educational environment." (Response E–167; DX 1203).

The effect of this action was twofold. First, as the Board admits, it precluded the introduction of students into Brooklawn from the predominantly white neighboring schools. Second, it contained the black pupils at Brooklawn since every year, when a fourth grader would presumably move to a predominantly white neighboring K–6 school, another grade level would appear at Brooklawn, thereby obviating the need to transfer. It is important to note that changing a school's grade structure is facially a neutral act. The effect of this change at Brooklawn, however, was clearly segregative.

## RELAY CLASSES AND BUSING

In an attempt to alleviate the severe systemwide overcrowding, particularly in the Hough area elementary schools, during the early 1960s, the Cleveland school board embarked upon a program of bus transportation. The objective of this program was twofold: easing the pressure on overcrowded schools until new school construction was completed, and the elimination of "relay classes."

Relay classes which commenced around 1955 and ran to 1961, reflected an effort to get twice the mileage out of a school day by teaching one group of students in the morning and another in the afternoon. The in-

struction thus received was abbreviated and therefore inferior, to that received by pupils not on relay classes and, in fact, fell far short of the minimal education standards set out by law.[14] (TR. at 463). The vast majority of the schools that employed relay classes had majority or predominantly black student enrollments.[15] (TR. at 504–05).

Similarly, almost all of those schools that were forced to utilize "transportation classes" were majority or predominantly black.

At trial, most of the plaintiffs' evidence with regard to the use of transportation classes involved the following schools during the indicated time periods:

| Year | Sending School | Receiving School |
| --- | --- | --- |
| 1961 | Chesterfield | Murray Hill |
| 1961 | Columbia | Murray Hill |
| 1961 | Doan | Murray Hill |
| 1961 | Hough | Murray Hill |
| 1961 | Orr | Murray Hill |
| 1961 | Marion | Rockefeller |
| 1961–66 | Iowa-Maple | Longfellow |
| 1961–62 | Holmes | Longfellow |
| 1961–63 | Hazeldell | Brett |
| 1962–66 | Hazeldell | Memorial |
| 1963–66 | Hazeldell | Murray Hill |
| 1963 | Pasteur | Longfellow |
| 1964–66 | Iowa-Maple | Brett |

In virtually all of the above cases, the sending school was predominantly black, overcrowded, and implementing relay classes. The receiving schools were under-utilized and predominantly white. On its face, besides being a highly practical, albeit educationally inferior, answer to the problem of overcrowding, the busing program initiated by the Board would also appear to have been highly integrative. But like many other integrative opportunities presented to the Board, this one, although not ignored, was prostituted into a segregative device.

From the time of the creation of transportation classes on January 29, 1962 until March 10, 1964, such classes were bused "intact." The pupils involved formed at their sending school and, complete with teacher, were transported as a unit to the receiving school. Once there, they remained "intact" forming a single, separate, isolated, and insulated educational unit. There was evidence presented that during this period every attempt was made to keep the transported students separate from the remainder of the student body at the predominantly white receiving schools. Dr. Theobald of the Cleveland School Board who took part in the organization and implementation of the busing program, and in fact made the decision to bus the children intact, (TR. at 525) testified that this degree of separation was required for "safety as well as educational reasons." (TR. at 525). It was not until March 10, 1964 that the local board, under severe pressure from local civil rights groups such as the United Freedom Movement, agreed to the cessation of intact busing and the "diffusion" of the transported pupils throughout the student body of the receiving school. This marked the first time that the integrative potential of the busing program had been tapped, but once again, board action abrogated the beneficial effects of this achievement of some degree of integration.

From the start, the busing program was considered a stop-gap measure to relieve overcrowding and eliminate relay classes. The real answer, in the eyes of the Board, lie in the creation of additional school facili-

14. Since children on relay classes received only 3½ hours instruction per day, as opposed to the 5 hour minimum required by law, the local board sought, and in fact received, a waiver from the State Board of Education.

15. Of the 26 schools with relay classes, 17 were 90–100% black, 3 were 60–90% black, and 5 were 0–10% black between 1955–61.

ties. During the early 1960s, while transportation classes were in effect, the Board was engaged in a feverish school construction program, particularly in the Hough and Glenville areas. The need for such construction, as well as its devastating racial effects, is fully discussed in the detailed analysis of those areas, *supra*. Suffice it to say that black students were bused intact, and then reluctantly diffused, only until such time as additional, racially impacted schools could be built, and the transported students restored to their prior racially isolated condition of containment. It is not necessary to determine whether this program of intact busing, standing alone, would be a sufficient predicate for a finding of liability against the local board, for it is but one facet of a "consistent and deliberate policy of racial isolation and segregation." *Amos v. Board of School Directors of the City of Milwaukee*, 408 F.Supp. 765, 819. (E.D.Wis.1976).

### SPECIAL TRANSFERS

With regard to student assignment policies at the junior and senior high school level, the plaintiffs' evidence focused primarily on special transfers granted to individual students. Special transfers allow a student to attend a school other than the neighborhood school to which he or she is otherwise assigned. To be granted a special transfer, the parent or guardian of the child must complete an application for such transfer, setting forth the reasons such a transfer is sought. Each year the number of application is large; the local defendants have indicated that they receive approximately 2,000 such applications per year. D.X. 1170 is a summary of the processing of these applications for the school year 1974–75. It sets forth the various general bases on which such transfers are considered: child care, safer or more convenient route to school, curriculum, temporary residence, community problems, avoidance of mid-year transfer, special placement of sibling, medical factors and other miscellaneous requests.

Initially the plaintiffs sought discovery of information about special transfers granted from and to a large number of schools for the period covered by the evidence on other issues in this case, generally from 1940 to 1975. This approach created logistical difficulties for the local defendants, who have kept their records of these transfers filed alphabetically with no further categorization such as by sending or receiving school, school year, grade level or any other classification. Because of the difficulty in separating out special transfers for all of the secondary schools where such transfers might have been relevant to this case, the plaintiffs and the local defendants compromised on the scope of discovery in regard to this issue. Accordingly, the local defendants provided the plaintiffs with copies of applications for special transfers to two junior high schools and four senior high schools for the ten year period from 1965 to 1975. Those copies were submitted to the court *in camera* to protect the identity of the individual students in accordance with federal law prohibiting the unconsented disclosure of information contained in individual students' files, 20 U.S.C. § 1232g(b).

While the application form for special transfers used during this period does not call for the applicant to indicate his or her race, according to the testimony of Abba Schwartz, Supervisor of the Division of Attendance, the forms provided the plaintiffs had been reviewed prior to their discovery by the plaintiffs by some school board employee who had attempted to determine the race of the applicants. A handwritten "W" thus appeared on the applications which this unidentified school employee believed to be white. Examination of the applications suggests that this individual's determination was frequently based on various indicia in the application which would strongly support the conclusion reached.

Based on this racial designation, the plaintiffs prepared six exhibits summarizing the special transfers granted to white students allowing them to attend six predominantly white schools rather than their "neighborhood" schools which happened to be predominantly black, P.X. 346 (transfers

to Hart), P.X. 355 (Willson), P.X. 357 (John Adams), P.X. 358 (Collinwood), P.X. 361 (Lincoln-West), and P.X. 363 (South). On one level, these exhibits indicate that during this period 261 white junior high school students and 572 white senior high school students were allowed to transfer from predominantly black "neighborhood" schools to identifiably white schools. When one considers the average annual figure of such transfers, approximately 26 per year for the two junior high schools, Hart and Willson, and approximately 57 per year for the four high schools, Adams, Collinwood, Lincoln-West and South, in relation to the total enrollments of either the sending or receiving schools, the significance of such transfers appears to pale. To understand clearly the significance of these figures, therefore, it is necessary to look at the context in which these transfers occurred. In 1964 (1965 figures not being available), three of the 12 regular high schools in the Cleveland system had proportional black enrollments of 95 percent or more; none were 100 percent black.[16] In the same year, five of the 12 regular high schools had proportional black enrollments of less than one percent, including one which had no black students enrolled. The remaining four high schools had proportional black enrollment as follows:

```
John Adams 58.9%
Collinwood 10.6%
East 73.1%
John Marshall 3.3%
```

By 1970, the enrollment of four Cleveland senior high schools, East Tech, Glenville, John Hay and John F. Kennedy, was 100 percent black. In addition, there were two other high schools which had black enrollments of more than 98 percent. At the same time, there were two high schools in the system with proportional black enrollments of less than one percent. The remaining schools had proportional black enrollments as follows:

```
Collinwood 33.04%
Lincoln-West 3.02%
John Marshall 4.17%
South 2.14%
```

Plainly the 219 special transfers allowed to John Adams, Collinwood and South High Schools between 1965 and 1970 are not the single factor nor perhaps even the most significant factor in the shift in enrollment patterns during this period. They do represent, at the very least, an acquiescence by school authorities in an emerging pattern which should have brought precisely the opposite response.

A similar pattern emerged in junior high school enrollments during the last half of the 1960s, as illustrated by the following table, showing the number of schools in each category for this period:

| | 1964 | 1970 | 1973 |
|---|---|---|---|
| 95%-100% black, | 6 | 13 | 15 |
| including 100% black | 1 | 4 | 6 |
| 10%-95% black | 6 | 3 | 6 |
| 0%-10% black, | 11 | 10 | 7 |
| including 0% black | 3 | 1 | 1 |

The last decade plainly has been a time of polarization in the junior high school enrollments. Special transfers can reasonably be viewed as only a small factor in this emerging pattern, but still a very significant one. For during this period, through the special transfer procedures, the school officials must be viewed as having impliedly approved the emerging pattern.

Perhaps the most notable use of special transfers is the one which was not encouraged in Cleveland, i. e. special transfers to promote integration. While school officials maintained that any transfer applications where the student was interested in transferring to a school where he or she would be in the minority would have been granted. At trial, the plaintiffs called the court's attention to at least one application for special transfer made in 1974–75 where the student, who the evidence indicates was black, sought to transfer from the over-

16. In 1965, John F. Kennedy High School opened. By 1967, its proportional black enrollment was 98.59%. As with other schools, no enrollment figures are available for 1965.

whelmingly black John Hay to the integrated Collinwood, which was denied by the Bureau of Attendance. (TR. 2120–21) Mr. Schwartz testified that very few such applications were received during any given year. D.X. 1170 does not list any category for such applications.

Various community groups had recommended at different times that one approach to mitigating the segregated conditions which had evolved in the Cleveland system would be to encourage majority-to-minority transfers. No program encouraging such action was undertaken by school officials. The court is not hardened to the dilemma which faced the individual parents who sought transfers for their children. Some of the transfer applications in the record make clear that they felt their children's safety was endangered. Forces operating within the Cleveland school system which were clearly beyond the control of the individual parent had brought about conditions which they believed in good faith threatened their children's well-being.

These forces, however, were not beyond the influence of school officials themselves. Rather than acquiescing to the growing separation in the system's secondary schools, they had the choice of developing programs to bring about voluntary integration of these schools, so that in no school in the system would children of any race be so greatly in the minority as to feel threatened. The problems of racial segregation in Cleveland's regular secondary schools can be viewed reasonably as a product of the manipulated neighborhood school policy at the elementary school level, which generally resulted in the separation of young students by race. It is natural to fear the unknown. The widespread separation of students and faculty by race at all levels of the school system aggravated, rather than mitigated these fears. The court does not pretend that there are easy answers. At some point, however, it became necessary to deal with underlying problems which had been exacerbated by the policies and practices of school officials, rather than to rely on them as an excuse for actions which, in turn, create still more difficulties.

## FACULTY ASSIGNMENT

During the course of the trial, plaintiffs sought to establish that the Cleveland School Board assigned its faculty on the basis of race—black teachers to predominantly black schools and white teachers to predominantly white schools. Numerous statistical exhibits were offered into evidence by both plaintiffs and the local board, from which the reasonable and necessary inferences have been drawn.

In PX–341, plaintiffs listed all of the Cleveland elementary schools in ascending order according to their 1973 proportional black student enrollment. Also listed was the number of black faculty members assigned to that school for each year from 1969–73. Presented in such a manner, the graphic impact of PX–341 is both immediate and obvious: as a school's black student percentage increased, so too did the number of black faculty assigned to that school.

As an example, in 1973, there were 17 elementary schools with a black student enrollment of 11.64 or less. All of these schools had either no black faculty from 1969–73 or did not receive their first black teacher during that period until 1973. Of these latter schools, two had four black faculty members and the remaining fifteen schools had no more than two.

At the other end of the spectrum, of the 30 elementary schools that were 100% black in 1973, 25 had at least 15 black faculty members.

This direct correlation between the racial composition of a school's student body and that of its faculty repeats itself with regard to both junior and senior high schools. In 1972, there were 12 junior high schools that were majority white and 15 junior high schools that were majority black. The majority white schools had a total of 55 black teachers while the majority black schools had 475 black teachers.

Among the senior high schools, the pattern remained unchanged. The six majority white schools had 35 black teachers in

1972, while the six majority black schools had 387 black teachers.

During the period in question (1969–72), at least 84% of the black elementary and junior high school teachers and 90% of the black senior high school teachers in the Cleveland public school system taught in schools that had at least 90% black student enrollments.

 In the face of such overwhelming statistical evidence, it is impossible to find such a vast disparity in the racial composition of faculty to be adventitious. The correlation between the racial makeup of a school's student body and its faculty is direct and consistent. It can only be the result of a pattern and practice by the local board of assigning teachers on the basis of race.[17] Neither can there be any doubt that this faculty assignment policy contributed significantly to the racial identifiability of the schools involved.

The school board was adamant in its insistence that exhibits such as PX–341 be updated to include 1975 figures for faculty assignment. Such additional figures would reflect some progress made in the area of faculty integration. Such progress is both necessary and highly commendable. But board actions taken after the initiation of this lawsuit are far less probative than policies followed for a significantly longer period prior to the institution of legal proceedings.

The school board correctly asserts that teachers are not a fungible commodity capable of random assignment. While it is true that most teachers are certified in one area, that fact cannot be viewed as responsible for the total racial imbalance that characterized faculty assignments within the Cleveland school system from 1969–72. Given the relative similarity of curricula offered, particularly on the elementary

school level, it is incomprehensible that a better racial mix among the faculty could not have been achieved.

By the same token, the shortage of qualified teachers during the 1960s cannot be viewed as the cause of the segregated condition of the Cleveland school system's faculty. That there were fewer teachers available to be hired is of little relevance to the assignment of those teachers already under the school board's employ. The board would argue that since it was a "seller's market" and competition was keen among local school boards for the limited supply of teachers, the board was forced to accede to new teachers' requests for assignment to a particular school. Implicit in this argument is the premise that black teachers preferred to teach in black schools and white teachers preferred assignment to white schools. Nowhere in the record does this implication leave the shadows of inference and emerge into the cold light of fact. In addition the shortage of teachers had significantly diminished by 1969, the commencement of the period covered by PX–341. Finally, even if the choice of assignment represented the *quid pro quo* for a new teacher's accepting a position in the Cleveland system, such a bargain would have to yield to the constitutional mandate of a unitary school system. If the price for garnering a new teacher is the perpetuation of a segregated faculty, then the school board must look elsewhere, for the price is constitutionally prohibitive.

The segregative nature of the school board's assignment of principals need not be inferred since such a policy was expressly admitted by the board. The deliberate and calculated assignment of black principals to black junior and senior high schools was done in the name of creating "role models." Whatever its effect in that regard, such a policy clearly added to the racial identifiability of the schools involved.

17. Such a conclusion is supported by the testimony of Mr. Russell Davis, who served the Cleveland Board of Education in various capacities over a period of 37 years. With regard to the board's assignment policy, Mr. Russell Davis stated:

"Well, I don't know whether you want to call it policy or custom or understanding or whatever it is, but if you were black, you went to a school with a predominantly black enrollment." Tr. at 1585.

Mr. Davis stated that such policy continued at least until his retirement in 1965.

The board sought to ameliorate the segregative effect of this policy by assigning white assistant principals in tandem with black principals. The fact remains, however, that the assignment of black principals to black schools is yet another board-created, artificial indicia of a school's racial identity.

■ It is important to note that the ability to identify a "white" or "black" school merely by reference to the racial composition of its faculty and administration constitutes a *prima facie* violation of the equal protection clause. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Other courts have been quick to dismiss the "role model" rationale as a basis for the assignment of faculty and staff:

"Whether the Board's excuse for this action, to provide black role models for black students, is the real motivation behind the staffing according to race is legally irrelevant . . .

It is not contended by this court that minority role models are not important for minority students. Racial and ethnic pride has its value. But, in the constitutional scheme, a higher value in the hierarchy is integration. Integration, and the understanding it fosters, will provide both black and white role models for both black and white children." *Arthur v. Nyquist,* 415 F.Supp. 904 (W.D.N.Y.1976). *See also, United States v. School District of Omaha,* 521 F.2d 530, 538–39 (8th Cir. 1975), *cert. denied* 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 289 (1975).

It should be noted that exhibits such as DX–1163–65 reflect considerable progress in the area of faculty integration. Whether that task has been completed, or is close to completion, is a question best left for another day. How far the local board has come, and how far they may yet have to go, will be addressed in the proceedings sure to follow in this action.

## HOUSING

The instant action was filed as related to housing cases previously heard by this court. Plaintiffs' counsel felt that residential segregation was inextricably related to school segregation and the expertise developed during the housing cases would be a valuable asset in evaluating the evidence to be presented in this case.

That Cleveland is a residentially segregated city is beyond dispute and conceded by all parties to this action. Defendants argue that these residential patterns are the result of outside forces beyond their control and that they merely put schools "where the children are," as reflected by their purported neighborhood school policy. Plaintiffs, on the other hand, contend that this residential condition is merely one facet in an overall policy of containment perpetrated by city, state, and federal agencies, as well as factions of the private real estate industry.

The role of the federal government in the creation and perpetration of segregated housing is documented in the Federal Housing Administration's (FHA) underwriting manual as it was distributed during the 1930s. That document contained a blatantly separationist policy as reflected by the admonition to FHA appraisers that they be aware of any "infiltration of inharmonious racial or nationality groups" into a neighborhood. Such an incursion was deemed to have an adverse effect and neighborhoods were assured of receiving a high FHA rating only if exclusionary devices such as zoning regulations and restrictive covenants were prevalent in the area. The FHA manual actually recommended that restrictive covenants with regard to race be included in deeds. Such restrictive covenants were judicially enforced until such practice was declared unconstitutional in *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Despite the Supreme Court action, the FHA continued to recommend the use of restrictive covenants until 1950. In that year, the FHA did a complete about-face, and refused to finance properties subject to such restrictive covenants. It was not until the 1962 Executive Order with regard to equal opportunity in housing that restrictive covenants ceased to be a

factor in the public financing of housing. Nevertheless, restrictive covenants were viewed as a cloud on the title and excepted by title companies in their policies, at least until 1969. Thus, for a period approaching 20 years, the federal government, through the FHA, was "the leading exponent of racial discrimination in housing and residential segregation" (TR. at 709).

No discussion of the Cleveland housing situation would be complete without some mention of the role of the Cuyahoga Metropolitan Housing Authority (CMHA). That organization, and its policies, were the subject of prior litigation in this court. *See, e. g., Banks v. Perk,* 341 F.Supp. 1175 (N.D. Ohio 1974) wherein CMHA practices were found to have contributed to the residentially segregated condition of the city. The effects of such conduct extended far beyond the walls of the individual housing estates.

In keeping with the local school board's policy of putting schools "where the children are," several facilities were constructed to service public housing estates.[18] As might be expected, the racial composition of such schools was the mirror image of their respective estates. The combination of CMHA'S discriminatory housing policies and the school board's construction program resulted in the creation of racially identifiable schools.

The relationship between CMHA policies and the Cleveland School Board is shown by PX–323. That exhibit lists CMHA estates and the public schools that service those estates. As previously noted, virtually all of the schools reflect the racial composition of their respective estates.

One of the first CMHA projects was Carver Park. Built in 1942, it was 99.9% black in 1973. Hayes elementary school was 97.5% black at the time Carver Park was opened and 100% black in 1973–74. Similarly the 1970 addition to the Garden Valley estate was 100% black when opened and 100% black in 1973. Chesnutt elementary school was 99% black in 1970 and 100%

black in 1973. Grdina was 100% black for those same years. The King Kennedy estate was 99% black at opening and 100% black in 1973 as was Dike elementary school which services that project. The Miles Heights estate and Brewer elementary school as well as the Wilson estate and Ireland school are additional examples of an overwhelmingly black project being serviced by an overwhelmingly black school. All of the above projects and schools are located on the east side of Cleveland.

The CMHA projects on the west side project the same type of relationship. Lorain Square was 0% black in 1973 as was Washington elementary school. The Park Denison project was 0% black in 1973 while the Denison school was .1% black in 1973–74. This racial correlation repeats itself for virtually all of the 27 CMHA projects listed in PX–323.

■ It is clear that the presence of racially segregated public housing in conjunction with school board policies operated to spawn racially segregated schools. There can be little doubt that this result was the natural, probable, foreseeable, and actual effect of the school board's "neighborhood school policy."

■ The interrelation of housing and school patterns has become an accepted fact of life, *see e. g. Hart v. Community School Board,* 383 F.Supp. 699, 706 (E.D.N.Y.1974), *aff'd,* 512 F.2d 37 (2d Cir. 1975). Equally clear is the fact that a local school board cannot use private discrimination to shield itself from an allegation of exclusionary attendance areas, *Brewer v. School Board of City of Norfolk,* 397 F.2d 37, 41–42 (4th Cir. 1968 (en banc)). *See also, United States v. School District of Omaha,* 521 F.2d 530, 537 n. 11 (8th Cir. 1974), *cert. denied* 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975).

"when school officials have followed for at least a decade a persistent course of conduct which intentionally incorporated

---

**18.** Charles Beard, planner for the City of Cleveland Planning Commission, testified that assurances by school officials with regard to the availability of classroom space was a prerequisite to federal funding of public housing (TR. at 986–987).

residential segregation into the system's schools, that conduct is unconstitutional." *Morgan v. Hennigan,* 379 F.Supp. 410, 470 (D.Mass.1974) *aff'd* 509 F.2d 580 (1st Cir. 1974), *cert. denied* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

Thus, the local school board actively contributed to the racially segregated nature of the CMHA projects by agreeing to construct schools to service those projects, knowing that those schools, as well as the projects themselves were destined to be racially identifiable from their inception. In addition, the board policy knowingly embodied existing residential segregation that was the result of, among other things, prior FHA policies and practices. Under such circumstances, the board's " 'neighborhood school policy' was not, and could not be, racially neutral." *Arthur v. Nyquist,* 415 F.Supp. 904, 968 (W.D.N.Y.1976).

"The school board should not be heard to plead that its neighborhood school policy was racially neutral when in fact 'state action under the color of law' produced or helped to produce the segregated neighborhoods in the first place." *Oliver v. Kalamazoo Board of Education,* 368 F.Supp. 143, 183 (W.D.Mich.1973), *aff'd* 508 F.2d 178 (6th Cir. 1974), *cert. denied* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

The natural, probable, foreseeable, and actual effect of the local school board's application of the neighborhood school policy was to create or perpetuate a segregated school system. *See United States v. Texas Education Agency,* 532 F.2d 380 (5th Cir. 1976).

## NEIGHBORHOOD SCHOOL POLICY

Of all the issues raised at trial, perhaps none engendered as much discussion as the local school board's purported "neighborhood school policy." At various times, such policy was both a sword and a shield. The plaintiffs wielded it as an offensive weapon and viewed the board's application of the neighborhood school policy as clear evidence of its segregative intent. The board, on the other hand, cloaked itself in the neighborhood school policy viewing such policy not only as a viable defense, but also one mandated by law.

The basis for the school board's contentions is § 3313.48 of the Ohio Revised Code. That section states in pertinent part:

"The board of education of each city, exempted village, local or joint vocational school district shall provide for the free education of the youth of school age within the district under its jurisdiction at such places as will be most convenient for the attendance of the largest number thereof."

The local board has apparently taken the broad language of this statute and extrapolated it into a policy that became the center of their universe. Sound educational policies and reasonable administrative practices paled in significance when compared to the board's seeming devotion to the neighborhood policy. This policy, which affected a multitude of board decisions, became as amorphous as it was pervasive.

Assuming, *arguendo,* that the local board was under some obligation to construct and maintain "neighborhood" schools, the manner in which they sought to perform that task was curious, to say the least. As has been noted before, the term "neighborhood" means different things to different people. To a student attending a vocational high school, the neighborhood encompasses the entire city. If a pupil were enrolled in some form of major works program, the neighborhood might mean the east side. An elementary school pupil's neighborhood is significantly smaller than that of a junior high school student's whose neighborhood, in turn, is smaller than that of a senior high school student. These are legitimate, and racially neutral, differences in the meaning of the term "neighborhood."

Different considerations obtain when a pupil's neighborhood is partitioned so as to create an optional zone or gerrymandered so as to produce an amoebic attendance area. Under those circumstances, the neighborhood school policy becomes a mere facade and educationally indefensible. The record in this case is replete with instances

where optional zones and attendance areas were manipulated in a racially segregatory manner or operated in conjunction with other factors (such as residential segregation) to create or maintain racial isolation.[19] In these instances, the neighborhood school policy must yield to the constitutional mandates of the Fourteenth Amendment.

The touchstone of any discussion of neighborhood schools, is the Supreme Court's treatment of the matter in *Keyes v. School District No. 1.,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). Therein, the Court declined to rule on whether adherence to a neighborhood school policy, in and of itself, constitutes sufficient justification for the existence of racial concentrations absent other acts of *de jure* segregation. *Id.* at 212, 93 S.Ct. at 2699. The Court did, however, hold

> "that the mere assertion of such a policy is not dispositive where, as in this case, the school authorities have been found to have practiced *de jure* segregation in a meaningful portion of the school system by techniques that indicate that the 'neighborhood school' concept has not been maintained free of manipulation." *Id.*

The record in this case contains numerous findings of acts of *de jure* segregation by the local school board and for that reason, the defendants cannot find sanctuary in the language of *Keyes.*

In *Amos v. Board of School Directors of the City of Milwaukee,* 408 F.Supp. 765 (E.D.Wis.1976), the District Court construed *Keyes* to mean that

> "a 'neighborhood school system' would be beyond serious constitutional attack if, and only if, the schools in the system remained essentially the same with respect to most of the factors mentioned in *Keyes,* such as teachers, facilities, staff, and boundaries. If such factors remained constant, and the change in the racial composition of the pupil populations in each school reflected only the change in the racial makeup of the attendance ar-

eas served, we can assume, for the purposes of this case, that the school district would incur no liability to remedy the resulting racial imbalance.

> But as soon as school officials start to make changes in school site locations, school sizes, school renovations and additions, student attendance zones, assignment and transfer options, transportation of students, assignments of faculty and staff, etc., their actions become, in the words of Mr. Justice Powell's concurring opinion in *Keyes,* 'constitutionally suspect.' The fact that these decisions are asserted to have been in conformity with a 'neighborhood school policy' does not save them from constitutional scrutiny." *Id.* 820.

All of the factors deemed critical in *Keyes* and whose importance was reiterated in *Amos* were scrutinized in this case, and numerous and substantial segregative acts were found. Under these circumstances, the neighborhood school policy defense "is essentially a smokescreen." *Arthur v. Nyquist,* 415 F.Supp. 904, 969 (W.D.N.Y.1976).

The plaintiffs' proofs concerning the defendants' administration of the neighborhood school policy covered a 35 year period. The court has given its close attention to the specific allegations of the plaintiffs and responses of the defendants. In the course of this analysis, the court perceived clearly a pattern wherein for many years identifiably black schools were frequently overcrowded, while neighboring white schools were under utilized. From this, the court must conclude that during these periods, there was essentially a dual system in which there were lower operating standards for many black schools by virtue of such conditions as overcrowding.

In response, the local defendants argued that the overcrowded conditions which plagued many identifiably black schools, as well as some identifiably white schools, has been cured by the massive construction program undertaken by the Cleve-

---

**19.** See, for example, the "two tier" neighborhood of Rosedale and Bethune elementary school or the saw-toothed 1947 attendance area for Columbia elementary school.

land board in the last 12 years. While these construction efforts are plainly commendable, they can only be viewed as solving half of the problem at best. Prior to *Brown v. Board of Education,* the fact that facilities which had become identified as white or black through state action were equal in quality would have been an answer. Since *Brown,* it is necessary to show both the equality of facilities and the absence of state involvement in isolating or identifying facilities by race. In this case, much of the school construction, upon which the defendants rely as a defense, ironically had the effect of exacerbating this isolation. Under these circumstances, the construction of quality neighborhood schools cannot be viewed as any defense.

### THE GOVERNOR AND ATTORNEY GENERAL

On June 11, 1956, the newly created State Board of Education passed a resolution seeking an opinion of the Ohio Attorney General as to the construction and applicability of § 3317.14 O.R.C. That section states in pertinent part:

"A school district, the board of education of which has not conformed with the law and the rules and regulations pursuant thereto, shall not participate in the distribution of funds authorized by sections 3317.02, 3317.04, and 3317.12 of the Revised Code . . . ."

The board resolution also asked the Attorney General's opinion as to the precise parameters of the board's investigative powers and authority to hold hearings. This request for an opinion represented compromise action by the board that followed close upon the heels of an unsuccessful attempt to withhold funds pursuant to the provisions of § 3317.14 (TR. 2278, 3561).

The Attorney General responded with an opinion that stated, *inter alia,*

1. The term "law" as used in Section 3317.14, Revised Code, forbidding the distribution of state funds to school districts which have not "conformed with the law," is used in the abstract sense and embraces the aggregate of all those rules

and principles enforced and sanctioned by the governing power in the community. Such term embraces the equal protection provision in the Fourteenth Amendment to the Constitution of the United States under which the segregation of pupils in schools according to race is forbidden.

2. The primary responsibility for administering the laws relating to the distribution of state and federal funds to the several public school districts is placed with the state board of education, subject to the approval of the state controlling board.

3. It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, "has not conformed with the law" so as to require the withholding of state funds from such district.

4. Following a determination by the state board of education that a school district "has not conformed with the law" so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for "good and sufficient reason" established to the satisfaction of each board, order a distribution of funds . . . .

The Attorney General did not leave any doubt as to the responsibility which devolved upon the State Board of Education:

It follows, therefore, that in those cases in which your board finds as a matter of fact that racial segregation exists in a particular school district the restrictive provisions of Section 3317.14, Revised Code, must be deemed to apply.

Plaintiffs seek to predicate a finding of liability against the Attorney General on his apparent failure to effectuate the letter and spirit of his 1956 opinion. It should be noted that such opinion did not go to the duties and obligations of the Attorney General, but rather to those of the State Board of Education. In addition, nowhere in the record does it appear that the Attorney General was asked to pursue litigation in

furtherance of the objectives of § 3317.14 O.R.C. To be sure, if anyone must answer as a result of the Attorney General's opinion, it is the State Board. For from that date forward, its role was clear and its authority unfettered by doubt.

Similarly, plaintiffs would hold the Governor liable on the basis of his position as Chief Executive of the State of Ohio and his power of preogative appointment to such agencies as the State Real Estate and State Banking Boards. Those entities were alleged to have contributed to the residential segregation in Cleveland through the discriminatory policies of the agencies and lending institutions they regulated. The chain of causation emanating from those real estate agents and bankers is far too attenuated to reach the Governor's door.

The only specific segregatory incident to which the office of the Governor might be directly linked is a 1944 change in the Cleveland school district boundary, which transferred a portion of the Beehive attendance area to the school district serving Warrensville Heights. Assuming *arguendo* that this change required the approval of the Governor's appointee, the Superintendent of Public Instruction, a single incident dating back more than 30 years does not provide a basis of liability for the present incumbent of the Governor's office.

It is too facile an argument to say that the Governor is the Chief executive of the state and therefore liable for the acts and omissions of its constituent parts. To do so would be to impose vicarious liability on the Governor for everything the state does, or fails to do, while he is in office. Absent some probative evidence of the Governor's involvement in the creation or maintenance of Cleveland's segregated school system, plaintiffs' arguments present far too fragile an underpinning upon which to base a finding of liability. It must be noted that at the time of the filing of this suit, some 17 years had passed since an elected State Board of Education acquired the responsibility for overseeing the education of the public school pupils of the State of Ohio. It

is to that body that a court should look first in determining what liability, if any, has been incurred by the respective state defendants.

## THE STATE BOARD OF EDUCATION

In 1953, Ohio adopted a system in which the rights and responsibilities of the state in regard to elementary and secondary education ultimately rested with an elected State Board of Education, Ohio Constitution, Article VI, § 4. This board hires a state superintendent, who administers the various state programs. The first state board was elected in 1955 and took office in January 1956. This system replaced an arrangement in which the State Superintendent of Public Education was appointed by the Governor.

The plaintiffs make two basic allegations and arguments against the state board and the state superintendent. The first is that with regard to predominantly black schools in Cleveland these state officials failed to fulfil their statutory obligation to enforce the minimum standards which they had established for public schools throughout the state. As a result, during the periods when such minimum standards were not enforced, many of the schools in Cleveland which were identifiably black were demonstrably inferior to other schools in the Cleveland system and, therefore, unequal.

Specifically, the plaintiffs introduced evidence which established that for a six-year period, from 1956 to 1961, the state board and state superintendent expressly exempted the Cleveland school officials from the requirement of providing at least five hours of classroom instruction per day in certain schools, the overwhelming majority of which were virtually all black. The result was that in these schools, students were put on relay classes, that is, they attended school for only three and a half hours per day, rather than five.

The plaintiffs also focused on the fact that the state education officials did nothing about the plainly discriminatory faculty

assignment practices of the Cleveland school officials, whereby most black teachers were assigned to predominantly black schools. Perhaps more significantly, the plaintiffs note that these state defendants did nothing about the high correlation between the relative inexperience of teachers in the Cleveland system and their assignment to identifiably black schools.

Prior to 1966, the State Board chartered each school individually. After 1966, entire school districts were chartered on an annual basis as were new schools which later were added to the district. The enforcement mechanisms available to the State Board so as to effectuate the minimum standards it promulgated included revocation of a school district's charter,[20] dissolution and annexation of a district, or the withholding of funds.

The second allegation of the plaintiffs is that the state school officials were aware from the first year of the operation of the state board that it had the power and the responsibility to act with regard to racial segregation in the public school systems of Ohio and that it failed to do so in the case of the Cleveland system. In January, 1956, one of the newly elected board members, Charles Lucas, Sr., sought passage of a resolution whereby the State Board of Education would survey all the public schools in Ohio so as to determine the extent of educational segregation within the state. Mr. Lucas' efforts were unavailing and the board, instead, on June 11, 1956, requested an opinion of the Attorney General. That request and its ramifications are discussed *supra*.

The language of the Attorney General's opinion was clear and unequivocal; its message to the board, unmistakable. Thereafter, the board was on notice of its obligation to seek out, locate, and extirpate racial segregation in the public schools of Ohio.

"The State Department of Education has known that it has an affirmative duty under both Ohio and federal law to take all actions necessary, including, but not limited to, the withholding of state and federal funds, to prevent and eliminate racial segregation in the public schools." *Brinkman v. Gilligan*, 503 F.2d 684, 704 (6th Cir. 1974).

Despite the import of the Attorney General's opinion, no board action, of any kind, was forthcoming.

The response of the State Board and State Superintendent to these charges was that they believed their powers to be very limited and felt constrained to act through persuasion. They further maintained that such persuasion was working over a period of time. They argued that their reading of the 1956 Attorney General's opinion empowered them to act only after some other body, a federal or state court or a federal or state agency concerned with the enforcement of civil rights, had determined that racial segregation existed in a local school system. In attempting to show that they diligently pursued the persuasive role which they believed to be their only function until such a finding, they introduced evidence showing the appointment in 1968 of an assistant superintendent for urban education. He was charged with addressing the problems of the segregation in fact which all conceded existed in many local Ohio school districts. The bulk of the defense of the state education officials was to call attention to the specific projects undertaken by Assistant Superintendent Robert Greer and his staff in developing teaching materials that recognized the contributions of blacks past and present and in providing programs of in-service training for local board personnel in cooperation with such boards.

Among other things, in 1968, in response to pressure from various civil rights groups, Assistant State Superintendent Greer came to Cleveland for a series of meetings with representatives of such groups. The product of this dialogue was the adoption by the

---

20. Such charter revocation has occurred at least once each year since the State Board of Education's inception (TR. 2309–21).

State Board of a policy statement with regard to equal educational opportunity. That policy statement and its resulting recommendations were marked by dynamic rhetoric and total inaction.

The State Board of Education is the recipient of countless statistical and evaluative reports from both state and local school board employees. These reports include the racial composition of faculty and students on a district, as well as individual school, basis. (TR. 1603) Moreover, the state board itself, on July 8, 1968, resolved to conduct a racial survey of every district and every school in the state. The results of this survey were correlated and distributed statewide. The Ohio Civil Rights Commission conducted a virtually identical survey for the school year 1968–69 with the results being similarly distributed.

The plaintiffs did not dispute or disparage such efforts, but simply maintained that more was required of the state education officials in view of the circumstances which had come to exist. The plaintiffs' position was underscored perhaps most effectively by an exhibit prepared by the state education defendants, DX 2013. The state defendants argued that as blacks move to the suburbs opportunities for integrated education are becoming available. To illustrate this proposition, they prepared a comparison of the number and percentage of blacks and whites enrolled in public schools in 12 of the 32 school districts in Cuyahoga County in 1969 and 1975. As with many of the exhibits in this case, this exhibit is indicative of both good news and bad, which are perhaps best summarized by the court's own tabulations:

| | 1969 | 1975 |
|---|---|---|
| School Districts Less than 50 percent black: | | |
| Number of white students | 171,643 | 156,190 |
| Number of black students | 3,746 | 6,201 |
| School Districts More than 50 percent black: | | |
| Number of white students | 68,501 | 52,399 |
| Number of black students | 92,441 | 86,207 |
| 20 School Districts In Cuyahoga County not listed on DX 2013: | | |
| Number of white students | 98,107 | 96,615 |
| Number of black students | 46 | 156 |

The suburban school boards were not made parties to the instant action.[21] The court, therefore, does not have additional data to fully understand the significance of the above figures.

On its face, however, the above record does not appear to be one of great progress. This is especially so when notice is taken of the fact that the above figures cover the period immediately following the passage of federal fair housing legislation and, therefore, would reflect the initial impact on the suburban real estate market of that legisla-

tion. When viewed in this perspective, the court is unable to share the optimism of the state school officials that time and persuasion are all that are necessary to the evolution of truly integrated education. Indeed, the court is amazed that the state education defendants can complacently offer into evidence a document which on its face indicates that the East Cleveland school district is now 97.4 percent black. From such figures, the court more easily might conclude that the direction of the future is to wholly separate school districts, rather than inte-

21. The plaintiffs have argued for the involvement of suburban school districts in any remedy which the court might order. Such action could only be taken by this court within what it determines to be the parameters of *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). Whether such involvement will be necessary must be determined as the efficacy of proposed remedies is considered. In the meantime, and in this regard, there is nothing to prevent the State board from finally commencing the carrying out of its responsibilities.

grated suburban school districts. In cataloging what the state board and superintendent have done or attempted, no mention was ever made of any plans to deal with the virtually all-black or all-white school districts, which constitute the majority of local school districts in Cuyahoga County.

The segregated nature of the Cleveland public schools was brought to the attention of the State Board of Education in other many and varied ways. Such matters could not, and did not, escape the notice of the board. Mr. Wayne E. Shaffer, who was a member of the State Board from its creation in 1956 to the present, testified that

"we couldn't help but be aware that Cleveland had some very serious problems and that they were connected with minority matters. We know that. Dr. Briggs was before us many times. His predecessor and his predecessor's predecessor came before our board. We knew that there were acute problems in Cleveland.

\* \* \* \* \* \*

We knew that there were schools that were predominantly black. We knew that there were other schools that were predominantly white." (TR. 3583).

It is difficult not to metaphorically refer to the State Board of Education as the proverbial ostrich with its head in the sand. Despite being virtually buried in an avalanche of data pointing up the severely segregated nature of the Cleveland schools, the board steadfastly adhered to its do-nothing policy. Nowhere is this made more painfully clear than in the testimony of Dr. Martin Essex, Superintendent of Public Instruction, that he was not even aware of the existence of the 1956 opinion of the Attorney General until 1973, some seventeen years later (TR. 2332). Even after he learned of the existence of the opinion, he still took no action pursuant to its terms. The board's oblivion was apparently surpassed only by its dedication to inaction.[22]

22. The State Board, however, was not adverse to granting a waiver to the local board so that

## CONCLUSION

Many of the factual questions in the instant action were brought into sharp focus by the submission of documentary evidence detailing the plaintiffs' allegations and the defendants' arguments in rebuttal. The court has scrutinized each allegation and its corresponding defense exhibit in conjunction with the other evidence, both documentary and testimonial, introduced at trial.

In a large majority of instances, the plaintiffs successfully established the segregative nature of the actions complained of. In a few instances, the defendants' actions were found to be racially neutral or actually integrative. Where there was insufficient evidence to either make a finding or draw reasonable inferences, that fact was noted.

■ Based upon this analysis of the record, the significant involvement of the Cleveland Board of Education in the creation or maintenance of a segregated school system cannot be denied. Many of its actions had that condition as their natural, probable, foreseeable and actual effect. Other actions cannot be explained except by ascribing to them a deliberate, conscious intent on the part of the board to segregate public school pupils on the basis of race. Therefore, the court finds that the Cleveland Board of Education has violated the plaintiffs' 14th Amendment right to equal protection under the laws by intentionally creating and maintaining a segregated school system.

The State Board of Education cannot escape liability by virtue of their historic proclamations of benevolent intent when such acts were coupled with frequent declarations of inability to act. The fact of the matter is that at least as of the time of Attorney General's 1956 opinion, the board knew of its obligations and authority in the area of racial segregation. Yet the board chose not to actively pursue the goal of integration, but rather to sit back and let

educationally inferior relay classes might be held.

the problem come to them, if it came to them at all. Instead of aggressive action, the board issued meaningless policy statements and created superficial and ineffectual mechanisms to deal with racial isolation in the public schools.

It is the finding of this court that the Cleveland Board of Education and the State Board of Education, through their constituent members and their appointed superintendents, have violated the plaintiffs' Fourteenth Amendment right to equal protection under the laws by intentionally fostering and maintaining a segregated school system within the Cleveland public schools.

At this time, it is the intention of the court to appoint a special master to assist it in the prudent exercise of its equitable jurisdiction to remedy the constitutional violations found herein. It is also anticipated that the special master will be assisted by a panel so that input may be received from legitimately affected interest groups. The determination of the remedy to be ordered in this case will be a deliberate and judicious process, while at the same time in keeping with the Supreme Court mandate that such a plan "promises realistically to work, and promises realistically to work *now.*" *Green v. County School Board of New Kent County*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).

The plaintiffs, the Cleveland School Board and State Board of Education will formulate and submit to this court proposed plans for the desegregation of the Cleveland School System within ninety (90) days of the entry of this order. Within twenty (20) days of the entry of this order, counsel for the above parties will submit proposed instructions to the special master and suggestions as to both the structure and membership of the panel named to assist the special master. Supplemental orders with regard to the remedial stage of this proceeding will follow.

This court, on its own motion, certifies the instant action for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The court's order involves a controlling question of law as to which there is substantial ground for difference of opinion, and an appeal from the order may materially advance the ultimate termination of the litigation.

It is further ordered that the defendant Cleveland School Board and State Board of Education, their constituent members, officers, agents, servants, employees, and all other persons in active concert or participation with them who receive notice of this order be permanently enjoined from discriminating on the basis of race in the operation of the public schools of the City of Cleveland, and from creating, promoting, or maintaining racial segregation in any school or other facility in the Cleveland School System.

It is further ordered that any construction now planned by the Cleveland Board of Education, which is not now underway, be enjoined until such plans are individually reviewed by the court. It is further ordered that the court be informed within twenty (20) days of this order of any construction presently underway and the stage of construction so that equitable review may be given such plans.